DEFENDANT
EXHIBIT

A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES LEATH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL NO. 3:2017-CV-1418** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>DECLARATION OF SUSAN ALBERT, PARALEGAL SPECIALIST</u>

1.  I am currently employed by the Federal Bureau of Prisons (hereafter "BOP"), as a Paralegal Specialist at the Federal Correctional Complex, Allenwood, Pennsylvania.   Pursuant to my official duties, I have access to records maintained in the ordinary course of business by the Federal Bureau of Prisons ("BOP"), including records relating to inmate Central Files.

2.  I am familiar with the complaint filed by inmate James Leath, federal register number 47208-066.

3.  Records show that on August 22, 2016, Northeast Regional Office staff received an administrative tort claim (TRT NER 2016-06382) filed by the claimant alleging failure to protect, and a sum certain amount of $5,000,000.  <u>See</u> Attachment 1 – Form 95.

4.  This administrative tort claim was denied by the Northeast Regional Counsel on February 13, 2017.  <u>See</u> Attachment 2 – denial letter.

**Exhibit A, p.1**

5.      Attachment 3 is a true and accurate copy of the Administrative Remedy Generalized Retrieval.

6.      Leath arrived at USP Lewisburg on October 5, 2015, to participate in the Special Management Unit ("SMU") for closer supervision due to disruptive behavior.  See Attachment 4 – Memorandum to Warden Maiorana, dated June 5, 2015.

7.      Attachment 5 is a true and accurate copy of the "Intake Screening Form."

8.      On April 24, 2016, Leath and his cellmate were placed in cell 315, on J Block.  See Attachment 6 – SENTRY Inmate History Quarters.

9.      On May 15, 2016, Leath and his cellmate were moved from cell 315 to cell 316.  Id.

10.     On May 30, 2016, at approximately 9:08 p.m., the J Block Officer was making rounds in the housing unit, and observed inmate Leath's cellmate standing at the cell door with blood on his face.  When the Officer asked Leath's cellmate what occurred, he responded by stating "We fought."  The Unit Officer called for assistance.  After assistance arrived, both inmated were handcuffed and taken out of the cell for immediate medical evaluation.  See Attachment 7 – Incident Report #2856472.

**Exhibit A, p.2**

11.    Leath was initially examined by institution medical, prior to being transported to the outside hospital.  Leath's primary complaint was that he could not see.  It was noted that he had significant periorbital swelling, missing upper cartilage on both ears, a laceration to his left eyelid, trauma to the cornea of his left eye, lateral gaze with his right eye, abrasion to his upper forehead, trauma to the inside of his lip, bite mark on his right thumb, missing pad on his right middle finger, bruising over his left clavicle, bruising on the upper medical aspect of his right bicep, an abrasion to his right first knuckle, and an abrasion over his left shoulder blade.  Further notes reveal that Leath was alert and oriented and was able to ambulate on his own.  See Attachment 8, pp. 13-15 – medical records.

12.    Leath was transported to the outside hospital on May 30, 2016, at approximately 10:27 p.m.  See Attachment 9, p.2. – SENTRY ADM-REL.

13.    On June 1, 2016, Leath was discharged from the outside hospital where he underwent surgery and was treated for multiple traumatic injuries including, "bilateral ruptured globe factures, bilateral intra/extra conal hemorrhage, left medical orbital wall fracture, tiny left sided apical pneumothorax, medical right lower lobe pneumothorax, bilateral pulmonary contusions, and right non-displaced rib fx 9-11." See Attachment 8, pp.8-11.

14.    Leath returned to USP Lewisburg at approximately 6:12 p.m.  See Attachment 9, p.2.

**Exhibit A, p.3**

15.    Leath's follow-up instructions included no strenuous activity for 8 weeks, follow-up with psychology staff regarding his poor vision prognosis and dental concerns, medication for pain management, and eye drops/ointments.  <u>See</u> Attachment 8, pp.4-7.

16.    Leath was transferred to USP Coleman, Florida, on July 20, 2016. His diagnosis at the time of his transfer was minimal vision in his right eye, and no vision in his left eye.  <u>Id.</u>, p.1-3.

17.    In addition to medical treatment, Leath was routinely evaluated by Psychology staff with no noted adjustment concerns.  <u>See</u> Attachment 10 – psychology records.

18.    On June 13, 2016, Leath appeared in front of the Discipline Hearing Officer ("DHO").  He was sanctioned to 27 days, disallowance of Good Conduct Time, 30 days of disciplinary segregation, and 120 days loss of commissary privileges for code 201, fighting with another person.  <u>See</u> Attachment 11 – DHO Report.

I declare that the foregoing is true and correct and is given under penalty of perjury pursuant to 28 U.S.C. § 1746.  I further declare that the documents attached to this declaration are true and accurate copies of documents maintained in the ordinary course of business by the Federal Bureau of Prisons and were created at

**Exhibit A, p.4**

or near the time of the occurrence of the matters reflected therein by someone with knowledge and were made by the Bureau of Prisons as a regular practice.

I am the custodian of the documents or am otherwise qualified to execute this certification, pursuant to Fed. R. Evid. 803(6) and 902(11).  I declare that the foregoing is true and correct, and is given under penalty of perjury pursuant to 28 U.S.C. §1746.

Executed this 26th day of August, 2019.

Susan Albert, Paralegal Specialist
FCC Allenwood

5

**Exhibit A, p.5**

**DEFENDANT EXHIBIT**

**Attach. 1**

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM N... OMB N... |
|---|---|---|

**1. Submit to Appropriate Federal Agency:**
Federal Bureau of Prisons
320 First St., NW
Washington, DC 20534

**2. Name, address of claimant, and claimant's personal represe...**
(See instructions on reverse). Number, Street, City, State and Zip code.
James Leath, #47208-066
USP - allenwood
Pc Box 3000
White Deer, PA 17887

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | | SINGLE | 5/30/16 Monday | 12:00 PM |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

Mr. James Leath was an inmate at USP the Lewisburg and was attacked by another inmate without provocation. The corrections officers allowed this attack to occur and were aware of the attackers violent propensities.

**9.** **PROPERTY DAMAGE**

**NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT** (Number, Street, City, State, and Zip Code.)
N/A.

**BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED.** (See instructions on reverse side.)
N/A.

**10.** **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

As a result of this incident, James Leath suffered blindness in his right eye and partial blindness in left eye. Mr. Leath was taken to the hospital for emergency surgery.

**11.** **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Corrections officers at USP Lewisburg | USP Lewisburg, 2400 Robert F. Miller Drive Lewisburg PA 17837 |

**12. (See instructions on reverse.)** **AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| ⊘ | $5,000,000.00 | ⊘ | $5,000,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| ⊗ James Leath | c/o 215 735 7535 | 7/9/16 |
| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS | |
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) | |

NSN 7540-00-634-4046

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

**15. Do you carry accident insurance?** ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

**16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?** ☐ Yes ☒ No   **17. If deductible, state amount.**

**18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).**

N/A.

**19. Do you carry public liability and property damage insurance?** ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code) ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in Item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

**Exhibit A**
**Attach. 1, p.2**

# LAW OFFICES OF JONATHAN J. SOBEL
ATTORNEY AT LAW

Jonathan J. Sobel, Esquire

|PENNSYLVANIA
|1500 WALNUT STREET
|SUITE 2000
|PHILADELPHIA, PA 19102
|TEL 215 735-7535
|FAX 215 735 7539
|Mato89@aol.com

August 16, 2016

**RECEIVED**

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Federal Bureau of Prisons
320 First Street, N.W.
Washington, D.C.  20534

FEDERAL BUREAU OF PRISONS
OGC/LITIGATION BRANCH

      RE:   James Leath

Dear Sir/Madam:

      Enclosed please find Mr. Leath's Form 95, in this matter.  Would you kindly process this accordingly.  Please direct all future correspondence to my attention.

      Should you have any questions, please do not hesitate to contact the undersigned.  I thank you in advance for your time and attention in this matter.

      Very truly yours,

      JONATHAN J. SOBEL

JJS/cl
Enc.

**Exhibit A**
**Attach. 1, p.3**







**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

DEFENDANT
EXHIBIT

**Attach. 2**

*Via Certified and Return Receipt Mail*

*U.S. Custom House-7th Floor*
*2nd & Chestnut Streets*
*Philadelphia, PA 19106*

February 13, 2017

James Leath, Reg. No. 47208-066
USP Atlanta
P.O. Box 150160
Atlanta, GA 30315

  RE: Administrative Claim No. TRT-NER-2016-06518

Dear Mr. Leath:

  Your Administrative Claim No. TRT-NER-2016-06518, properly received on August 22, 2016, has been considered for settlement as provided by the Federal Tort Claims Act (FTCA), 28 U.S.C. §2672, under authority delegated to me by 28 C.F.R. §543.30. Damages are sought in the amount of $5,000,000.00 based on a personal property and injury claim. Specifically, you allege on May 30, 2016, the staff at USP Lewisburg failed to protect you and you were assaulted by another inmate causing blindness is your right eye and partial blindness in your left eye.

  An investigation, including review of your medical records, shows on May 30, 2016, upon observing you and your cellmate with injuries consistent with a fight, the staff at USP Lewisburg immediately intervened. Following the incident, you were evaluated by the Health Services staff at USP Lewisburg and transported to an outside medical center for further treatment. There is no evidence that you experienced a compensable loss as the result of negligence on the part of any Bureau of Prisons employee. Accordingly, your claim is denied.

  If you are dissatisfied with this decision, you may bring an action against the United States in an appropriate United States District Court within six (6) months of the date of this letter.

       Sincerely,

       Michael D. Tafelski
       Regional Counsel

cc: David J. Ebbert, Warden, USP Lewisburg

**Exhibit A**
**Attach. 2, p.1**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

James Leath #47208-066
USP Atlanta
P.O. Box 150160
Atlanta, GA 30315

TCT-NER 2016-06518

9590 9402 1851 6104 7811 12

2. Article Number (Transfer from service label)

7013 0600 0001 4910 023b

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                                      ☐ Agent
                                       ☐ Addressee

B. Received by (Printed Name)          C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt

2

**Exhibit A**
**Attach. 2, p.2**



USPS TRACKING #

9590 9402 1851 6104 7811 12

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Legal Services

Northeast Regional Office
Federal Bureau of Prisons
U.S. Customs House
2nd & Chestnut Streets, 7th Floor
Philadelphia, PA 19106

3

**Exhibit A**
**Attach. 2, p.3**

TRT-MXR 2016-cc518

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)   C. Date of Delivery |
| 1. Article Addressed to:<br><br>James Leath #47208-066<br>USP Atlanta<br>P.O. Box 150160<br>Atlanta, GA 30315 | D. Is delivery address different from item 1? ☐ Yes<br>   If YES, enter delivery address below: ☐ No<br><br>POST OFFICE   FEB 17 2017   USPS 3 |
| ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖<br>9590 9402 1851 6104 7811 12 | 3. Service Type<br>☐ Adult Signature<br>☐ Adult Signature Restricted Delivery<br>☑ Certified Mail®<br>☐ Certified Mail Restricted Delivery<br>☐ Collect on Delivery<br>☐ Collect on Delivery Restricted Delivery<br>☐ Insured Mail<br>☐ Insured Mail Restricted Delivery | ☐ Priority Mail Express®<br>☐ Registered Mail™<br>☐ Registered Mail Restricted Delivery<br>☑ Return Receipt for Merchandise<br>☐ Signature Confirmation™<br>☐ Signature Confirmation Restricted Delivery |
| 2. Article Number *(Transfer from service label)*<br>7013 0600 0001 9910 0236 | |

PS Form 3811, July 2015 PSN 7530-02-000-9053      Domestic Return Receipt

4

**Exhibit A**
**Attach. 2, p.4**





First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 1851 6104 7811 12

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Legal Services

Northeast Regional Office
Federal Bureau of Prisons
U.S. Customs House
2nd & Chestnut Streets, 7th Floor
Philadelphia, PA 19106

**Exhibit A
Attach. 2, p.5**

PR15

**DEFENDANT EXHIBIT**

**Attach. 3**

```
ALMG2        *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *
PAGE 001 OF 001
     FUNCTION: LST SCOPE: REG  EQ 47208-066   OUTPUT FORMAT: FULL
-------LIMITED TO SUBMISSIONS WHICH MATCH ALL LIMITATIONS KEYED BELOW---------
DT RCV: FROM _____ THRU _____ DT STS: FROM _____ THRU _____
DT STS: FROM ____ TO ____ DAYS BEFORE "OR" FROM ____ TO ____ DAYS AFTER DT RDU
DT TDU: FROM ____ TO ____ DAYS BEFORE "OR" FROM ____ TO ____ DAYS AFTER DT TRT
STS/REAS: ____ ____ ____ ____ ____ ____ ____ ____ ____
SUBJECTS: __ __ __ __ __ __ __ __ __ __ __ __
EXTENDED: _ REMEDY LEVEL: _ _        RECEIPT: _ _ _ "OR" EXTENSION: _ _ _
RCV  OFC : EQ ____
TRACK: DEPT: ____
      PERSON: ____
        TYPE: ____
EVNT FACL: EQ ____
RCV FACL.: EQ ____
RCV UN/LC: EQ ____
RCV QTR..: EQ ____
ORIG FACL: EQ ____
ORG UN/LC: EQ ____
ORIG QTR.: EQ ____


G5152     NO REMEDY DATA EXISTS FOR THIS INMATE
```

**Exhibit A**
**Attach. 3, p.1**



U. S. Department of Justice Federal Bureau of Prisons
USP Canaan

**DEFENDANT
EXHIBIT**

**Attach. 4**

3057 Easton Turnpike
Waymart, PA 18472

June 5, 2015

MEMORANDUM FOR C. MAIOR   C. AIORANA, WARDEN

FROM: F Unit Manager   J. Kaminski,

SUBJECT:   Special Management Unit (SMU) Referral
RE: LEATH, James
Reg. No.: 47208-066

We are recommending that inmate Leath be considered for placement in the Special Management Unit in accordance with Program Statement 5217.01. Inmate Leath was received at USP Canaan on October 27, 2014, as an initial designation.

Inmate Leath has incurred an incident report for Code 224/Assaulting without Serious Injury and Code 115/Destroying and/or Disposing of any Item During a Search or Attempt to Search. Inmate Leath shoved a correctional officer to the ground, after the officer attempted to search him, then flushed the contraband down a toilet.

Inmate Leath's actions and behavior have resulted in disruptive situations that endanger the welfare of staff and inmates. Inmate Leath's behavior requires greater management to address his interaction with others to ensure the safety, security, and operation in an institutional setting.

I have reviewed the attached material concerning the classification of the above referenced individual as a Special Management Unit Case and my decision is to:

( ) I concur with the Unit Team to approve a Special Management Unit referral.


(   ) I do not concur with the Unit Team and disapprove referral to a Special Management Unit.

C. Maiorana, Warden

**Exhibit A
Attach. 4, p.1**

**DEFENDANT EXHIBIT**

**Attach. 5**

```
LEWD3  535*08  *          FEDERAL BUREAU OF PRISONS      *   10-05-2015
PAGE 001       *            INTAKE SCREENING FORM        *   15:33:24
```

```
NAME.......: LEATH, JAMES              UNIT.....:  5.112
REGISTER NO: 47208-066                 DOB (AGE):        (49)
RACE / SEX.: BLACK / MALE              ETHNIC...: OTHER THAN HISP
RESIDENCE..:                           RSP OF...: LEW A-DES
```

****************   I N M A T E   I N T E R V I E W   ****************

DATE && TIME ARRIVED:10-05-2015   14:30        TIME INTERVIEWED: 1620

1)  DO YOU KNOW OF ANY REASON THAT YOU SHOULD NOT BE            YES ____   NO  ✓
    PLACED IN GENERAL POPULATION ?

2)  HAVE YOU ASSISTED LAW ENFORCEMENT AGENTS IN ANY WAY ?   YES ____   NO  ✓

3)  ARE YOU A CIM CASE ?                                    YES  ✓   NO ____

4)  HAVE YOU TESTIFIED AGAINST ANYONE IN COURT ?            YES ____   NO  ✓

5)  ARE YOU A MEMBER/ASSOCIATE OF ANY GANG ?                YES ____   NO  ✓

6A) HAVE YOU EVER BEEN SEXUALLY ASSAULTED ?                 YES ____   NO  ✓

6B) HAVE YOU RECENTLY BEEN SEXUALLY ASSAULTED ?             YES ____   NO  ✓

INTERVIEWER COMMENTS : _____

_____

CIRCLE ONE:
      I  HAVE / HAVE NOT    RECEIVED A BUREAU OF PRISON "ADMISSIONS &&
      ORIENTATION BOOKLET" DEFINING MY "RIGHTS && RESPONSIBILITIES" AND
      THE "PROHIBITED ACTS AND DISCIPLINARY SEVERITY SCALE".

INMATE SIGNATURE: _James Leath____        DATE: 10-5-15

INTERVIEWER: DILTZ              TITLE: CC          DATE: 10-05-2015

****************   S T A F F   C H E C K L I S T   ****************

PSI REVIEWED.............: YES  ✓   NO ____
CENTRAL FILE REVIEWED....: YES  ✓   NO ____
IS THERE A HISTORY OF SEXUALLY AGGRESSIVE BEHAVIOR?  YES ____   NO  ✓
COMMENTS:_____

_____

IF GENERAL PHYSICAL APPEARANCE IS NOT GOOD, EXPLAIN:_____

PSYCH ALERT (YES/NO).....: (NO)         (IF YES, DO NOT RELEASE TO GENERAL
                                         POPULATION, NOTIFY PSYCHOLOGY)
OK FOR GENERAL POPULATION:  YES ____  NO  ✓   (IF NO, EXPLAIN)
                                  sec/comm't   I'm self-identified
                                               as straight.

**No apparent PREA criteria met**

```
ALMG2  531.01 *              INMATE HISTORY           *  .   09-05-2
PAGE 001        *               QUARTERS              *       10:29:1
```

**DEFENDANT EXHIBIT**

**Attach. 6**

```
REG NO..: 47208-066 NAME....: LEATH, JAMES
CATEGORY: QTR      FUNCTION: PRT       FORMAT:
```

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|-----------|-------------|-----------------|----------------|
| COP | F01-122U | HOUSE F/RANGE 01/BED 122U | 08-24-2017 1919 | CURRENT |
| COP | R01-101L | HOUSE R/RANGE 01/BED 101L | 08-24-2017 1306 | 08-24-2017 1919 |
| ATL | J04-406L | HOUSE J/RANGE 04/BED 406L | 08-17-2017 2123 | 08-24-2017 0530 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 08-17-2017 1753 | 08-17-2017 2123 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 08-17-2017 1018 | 08-17-2017 1032 |
| BSY | Z02-119LAD | HOUSE Z/RANGE 02/BED 119L AD | 08-06-2017 2113 | 08-17-2017 0907 |
| BSY | Z02-120LAD | HOUSE Z/RANGE 02/BED 120L AD | 08-04-2017 1409 | 08-06-2017 2113 |
| BSY | Z02-146UAD | HOUSE Z/RANGE 02/BED 146U AD | 07-29-2017 2127 | 08-04-2017 1409 |
| BSY | Z01-102LAD | HOUSE Z/RANGE 01/BED 102L AD | 07-29-2017 1259 | 07-29-2017 2127 |
| BSY | Z02-148LAD | HOUSE Z/RANGE 02/BED 148L AD | 07-17-2017 2037 | 07-29-2017 1259 |
| BSY | Z02-147LAD | HOUSE Z/RANGE 02/BED 147L AD | 07-13-2017 1622 | 07-17-2017 2037 |
| BSY | Z02-130LAD | HOUSE Z/RANGE 02/BED 130L AD | 06-28-2017 2120 | 07-13-2017 1622 |
| BSY | Z02-129LAD | HOUSE Z/RANGE 02/BED 129L AD | 06-26-2017 1341 | 06-28-2017 2120 |
| BSY | Z01-117LAD | HOUSE Z/RANGE 01/BED 117L AD | 06-26-2017 1324 | 06-26-2017 1341 |
| BSY | B07-320U | HOUSE B/RANGE 07/BED 320U | 05-25-2017 1328 | 06-26-2017 1324 |
| BSY | B07-320U | HOUSE B/RANGE 07/BED 320U | 04-07-2017 1148 | 05-25-2017 1010 |
| BSY | B07-320U | HOUSE B/RANGE 07/BED 320U | 03-27-2017 1341 | 04-07-2017 0737 |
| BSY | B07-307U | HOUSE B/RANGE 07/BED 307U | 03-08-2017 0841 | 03-27-2017 1341 |
| BSY | B07-306L | HOUSE B/RANGE 07/BED 306L | 03-07-2017 1411 | 03-08-2017 0841 |
| BSY | B07-319U | HOUSE B/RANGE 07/BED 319U | 03-01-2017 1856 | 03-07-2017 1411 |
| BSY | R01-001L | HOUSE R/RANGE 01/BED 001L | 03-01-2017 1337 | 03-01-2017 1856 |
| ATL | J04-450U | HOUSE J/RANGE 04/BED 450U | 02-08-2017 1947 | 03-01-2017 0600 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 02-08-2017 1300 | 02-08-2017 1947 |
| ATL | R01-001L | HOUSE R/RANGE 01/BED 001L | 02-08-2017 0941 | 02-08-2017 1018 |
| OKL | C11-306L | HOUSE C/RANGE 11/BED 306L | 01-30-2017 1911 | 02-08-2017 0730 |
| OKL | C11-901L | HOUSE C/RANGE 11/BED 901L | 01-30-2017 1645 | 01-30-2017 1911 |
| ALP | Z01-113UAD | HOUSE Z/RANGE 01/BED 113U AD | 01-15-2017 0848 | 01-30-2017 0518 |
| ALP | Z01-110UAD | HOUSE Z/RANGE 01/BED 110U AD | 12-25-2016 0841 | 01-15-2017 0848 |
| ALP | Z01-109UAD | HOUSE Z/RANGE 01/BED 109U AD | 12-04-2016 0832 | 12-25-2016 0841 |
| ALP | Z01-107UAD | HOUSE Z/RANGE 01/BED 107U AD | 11-29-2016 1332 | 12-04-2016 0832 |
| ALP | Z01-101LAD | HOUSE Z/RANGE 01/BED 101L AD | 11-29-2016 1241 | 11-29-2016 1332 |
| ALP | A03-115L | HOUSE A/RANGE 03/BED 115L | 09-16-2016 1507 | 11-29-2016 1241 |
| ALP | A03-115L | HOUSE A/RANGE 03/BED 115L | 07-20-2016 1314 | 09-16-2016 1201 |
| ALP | R01-001L | HOUSE R/RANGE 01/BED 001L | 07-20-2016 1150 | 07-20-2016 1314 |
| LEW | X03-228L | HOUSE X/RANGE 03/BED 228L | 07-15-2016 1122 | 07-20-2016 1115 |
| LEW | X03-228L | HOUSE X/RANGE 03/BED 228L | 07-02-2016 0821 | 07-15-2016 0802 |
| LEW | X03-229L | HOUSE X/RANGE 03/BED 229L | 06-28-2016 1206 | 07-02-2016 0821 |
| LEW | X03-229L | HOUSE X/RANGE 03/BED 229L | 06-11-2016 1010 | 06-28-2016 0906 |
| LEW | X03-228L | HOUSE X/RANGE 03/BED 228L | 06-01-2016 1812 | 06-11-2016 1010 |
| LEW | J03-316L | HOUSE J/RANGE 03/BED 316L | 05-15-2016 0901 | 05-30-2016 2227 |
| LEW | J03-315L | HOUSE J/RANGE 03/BED 315L | 04-24-2016 0736 | 05-15-2016 0901 |

```
G0002     MORE PAGES TO FOLLOW . . .
```

**Exhibit A
Attach. 6, p.1**

```
ALMG2  531.01 *              INMATE HISTORY           *      09-05-2017
PAGE 001        *              QUARTERS               *      10:31:46

REG NO..: ███████ NAME....: ██████████
CATEGORY: QTR       FUNCTION: PRT        FORMAT:

FCL   ASSIGNMENT DESCRIPTION                    START DATE/TIME STOP  DATE/TIME
MCR   Z05-232LAD HOUSE Z/RANGE 05/BED 232L AD   08-22-2017 1200 CURRENT
MCR   Z05-233LAD HOUSE Z/RANGE 05/BED 233L AD   08-01-2017 1051 08-22-2017 1200
MCR   Z05-234LAD HOUSE Z/RANGE 05/BED 234L AD   07-11-2017 1305 08-01-2017 1051
MCR   Z05-235LAD HOUSE Z/RANGE 05/BED 235L AD   07-02-2017 2156 07-11-2017 1305
MCR   Z01-101LAD HOUSE Z/RANGE 01/BED 101L AD   07-02-2017 2047 07-02-2017 2156
MCR   E02-202L   HOUSE E/RANGE 02/BED 202L      05-30-2017 1031 07-02-2017 2047
MCR   E01-105L   HOUSE E/RANGE 01/BED 105L      05-30-2017 1022 05-30-2017 1031
MCR   E01-113U   HOUSE E/RANGE 01/BED 113U      05-02-2017 0646 05-30-2017 1022
MCR   E01-109U   HOUSE E/RANGE 01/BED 109U      04-24-2017 1006 05-02-2017 0646
MCR   E01-123U   HOUSE E/RANGE 01/BED 123U      04-20-2017 2006 04-24-2017 1006
MCR   R01-001L   HOUSE R/RANGE 01/BED 001L      04-20-2017 1734 04-20-2017 2006
OKL   C08-411U   HOUSE C/RANGE 08/BED 411U      04-13-2017 1436 04-20-2017 0900
OKL   C08-422U   HOUSE C/RANGE 08/BED 422U      04-04-2017 0747 04-13-2017 1436
OKL   C08-417L   HOUSE C/RANGE 08/BED 417L      04-04-2017 0055 04-04-2017 0747
OKL   C07-901L   HOUSE C/RANGE 07/BED 901L      04-03-2017 1821 04-04-2017 0055
LEW   I02-212L   HOUSE I/RANGE 02/BED 212L      03-29-2017 0652 04-03-2017 0709
LEW   E02-212U   HOUSE E/RANGE 02/BED 212U      03-26-2017 0731 03-29-2017 0652
LEW   E02-211L   HOUSE E/RANGE 02/BED 211L      03-05-2017 0654 03-26-2017 0731
LEW   E02-210L   HOUSE E/RANGE 02/BED 210L      02-12-2017 0854 03-05-2017 0654
LEW   E02-209L   HOUSE E/RANGE 02/BED 209L      01-22-2017 0855 02-12-2017 0854
LEW   E02-208L   HOUSE E/RANGE 02/BED 208L      01-17-2017 0823 01-22-2017 0855
LEW   J02-223L   HOUSE J/RANGE 02/BED 223L      01-15-2017 0827 01-17-2017 0823
LEW   J02-222L   HOUSE J/RANGE 02/BED 222L      12-25-2016 0832 01-15-2017 0827
LEW   J02-221L   HOUSE J/RANGE 02/BED 221L      12-05-2016 1044 12-25-2016 0832
LEW   J02-220U   HOUSE J/RANGE 02/BED 220U      11-23-2016 1112 12-05-2016 1044
LEW   G02-223U   HOUSE G/RANGE 02/BED 223U      11-06-2016 0732 11-23-2016 1112
LEW   G02-220U   HOUSE G/RANGE 02/BED 220U      10-16-2016 0947 11-06-2016 0732
LEW   G02-219U   HOUSE G/RANGE 02/BED 219U      09-25-2016 0721 10-16-2016 0947
LEW   G02-218U   HOUSE G/RANGE 02/BED 218U      09-25-2016 0707 09-25-2016 0721
LEW   G02-211U   HOUSE G/RANGE 02/BED 211U      09-04-2016 0841 09-25-2016 0707
LEW   G02-202U   HOUSE G/RANGE 02/BED 202U      08-14-2016 0929 09-04-2016 0841
LEW   G02-224U   HOUSE G/RANGE 02/BED 224U      07-24-2016 0859 08-14-2016 0929
LEW   G02-223U   HOUSE G/RANGE 02/BED 223U      07-23-2016 1035 07-24-2016 0859
LEW   J03-319U   HOUSE J/RANGE 03/BED 319U      07-17-2016 0641 07-23-2016 1035
LEW   J03-318U   HOUSE J/RANGE 03/BED 318U      06-30-2016 1505 07-17-2016 0641
LEW   J03-318U   HOUSE J/RANGE 03/BED 318U      06-26-2016 0652 06-30-2016 1245
LEW   J03-317U   HOUSE J/RANGE 03/BED 317U      06-05-2016 0904 06-26-2016 0652
LEW   J03-316U   HOUSE J/RANGE 03/BED 316U      05-31-2016 2123 06-05-2016 0904
LEW   J03-316U   HOUSE J/RANGE 03/BED 316U      05-15-2016 0901 05-30-2016 2257
LEW   J03-315U   HOUSE J/RANGE 03/BED 315U      04-24-2016 0736 05-15-2016 0901
LEW   J03-314U   HOUSE J/RANGE 03/BED 314U      04-03-2016 0834 04-24-2016 0736

G0002       MORE PAGES TO FOLLOW . . .
```

**Exhibit A**
**Attach. 6, p.2**

BOYDBP-S288.052 INCIDENT REPORT CDFR-
MAY 1994
U.S. DEPARTMENT OF JUSTICE                                              FEDERAL BU

**DEFENDANT EXHIBIT**

**Attach. 7**

1. Name Of Institution: U.S.P. Lewisburg

PART I - INCIDENT REPORT #2856472

| 2. Name Of Inmate<br>Leath, James | 3. Register Number<br>47208-066 | 4. Date Of Incident<br>5/30/2016 | 5. Time<br>9:08 pm |
|---|---|---|---|
| 6. Place Of Incident<br>J-Block cell 316 | 7. Assignment<br>N/A | 8. Unit<br>J-Block, Dressler | |

| 9. Incident:  Fighting with another person | 10. Code:201 |
|---|---|

11. Description of incident: Date: 5/30/16 Time: 9:08 pm Staff became aware of Incident.

On May 30th, 2016, at approximately 9:08 pm, I was notified via radio to report to J-Block 3rd floor due to inmate ▮▮▮▮▮ and Leath, James #47208-066 having injuries consistent with being in a physical altercation in J-Block cell 316. Specifically, the J-Block #3 Officer approached cell 316 as he was making irregular rounds and noticed both inmates being covered in blood. Upon my arrival, inmates ▮▮▮▮▮ and Leath submitted to hand restraints. Both inmates were removed from the cell and escorted by other staff members to the Urgent Care Rooms in the Health Services area to be further evaluated. Based on inmate Leath injuries, it was determined that inmate ▮▮▮▮▮ and inmate Leath were involved in a physical altercation which was not witnessed by staff. Both inmate ▮▮▮▮▮ and Leath sustained multiple injuries which required outside medical treatment.

| 12. Signature Of Reporting | Date And Time<br>5/30/16<br>11:01 pm | 13. Name And Title (Printed)<br>J. Leonowicz, Lieutenant |
|---|---|---|
| 14. Incident Report Delivered To Above Inmate By | 15. Date Incident<br>Report Delivered-<br>6-3-16 | 16.Time Incident<br>Report Delivered<br>7:50AM |

Part II - COMMITTEE ACTION

17. Comments Of The Inmate To The Unit Discipline Committee Regarding The Above Incident: **See Attached**

| 18. A. It Is The Finding Of The Committee That You:<br>____ Committed The Following Prohibited Act.<br><br>____ Did Not Commit A Prohibited Act. | B. ⊗ The Committee Is Referring The Charge(s) To The DHO For Further Hearing.<br>C. ____ The Committee Advised The Inmate Of Its Finding And Of The Right To File An Appeal Within 15 Calendar Days. |
|---|---|

19. Committee Decision Is Based On The Following Information   **See Attached**

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act)

**See Attached**

21. Date And Time Of Action  6-3-16  12:10 r    (The UDC Chairman=s Signature Next To His Name Certifies Who Sat On The UDC And That The Completed Report Accurately Reflects The UDC Proceedings.)

| Chairman (Typed Name/signature) | Member (Typed Name) | Member (Typed Name) |
|---|---|---|

Record Copy - Central File Record;  Copy - DHO;  Copy - Inmate After UDC Action;  Copy - Inmate Within 24 Hours Of
Part I Preparation

**Exhibit A**
**Attach. 7, p.1**

**DEFENDANT EXHIBIT**

**Attach. 8**

**Bureau of Prisons**
**Health Services**
**Consultation Request**

| | | |
|---|---|---|
| Inmate Name: LEATH, JAMES | Reg #: 47208-066 | Complex: LEW |
| Date of Birth: | Sex: M | |

Report of Consultation: Ophthalmology
Subtype: Ophthalmology - Outside

Inmate Name: LEATH, JAMES
Reg #: 47208-066

Date of Birth:
Sex: M

Institution: LEWISBURG USP
2400 ROBERT F. MILLER DRIVE
LEWISBURG, Pennsylvania 17837
5705231251

Assessment:

VA- CF@ 4ft
NLP

IOP <16
<10

- still w/ poor vision.

DFE < Clear view, no Retinal
Retinal detachment
w/ vitreous hemorrhage

① Presumed Traumatic Optic neuropathy, history
- Guarded prognosis.

② S/P ruptured Globe, left eye
- will not see again, No surgeries planned

Plan: ① Drops
- stop Timolol Both eyes
- Continue Brimonidine BIP, Right eye only
- Continue Moxitol ophthalmic ointment 4x per day, Left eye only
- Start Atropine 1 drop left eye daily only.

Signature: Jauer Koeur, MD

Date: 6-28-16

Completed By:

Report may be hand-written or (preferably) typed on this form. If dictated on office or hospital letterhead to follow, please indicate essential findings or recommendations to be acted upon pending final report.

Follow-up services and primary responsibility for inmate health care remains with Bureau of Prisons staff. While discussion of diagnostic/treatment options with the inmate may be appropriate, they are subject to review by the inmate's primary care provider, the institution utilitzation review committee and/or the BOP National Formulary.

Please notify institution prior to scheduling surgery dates or follow-up appointments.

Inmate not to be informed of appointment dates.

1

**Exhibit A**
**Attach. 8, p.1**

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: LEATH, JAMES | | Reg #: 47208-066 |
| Date of Birth: | Sex: M   Race: BLACK | Facility: LEW |
| Encounter Date: 06/03/2016 15:44 | Provider: Edinger, Andrew MD | Unit: X03 |

Physician - Follow up Visit encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT 1**     **Provider:** Edinger, Andrew MD

**Chief Complaint:** Eyes/Vision Problems

**Subjective:** Inmate was brought to health services to undergo an eye drop administration training. He requires 3 different eye drops at present. He has minimal vision OD and no vision OS. I discussed his poor prognosis with him and stressed the importance that he learn to self administer eye drops. He was initially very resistive. He attempted to use the encounter to draw sympathy regarding his desire for a phone call. He also tried to divert attention into getting a medical transfer. When I told him that this was not an opportunity for negotiation, he then became more compliant and proceeded with the training. I carefully walked him through the process of self administering drops. He would require the use of both hands to perform this. He was able to administer the drops with reasonable accuracy. Because he could not see, he brought the bottles to contact with his eye and then placed the drops in his eyes. He successfully placed Atropine in his left eye and Timolol and Brimonidine in his right eye. He was subsequently given the remainder of his pill line medication and returned to his cell.

**Pain:** Yes

**Pain Assessment**

| | |
|---|---|
| **Date:** | 06/03/2016 10:01 |
| **Location:** | Eyes-bilateral |
| **Quality of Pain:** | Tender |
| **Pain Scale:** | Refused |
| **Intervention:** | See chart |
| **Trauma Date/Year:** | |
| **Injury:** | |
| **Mechanism:** | |
| **Onset:** | 3-5 Days |
| **Duration:** | 3-5 Days |
| **Exacerbating Factors:** | IM refused to elaborate |
| **Relieving Factors:** | IM refused to elaborate |
| **Comments:** | |

**OBJECTIVE:**

**ASSESSMENT:**

Unspecified disorder of globe, H449 - Current

**PLAN:**

**Disposition:**

Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|

Generated 06/03/2016 15:53 by Edinger, Andrew MD          Bureau of Prisons - LEW                              Page 1 of 2

2

**Exhibit A**
**Attach. 8, p.2**

Inmate Name:   LEATH, JAMES
Date of Birth:
Encounter Date: 06/03/2016 15:44

Sex:      M      Race:  BLACK
Provider:  Edinger, Andrew MD

Reg #:    47208-066
Facility:  LEW
Unit:      X03

| Date Initiated Format | | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 06/03/2016 | Counseling | Compliance - Treatment | Edinger, Andrew | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:**   No

Completed by Edinger, Andrew MD on 06/03/2016 15:53

3

**Exhibit A
Attach. 8, p.3**

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: LEATH, JAMES | | Reg #: 47208-066 |
| Date of Birth: | Sex: M   Race: BLACK | Facility: LEW |
| Encounter Date: 06/01/2016 18:49 | Provider: Schoonover, Amy J RN | Unit: X03 |

Nursing - Medical Trip Return encounter performed at Special Housing Unit.

**SUBJECTIVE:**

**COMPLAINT 1** **Provider:** Schoonover, Amy J RN

**Chief Complaint:** Eyes/Vision Problems
**Subjective:** Return from OSH s/p multiple traumatic injuries
**Pain:** No

**OBJECTIVE:**

Exam:
  **General**
    **Affect**
      Yes: Cooperative
    **Appearance**
      Yes: Alert and Oriented x 3
  **Ears**
    **External Ear**
      Yes: Trauma
  **Face**
    **General**
      Yes: Periorbital Edema

**ASSESSMENT:**

Eye Abrasion or Contusion

I/M returned from OSH, where he was treated for multiple traumatic injuries, including, bilateral ruptured globe fractures, bilateral intra/extra conal hemorrhage, left medial orbital wall fracture, tiny left sided apical pneumothorax, medial right lower lobe pneumothorax, bilateral pulmonary contusions, right non-displaced rib fx 9-11. I/M was taken to the OR, where he underwent repair of scleral laceration OS, exploration and repair of complex conjunctival laceration OD and repair of complex eyelid laceration left upper lid by Plastic surgery, Ophthalmology and OMFS.

Per D/C instructions, recommend F/U with USP Psych regarding his poor vision prognosis and Dental regarding discomfort he is experiencing in his teeth post-op.

No strenuous activity for 8 weeks. Will update MDS.

Several eye drops and ointments have been prescribed. Spoke with Dr. Pigos, he will place orders for them. Will order Augmentin, per D/C instructions. Will also order Tylenol #3 for pain control.

See orders for follow up appointments needed.

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|

4

**Exhibit A**
**Attach. 8, p.4**

| Inmate Name: | LEATH, JAMES | | | | Reg #: | 47208-066 |
|---|---|---|---|---|---|---|
| Date of Birth: | | Sex: | M | Race: BLACK | Facility: | LEW |
| Encounter Date: | 06/01/2016 18:49 | Provider: | Schoonover, Amy J RN | | Unit: | X03 |

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Acetaminophen/Codeine 300/30 MG Tablets | 06/01/2016 18:49 | 2 tabs Orally - Two Times a Day x 3 day(s) Pill Line Only |

    **Start Now:** Yes
        **Night Stock Rx#:**
        **Source:** Pyxis
        **Admin Method:** Pill Line
        **Stop Date:** 06/04/2016 18:48
        **MAR Label:** 2 tabs Orally - Two Times a Day x 3 day(s) Pill Line Only
        **One Time Dose Given:** No

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | Amoxicillin/Clav Tablet | 06/01/2016 18:49 | 875/125 mg take 1 tab Orally - Two Times a Day x 4 day(s) |

    **Start Now:** Yes
        **Night Stock Rx#:**
        **Source:** Pyxis
        **Admin Method:** Self Administration
        **Stop Date:** 06/05/2016 18:48
        **MAR Label:** 875/125 mg take 1 tab Orally - Two Times a Day x 4 day(s)
        **One Time Dose Given:** No

**New Radiology Request Orders:**

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| General Radiology-Chest-2 Views | One Time | | 06/01/2016 | Routine |

    Specific reason(s) for request (Complaints and findings):
        Repeat chest x-ray to evaluate rib fractures. Need prior to 2 week follow up with Trauma clinic.

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Ophthalmology | 06/01/2016 | 06/01/2016 | Routine | No | |

    **Subtype:**
        Ophthalmology - Outside
    **Reason for Request:**
        One week follow up s/p repair of scleral laceration OS and exploration and repair of complex conjunctival laceration OD. Needs appointment on a day that the Retina Specialist is available.

**Disposition:**

    Follow-up at Sick Call as Needed
    Return Immediately if Condition Worsens
    Discharged to Housing Unit with Restrictions

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 06/01/2016 | Counseling | Access to Care | Schoonover, Amy | Verbalizes Understanding |

**Exhibit A**
**Attach. 8, p.5**

Inmate Name:  LEATH, JAMES
Date of Birth:                                    Sex:        M      Race:  BLACK          Reg #:      47208-066
Encounter Date: 06/01/2016 18:49              Provider:  Schoonover, Amy J RN      Facility:  LEW
                                                                                    Unit:      X03

**Copay Required:** No               **Cosign Required:** Yes
**Telephone/Verbal Order:**  Yes        **By:**  Pigos, Kevin MD/Clinical Director
**Telephone or Verbal order read back and verified.**

Completed by Schoonover, Amy J RN on 06/01/2016 19:24
Requested to be cosigned by  Pigos, Kevin MD/Clinical Director.
Cosign documentation will be displayed on the following page.

**Exhibit A**
**Attach. 8, p.6**

## Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | | Sex: | M | Race: | BLACK |
| Encounter Date: | 06/01/2016 18:49 | Provider: | Schoonover, Amy J RN | Facility: | LEW |

**Cosigned with New Encounter Note by Pigos, Kevin MD/Clinical Director on 06/02/2016 11:49.
Screenings have been acknowledged.**

Leath, James (MR # ███████)

DOB: ████████

USP Lewisburg   47208-060

**Patient Information**

| Patient Name | MRN | Gender | DOB (Age) |
|---|---|---|---|
| Leath, James | ████████ | Male | 50 year old) |

| Mark Alan Ubbens, CRNP | Certified Registered Nurse Practitioner | Signed | Trauma Surgery (GMCTRS) | Discharge Instructions | 06/01/16 1006 |

## DISCHARGE INSTRUCTIONS
### GMC-GEISINGER MEDICAL CENTER
100 North Academy Ave
Danville PA 17822

**Patient Name:** James Leath      **MRN:** ████████
**Discharge Date:** 6/1/16

---

**You may call the Department of Trauma Surgery at 570-271-7149 for questions or test results. For after-hours emergencies call 570-271-6211 and have your doctor paged.**

The information below provides you with the instructions and the list of medications you need to be taking following discharge from the hospital. If you have any questions, please ask before leaving. Please carry this letter with you when you see your doctor in the clinic. If you have questions, you can reach us at the numbers above.

**Brief summary of your inpatient care:** Mr. Leath was admitted on 5/30/16 after suffering from multiple traumatic injuries. Injuries included

Bilateral ruptured globe fractures
Bilateral intra/extra conal hemorrhage
Left medial orbital wall fracture
Tiny left sided apical pneumothorax
Medial right lower lobe pneumothorax
Bilateral pulmonary contusions
Right non-displaced rib fx 9-11

Mr. Leath was taken to the operating room where the following procedures were performed by Plastic surgery, Ophthalmology, and OMFS.

Repair of scleral laceration OS
Exploration and repair of complex conjunctival laceration OD
Repair of complex eyelid laceration left upper lid

It is recommended Mr. Leath follow-up with the psych program at the prison regarding his poor vision prognosis and the dental department regarding some discomfort he is experiencing in his teeth post-operatively. Since narcotics are limited at the prison, Tylenol #3 as directed by Prison health can be used for pain mgmt. He will need one week follow-up with ophthalmology on a day that the retina specialist is available. He will need a two week follow-up in trauma clinic with a repeat chest x-ray to evaluate his rib fractures.

8

**Exhibit A**
**Attach. 8, p.8**

Leath, James (MR # ███████)                                    DOB: ████████

## Future Geisinger Appointments

| Date | Time | Provider | Department |
|------|------|----------|------------|
| 6/27/2016 | 10:00 AM | Dana L Rubin, PA-C | Plastic Surgery, Danville |

There are no future non-Geisinger appointments scheduled at this time.

## Special Instructions:

### Wound Care Instructions for the Plastic Surgery Patient

1. While the stitches are still in place, keep the wound clean by washing with a liquid antibacterial soap (Dial, Safeguard, etc.). Should this be irritating to the skin, Dove soap can be used.

2. After washing the suture line(s), apply an antibiotic ointment (Bacitracin or Polysporin). Any of these ointments can cause irritation with prolonged use, so use them sparingly. Discontinue use when all areas have healed or when advised by your doctor.

3. All sutures are dissolvable and will take a couple weeks to completely dissolve.

4. Once the wound is healed, begin moisturizing the scar with Vitamin E oil, Cocoa Butter, or other doctor-recommended product to help soften the scar. This is massaged into the the scar twice daily for up to one year following your surgery.

5. If the scar is in an area exposed to sun (or tanning booth), protect it by applying a #15 or greater sun protection factor sunscreen for one full year following your surgery. A sunburn could potentially cause freckling or brown pigmentation of the scar.

6. If a rash or redness develops after the application of an ointment, moisturizer, or sunscreen product, stop using it. You could possibly be allergic to the product. If severe itching or a rash develops, please call our office.

7. If you have any questions about the appearance of your wound or need to review the information provided on this page, do not hesitate to contact us.
Our daytime office Monday - Friday: **570-271-6335**.
Evenings/weekends: **570-271-6211** and ask for Plastic Surgery.

## Do not smoke or use tobacco products in any way!

## Medications:
### Current Discharge Medication List

### START taking these medications

| | Details |
|---|---|
| briMONidine tartrate (ALPHAGAN) 0.2 % ophthalmic solution | Instill 1 Drop into the right eye 2 times a day. |
| erythromycin 5 MG/GM ophthalmic ointment | Instill into the left eye 4 times a day. Apply to the laceration of the left eyebrow |

**Exhibit A**
**Attach. 8, p.9**

Leath, James (MR # ██████)

DOB: ████████

| timolol (TIMOPTIC) 0.25 % ophthalmic solution | Instill 1 Drop into the right eye 2 times a day. |
| neomycin-polymyxin-dexameth (MAXITROL) 0.1 % ophthalmic ointment | Instill into the right eye 4 times a day. |
| neomycin-polymyxin-dexameth (MAXITROL) 0.1 % ophthalmic ointment | Instill into the left eye every 2 hours. |
| atropine sulfate 1 % OINT | Instill into the left eye 2 times a day. |
| acetaminophen 650 MG Tablet | Take 1 Tab by mouth every 6 hours as needed for Pain. |
| bacitracin zinc 500 UNIT/GM ointment | Apply topically to affected area 2 times a day. Apply to finger abrasions |
| docusate sodium 100 MG CAPS | Take 1 Cap by mouth every 12 hours. |
| senna (SENOKOT) Tablet | Take 2 Tabs by mouth every 12 hours. |
| amoxicillin-clavulanate (AUGMENTIN) 500-125 MG per tablet   875/125 mg | Take 1 Tab by mouth 3 times a day for 4 days. |

**STOP taking these medications**

NO KNOWN MEDICATIONS

If you feel suicidal or homicidal, please call the crisis hotline at 1-800-273-TALK (8255).

**Discharge Checklist:**

_____ I have my prescriptions.
_____ I was given medication instructions (if applicable).
_____ I have all of my personal belongings.
_____ I have my medications I brought from home (if applicable).

To understand how well we have prepared you (the Patient or Caregiver) for your discharge, can you answer the following teach-back questions?

1. _____ Why was I in the hospital?

Leath, James (MR # █████)

DOB: ████████

2. _____ What do I need to do to care for myself after discharge? (Example: diet, activity, follow up appointments, medications, when to call the doctor, etc.)

3. _____ Why is this important to my health?

**Acknowledgement:** I have had these instructions explained to me, was given a copy and had a chance to ask questions.

Patient Signature

_____

Date & Time:

_____

Nurse Signature

_____

Date & Time:

_____

**If the patient is unable to sign:**

Responsible Adult

_____

Date & Time:

_____

Relationship to Patient

_____

**\* PLEASE TAKE THIS FORM TO YOUR NEXT VISIT WITH YOUR PRIMARY CARE PHYSICIAN.**

**Have You Signed Up for MyGeisinger.org?**
To access portions of your medical record and to communicate with your Geisinger physicians electronically, logon to www.mygeisinger.org, your online health management tool.

Mark Alan Ubbens, CRNP
Certified Registered Nurse Practitioner
GMC-GEISINGER MEDICAL CENTER
06/01/16 1550

**Revision History**

**Chart Review Routing History**
No Routing History on File

**Exhibit A**
**Attach. 8, p.11**

## Bureau of Prisons
## Health Services
## Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | | Sex: | M | Race: | BLACK |
| Scanned Date: | 06/02/2016 07:25 EST | | | Facility: | LEW |

**Reviewed by Pigos, Kevin MD/Clinical Director on 06/02/2016 12:18.**

**Exhibit A**
**Attach. 8, p.12**

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: 47208-066 |
| Date of Birth: | | Sex: M Race: BLACK | | Facility: LEW |
| Encounter Date: 05/30/2016 21:08 | | Provider: Dees, S. NREMT-P | | Unit: J03 |

Injury Assessment - Non-work related encounter performed at Health Services.

**SUBJECTIVE:**

    **INJURY 1**    **Provider:**  Dees, S. NREMT-P

        **Date of Injury:**    05/30/2016 20:30      **Date Reported for Treatment:**    05/30/2016 21:08

        **Work Related:**    No        **Work Assignment:**    UNASSG

        **Pain Location:**

        **Pain Scale:**   Refused

        **Pain Qualities:**

        **Where Did Injury Happen (Be specific as to location):**

            J-Block Cell 316

        **Cause of Injury (Inmate's Statement of how injury occurred):**

            IM involved in an unwitnessed cell fight

        **Symptoms (as reported by inmate):**

            "I can't see!"

**OBJECTIVE:**

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 05/30/2016 | 22:12 LEW | 73 | Via Machine | Regular | Dees, S. NREMT-P |
| 05/30/2016 | 22:01 LEW | 75 | Via Machine | Regular | Dees, S. NREMT-P |
| 05/30/2016 | 21:51 LEW | 82 | Via Machine | Regular | Dees, S. NREMT-P |
| 05/30/2016 | 21:43 LEW | 89 | Via Machine | Regular | Dees, S. NREMT-P |
| 05/30/2016 | 21:33 LEW | 71 | Via Machine | Regular | Dees, S. NREMT-P |
| 05/30/2016 | 21:23 LEW | 82 | Via Machine | Regular | Dees, S. NREMT-P |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 05/30/2016 | 22:12 LEW | 16 | Dees, S. NREMT-P |
| 05/30/2016 | 22:01 LEW | 16 | Dees, S. NREMT-P |
| 05/30/2016 | 21:51 LEW | 16 | Dees, S. NREMT-P |
| 05/30/2016 | 21:43 LEW | 16 | Dees, S. NREMT-P |
| 05/30/2016 | 21:33 LEW | 16 | Dees, S. NREMT-P |
| 05/30/2016 | 21:23 LEW | 16 | Dees, S. NREMT-P |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 05/30/2016 | 22:12 LEW | 138/75 | Right Arm | Lying | | Dees, S. NREMT-P |
| 05/30/2016 | 22:01 LEW | 136/73 | Right Arm | Lying | | Dees, S. NREMT-P |
| 05/30/2016 | 21:51 LEW | 128/72 | Right Arm | Lying | | Dees, S. NREMT-P |
| 05/30/2016 | 21:43 LEW | 106/62 | Right Arm | Lying | | Dees, S. NREMT-P |
| 05/30/2016 | 21:33 LEW | 106/58 | Right Arm | Lying | | Dees, S. NREMT-P |

**Exhibit A**
**Attach. 8, p.13**

Inmate Name:  LEATH, JAMES
Date of Birth:
Encounter Date: 05/30/2016 21:08

Sex:      M    Race:  BLACK
Provider:  Dees, S. NREMT-P

Reg #:   47208-066
Facility:  LEW
Unit:      J03

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|------|------|-------|----------|----------|-----------|----------|
| 05/30/2016 | 21:23 LEW | 101/66 | Right Arm | Sitting | | Dees, S. NREMT-P |

**Exam:**

**General**

**Affect**

Yes: Irritable

No: Cooperative

**Appearance**

Yes: Appears Distressed, Alert and Oriented x 3

**Eyes**

**Periorbital/Orbital/Lids**

Yes: Deformity, Edema/Swelling, Periorbital Edema, Swelling, Tenderness to Palpation, Trauma, Laceration(s)

**Ears**

**External Ear**

Yes: Tenderness to Palpation, Trauma

**Face**

**General**

Yes: Swelling, Periorbital Edema, Tenderness, Trauma, Laceration

No: Deformity

**Sinus/Maxilla**

Yes: Non-Tender to Palpation

**Musculoskeletal**

**Wrist/Hand/Fingers**

Yes: Tenderness, Trauma

**Comments**

IM is noted to be missing the upper cartilage on both ears.
IM is noted to have a laceration to his left eyelid.
IM is noted to have trauma to the cornea of his left eye.  IM relays that he cannot see out of his eye.
IM is noted to have a lateral gaze with his right eye.  IM relays that he cannot see out of this eye.
IM is noted to have an abrasion to his upper forehead.
IM is noted to have trauma to the inside of his upper lip.
IM is noted to have a bite mark on his right thumb.
IM is noted to be missing the pad on his right middle finger.
IM is noted to have a bruise forming over his left clavicle.
IM is noted to have a bruise forming on the upper medial aspect of his right bicep.
IM is noted to have an abrasion to his right first knuckle.
IM is noted to have an abrasion over his left shoulder blade.

**ASSESSMENT:**

Bite-Animal or Human

Requested to report to J-block 3rd floor. Arrived to find IM being restrained and escorted from the cell. IM is noted to be alert and oriented. IM is noted to have significant periorbital swelling. IM escorted to Urgent Care Room. IM is noted to ambulate without difficulty.  IM is noted to be missing the upper cartilage on both ears.  IM is noted to have a laceration to his left eyelid.  IM is noted to have trauma to the cornea of his left eye.  IM relays that he cannot see out of his eye. IM is noted to have a lateral gaze with his right eye.  IM relays that he cannot see out of this eye. IM is noted to have an abrasion to his upper forehead.  IM is noted to have trauma to the inside of his upper lip.  Septum is stable to palpation. IM is noted to have a bite mark on his right thumb.  IM is noted to be missing the pad on his right middle finger.  IM is noted to have a bruise forming over his left clavicle.  IM is noted to have a bruise forming on the upper medial aspect of his right bicep.  IM is noted to have an abrasion to his right first knuckle.  IM is noted to have an abrasion over his left shoulder blade.  Gauze applied to ears to attempt to stop the bleeding.  18g IV established left forearm.  Good flash

Generated 05/30/2016 23:45 by Dees, S. NREMT-P          Bureau of Prisons - LEW                     Page 2 of 3

14

**Exhibit A**
**Attach. 8, p.14**

| Inmate Name:   LEATH, JAMES | | | | Reg #:   47208-066 |
| Date of Birth: ▊▊▊▊▊▊ | Sex:      M     Race:  BLACK | | | Facility:  LEW |
| Encounter Date:  05/30/2016 21:08 | Provider:  Dees, S. NREMT-P | | | Unit:      J03 |

noted. Site secured with tegaderm and tape. IM given a total of 700cc of fluid through out contact. IM concerned that he cannot see. Reassurance given. Consulted with Dr. Pigos who requested that the IM be sent to GMC for trauma. IM denies neck or back pain. IM placed on oxygen via NRB at 15 LPM throughout patient contact. Patient care and report given to ALS provider upon arrival.

**PLAN:**

**Disposition:**

Transfer to Local Hospital

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 05/30/2016 | Counseling | Plan of Care | Dees, S. | No Participation |

**Copay Required:** No
**Telephone/Verbal Order:** No
**Cosign Required:** Yes

Completed by Dees, S. NREMT-P on 05/30/2016 23:45
Requested to be cosigned by  Pigos, Kevin MD/Clinical Director.
Cosign documentation will be displayed on the following page.

15

**Exhibit A**
**Attach. 8, p.15**

```
ALMG2 531.01 *              INMATE HISTORY            *    09-06-2
PAGE 001        *              ADM-REL               *    11:32:0
```

**DEFENDANT EXHIBIT**

**Attach. 9**

```
REG NO..: 47208-066 NAME....: LEATH, JAMES
CATEGORY: ARS     FUNCTION: PRT      FORMAT:
```

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|-----------|-------------|-----------------|----------------|
| COP | A-DES | DESIGNATED, AT ASSIGNED FACIL | 08-24-2017 1306 | CURRENT |
| B03 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 08-24-2017 1306 | 08-24-2017 1306 |
| B03 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 08-24-2017 0530 | 08-24-2017 1306 |
| ATL | HLD REMOVE | HOLDOVER REMOVED | 08-24-2017 0530 | 08-24-2017 0530 |
| ATL | A-BOP HLD | HOLDOVER FOR INST TO INST TRF | 08-17-2017 1753 | 08-24-2017 0530 |
| B02 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 08-17-2017 1753 | 08-17-2017 1753 |
| B02 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 08-17-2017 1032 | 08-17-2017 1753 |
| ATL | ADMIN REL | ADMINISTRATIVE RELEASE | 08-17-2017 1032 | 08-17-2017 1032 |
| ATL | A-ADMIN | ADMINISTRATIVE ADMISSION | 08-17-2017 1018 | 08-17-2017 1032 |
| B02 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 08-17-2017 1018 | 08-17-2017 1018 |
| B02 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 08-17-2017 0907 | 08-17-2017 1018 |
| BSY | TRANSFER | TRANSFER | 08-17-2017 0907 | 08-17-2017 0907 |
| BSY | A-DES | DESIGNATED, AT ASSIGNED FACIL | 05-25-2017 1328 | 08-17-2017 0907 |
| BSY | LOCAL HOSP | ESC TRIP TO LOCAL HOSP W/RETN | 05-25-2017 1010 | 05-25-2017 1328 |
| BSY | A-DES | DESIGNATED, AT ASSIGNED FACIL | 04-07-2017 1148 | 05-25-2017 1010 |
| BSY | LOCAL HOSP | ESC TRIP TO LOCAL HOSP W/RETN | 04-07-2017 0737 | 04-07-2017 1148 |
| BSY | A-DES | DESIGNATED, AT ASSIGNED FACIL | 03-01-2017 1337 | 04-07-2017 0737 |
| B02 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 03-01-2017 1337 | 03-01-2017 1337 |
| B02 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 03-01-2017 0600 | 03-01-2017 1337 |
| ATL | HLD REMOVE | HOLDOVER REMOVED | 03-01-2017 0600 | 03-01-2017 0600 |
| ATL | A-BOP HLD | HOLDOVER FOR INST TO INST TRF | 02-08-2017 1300 | 03-01-2017 0600 |
| A03 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 02-08-2017 1300 | 02-08-2017 1300 |
| A03 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 02-08-2017 1018 | 02-08-2017 1300 |
| ATL | ADMIN REL | ADMINISTRATIVE RELEASE | 02-08-2017 1018 | 02-08-2017 1018 |
| ATL | A-ADMIN | ADMINISTRATIVE ADMISSION | 02-08-2017 0941 | 02-08-2017 1018 |
| A03 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 02-08-2017 0941 | 02-08-2017 0941 |
| A03 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 02-08-2017 0830 | 02-08-2017 0941 |
| OKL | HLD REMOVE | HOLDOVER REMOVED | 02-08-2017 0730 | 02-08-2017 0730 |
| OKL | A-BOP HLD | HOLDOVER FOR INST TO INST TRF | 01-30-2017 1645 | 02-08-2017 0730 |
| A01 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 01-30-2017 1745 | 01-30-2017 1745 |
| A01 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 01-30-2017 0518 | 01-30-2017 1745 |
| ALP | TRANSFER | TRANSFER | 01-30-2017 0518 | 01-30-2017 0518 |
| ALP | A-DES | DESIGNATED, AT ASSIGNED FACIL | 09-16-2016 1507 | 01-30-2017 0518 |
| ALP | LOCAL HOSP | ESC TRIP TO LOCAL HOSP W/RETN | 09-16-2016 1201 | 09-16-2016 1507 |
| ALP | A-DES | DESIGNATED, AT ASSIGNED FACIL | 07-20-2016 1150 | 09-16-2016 1201 |
| B01 | RELEASE | RELEASED FROM IN-TRANSIT FACL | 07-20-2016 1150 | 07-20-2016 1150 |
| B01 | A-ADMIT | ADMITTED TO AN IN-TRANSIT FACL | 07-20-2016 1115 | 07-20-2016 1150 |
| LEW | TRANSFER | TRANSFER | 07-20-2016 1115 | 07-20-2016 1115 |
| LEW | A-DES | DESIGNATED, AT ASSIGNED FACIL | 07-15-2016 1122 | 07-20-2016 1115 |
| LEW | LOCAL HOSP | ESC TRIP TO LOCAL HOSP W/RETN | 07-15-2016 0802 | 07-15-2016 1122 |
| LEW | A-DES | DESIGNATED, AT ASSIGNED FACIL | 06-28-2016 1206 | 07-15-2016 0802 |

```
G0002       MORE PAGES TO FOLLOW . . .
```

**Exhibit A**
**Attach. 9, p.1**

```
ALMG2  531.01 *            INMATE HISTORY           *     09-06-2017
PAGE 002 OF 002 *            ADM-REL                *     11:32:02

REG NO..: 47208-066 NAME....: LEATH, JAMES
CATEGORY: ARS        FUNCTION: PRT        FORMAT:

FCL    ASSIGNMENT  DESCRIPTION                      START DATE/TIME STOP  DATE/TIME
LEW    LOCAL HOSP  ESC TRIP TO LOCAL HOSP W/RETN    06-28-2016 0906 06-28-2016 1206
LEW    A-DES       DESIGNATED, AT ASSIGNED FACIL    06-01-2016 1812 06-28-2016 0906
LEW    LOCAL HOSP  ESC TRIP TO LOCAL HOSP W/RETN    05-30-2016 2227 06-01-2016 1812
LEW    A-DES       DESIGNATED, AT ASSIGNED FACIL    10-05-2015 1430 05-30-2016 2227
A01    RELEASE     RELEASED FROM IN-TRANSIT FACL    10-05-2015 1430 10-05-2015 1430
A01    A-ADMIT     ADMITTED TO AN IN-TRANSIT FACL   10-05-2015 0606 10-05-2015 1430
CAA    TRANSFER    TRANSFER                         10-05-2015 0606 10-05-2015 0606
CAA    A-DES       DESIGNATED, AT ASSIGNED FACIL    10-27-2014 1010 10-05-2015 0606
9-L    RELEASE     RELEASED FROM IN-TRANSIT FACL    10-27-2014 1010 10-27-2014 1010
9-L    A-ADMIT     ADMITTED TO AN IN-TRANSIT FACL   10-08-2014 1636 10-27-2014 1010
DSC    ADMIN REL   ADMINISTRATIVE RELEASE           10-08-2014 1536 10-08-2014 1536
DSC    A-ADMIN     ADMINISTRATIVE ADMISSION         10-08-2014 1505 10-08-2014 1536
SCH    PRE REMOVE  PRE SENT DETAINEE REMOVED        01-25-1994 1329 10-08-2014 1505
SCH    A-PRE       PRE-SENTENCE ADMISSION           11-16-1993 1142 01-25-1994 1329
FAI    PRE REMOVE  PRE SENT DETAINEE REMOVED        11-16-1993 0734 11-16-1993 1142
FAI    A-PRE       PRE-SENTENCE ADMISSION           11-09-1993 1840 11-16-1993 0734
FAI    PRE REMOVE  PRE SENT DETAINEE REMOVED        11-09-1993 0746 11-09-1993 1840
FAI    A-PRE       PRE-SENTENCE ADMISSION           09-24-1993 1835 11-09-1993 0746
FAI    COURT       COURT APPEARANCE W/SCHED RETRN   09-24-1993 0740 09-24-1993 1835
FAI    A-PRE       PRE-SENTENCE ADMISSION           09-21-1993 1932 09-24-1993 0740
FAI    COURT       COURT APPEARANCE W/SCHED RETRN   09-21-1993 0727 09-21-1993 1932
FAI    A-PRE       PRE-SENTENCE ADMISSION           09-17-1993 1436 09-21-1993 0727




G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

**Exhibit A**
**Attach. 9, p.2**

## Bureau of Prisons
## Psychology Services
## Intake Screening

**SENSITIVE

DEFENDANT
EXHIBIT

Attach. 10

| | | | | |
|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: 47208-0€9 |
| Date of Birth: | | Sex: M | Facility: COP | Unit Team: E/F |
| Date: | 08/31/2017 12:45 | Provider: Armstrong, Kelly PsyD | | |

### Limits of Confidentiality

Limits of confidentiality were reviewed with inmate LEATH.  He expressed an understanding of the limits of confidentiality and consented to be interviewed accordingly.

### Data Source(s)

The following data sources were reviewed in conjunction with this Initial Intake Evaluation: Self-Report, SENTRY, Staff Observation, Other.
    PSIQ, BEMR-PDS

### Mental Health History and Current Symptoms

No history of mental health issues was noted.

No history of prior mental health treatment was noted.

No current mental health symptoms were noted.

No suicidal ideation, attempts, or self-harm were noted.

### Substance Abuse

No history of substance abuse was noted.

No history of substance abuse treatment was noted.

### Sex Offenses

No sexual offense convictions were noted.

No history of sexual predation in a correctional setting was noted.

### Relevant Psychosocial History

Noteworthy psychosocial issues: Criminal History, Other.
    Per SENTRY: Currently serving LIFE sentence for "CONSPIRACY TO DISTRIBUTE COCAINE BASE" and "91-SHOT LEO DURING TRFK STOP/PAROLED FRM STATE."

LEATH denied a history of sexual misconduct toward staff and available records corroborate his report. Regardless, LEATH was reminded FCC Coleman has a zero tolerance for inmate sexual misconduct toward staff. Inmate LEATH was informed of the Prison Sexual Abuse/Sexual Assault Prevention Program. He denied a history of sexual victimization or predation during incarceration. As of this date, there is no evidence that LEATH has threatened or attempted sexual abuse/assault during his incarceration. Neither records nor reports provide any information that would warrant concern about his risk for victimization or potential for abusiveness. He did not endorse any current concerns regarding adjustment or concerns for his safety. He indicated he is aware of how to seek staff assistance should he feel Protective Custody is necessary, but he does not feel it is warranted at this time.

### Adjustment to Incarceration

No adjustment to incarceration concerns.

### Findings

Care Level:    CARE1-MH
LEATH appeared alert and oriented to all spheres. He presented appropriately dressed in the standard inmate issued uniform, and grooming and hygiene were within normal limits. His affect was appropriate and congruent to mood. Recent and remote memory appeared intact. Insight and judgment were adequate. He maintained an appropriate level of eye contact throughout the interview. His speech was normal in rate and tone, and his thoughts were logical, coherent, and goal directed. He denied hallucinations and did not appear to be responding to internal stimuli during this interview. There were no clinical indications of acute psychosis or a formal thought disorder. He denied current suicidal ideation, plan, or intent. He denied current symptoms of mental illness and did not appear to be in acute distress. He reported that his activities of daily living are currently within normal limits. He does not currently have a diagnosis, nor is he currently prescribed psychotropic medication. LEATH denied in interest in follow-up services.

Given his current stability and denial for services, he meets the criteria for a Care1-MH assignment. No follow-up is warranted at this time. Procedures for contacting Psychology Services for both routine and emergency situations were reviewed with the

Exhibit A
Attach. 10, p.1

| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
|---|---|---|---|---|---|
| Date of Birth: | ▮▮▮▮▮ | Sex: M | Facility: COP | Unit Team: | E/F |
| Date: | 08/31/2017 12:45 | Provider: Armstrong, Kelly PsyD | | | |

inmate. He acknowledged understanding of them and agreed to utilize them, as needed.

**Recommendations**

No psychological services are recommended at this time.

Completed by Armstrong, Kelly PsyD on 09/09/2017 10:22

**Reviewed by Ramos Santiago, Iris PhD/Deputy Chief Psychologist on 09/12/2017 09:16**

**Exhibit A
Attach. 10, p.2**

# Bureau of Prisons
# Psychology Services
# SHU Review

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| Inmate Name: | LEATH, JAMES | | | | Reg #: | 47208-066 |
|---|---|---|---|---|---|---|
| Date of Birth: | ▮▮▮▮▮ | **Sex:** | M | **Facility** BSY | **Unit Team:** | B UNIT |
| Date: | 08/16/2017 12:54 | **Provider:** | Olive, Brandon PhD | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 08/06/2017 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

### Comments

A 30-day SHU Review was conducted on this date in the USP - Big Sandy special housing unit (SHU). Inmate LEATH was provided an opportunity to consult with a psychologist for mental health concerns, and no complaints or acute issues were reported or observed. No additional information was provided by SHU staff to suggest the presence of any psychological symptoms or other mental health concerns not specifically referenced elsewhere in the inmate's file. Consequently, there appear to be no acute mental health problems requiring immediate psychological intervention. Inmate LEATH will continue to be seen regularly by Psychology during rounds in SHU. He was advised of how to contact Psychology Services in the meantime if needed. No further intervention appeared warranted at this time.

Completed by Olive, Brandon PhD on 08/16/2017 13:18

**Exhibit A**
**Attach. 10, p.3**

# Bureau of Prisons
# Psychology Services
# SHU Review

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ▊▊▊▊ | **Sex:** | M | **Facility** BSY | **Unit Team:** | B UNIT |
| **Date:** | 07/21/2017 15:41 | **Provider:** | Olive, Brandon PhD | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 07/17/2017 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

### Comments

A 30-day SHU Review was conducted on this date in the USP - Big Sandy special housing unit (SHU). Inmate LEATH was provided an opportunity to consult with a psychologist for mental health concerns, and no complaints or acute issues were reported or observed. No additional information was provided by SHU staff to suggest the presence of any psychological symptoms or other mental health concerns not specifically referenced elsewhere in the inmate's file. Consequently, there appear to be no acute mental health problems requiring immediate psychological intervention. Inmate LEATH will continue to be seen regularly by Psychology during rounds in SHU. He was advised of how to contact Psychology Services in the meantime if needed. No further intervention appeared warranted at this time.

Completed by Olive, Brandon PhD on 07/21/2017 15:53

**Exhibit A**
**Attach. 10, p.4**

**Bureau of Prisons**
**Psychology Services**
**SHU Review**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ▓▓▓▓▓▓ | **Sex:** | M | **Facility** BSY | **Unit Team:** | B UNIT |
| **Date:** | 06/28/2017 16:12 | **Provider:** | Olive, Brandon PhD | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 06/26/2017 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

### Comments

A 30-day SHU Review was conducted on this date in the USP - Big Sandy special housing unit (SHU). Inmate LEATH was provided an opportunity to consult with a psychologist for mental health concerns, and no complaints or acute issues were reported or observed. No additional information was provided by SHU staff to suggest the presence of any psychological symptoms or other mental health concerns not specifically referenced elsewhere in the inmate's file. Consequently, there appear to be no acute mental health problems requiring immediate psychological intervention. Inmate LEATH will continue to be seen regularly by Psychology Services during weekly SHU rounds. The inmate was also advised of how to contact Psychology Services for emerging urgent or non-urgent mental health issues, if needed. No further clinical intervention appears to be warranted at this time.

Completed by Olive, Brandon PhD on 06/28/2017 16:43

**Exhibit A**
**Attach. 10, p.5**

# Bureau of Prisons
# Psychology Services
## Protective Custody Review

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | ▮▮▮▮▮▮ | Sex: | M   Facility:  BSY | Unit Team: | B UNIT |
| Date: | 06/27/2017 12:10 | Provider: | LeFever, Mollie PsyD/Chief | | |

## Reason for Placement

Inmate LEATH was placed in protective custody status per his request for protection when threatened on the compound on 06-27-2017. The inmate was screened by Psychology Services on 06-27-2017. The contact assessed whether mental health services might be warranted for this inmate based on his past and current level of institutional adjustment in response to his placement into protective custody.

## Mental Status

Inmate XXXX was alert and oriented and demonstrated no sign of fatigue. He was dressed and groomed appropriately. Speech was normal in rate, rhythm, and tone. Eye contact was maintained throughout the encounter. No evidence of psychomotor agitation or retardation was observed. He presented as polite and cooperative with this writer. Thought content was logical and goal-oriented. Perceptual disturbances were denied and delusions were not elicited. Mood was unremarkable with consistent affect. He denied suicidal/homicidal ideation, intent, and plan. Insight and judgment presented as fair.

## Mental Health History

A review of available psychological records reveals the inmate has no history of significant mental health issues.

## Comments

At the time of the interview no special recommendations are warranted. Sound correctional principles and practices should be applied in the management of this inmate unless there are changes in his overall functioning warranting re-assessment and/or additional psychological interventions. For the duration of his time housed in SHU he will have access to mental health services as needed.

## Recommendations

At the time of the interview his level of psychological adjustment is viewed as satisfactory.  Therefore, current assignment to the Special Housing Unit relative to protective custody does not appear to be adversely impacting the inmate. It is recommended he participate in SHU self-study programming and advised how to request such materials. It is always good practice to avoid a single cell scenario, particularly with inmates in Protective Custody. Therefore, the SHU Lt was notified and it was recommended the inmate be housed with a cellmate.

Completed by LeFever, Mollie PsyD/Chief Psychologist on 06/27/2017 12:11

**Exhibit A**
**Attach. 10, p.6**

**Bureau of Prisons**                                        **\*\*SENSITIVE BUT UNCLASSIFIED\*\***
**Psychology Services**
**Transfer Intake Screening**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | | Sex: | M | Unit Team: | B UNIT |
| Date: | 03/01/2017 09:24 | Provider: | LeFever, Mollie PsyD/Chief | | |

Facility:  BSY

Date of Intrasystem Transfer:   03/01/2017        Transfered From:   ALX--ALLENWOOD FCC

| | | |
|---|---|---|
| **1.  Review of Inmate's PSIQ indicates that an in-person interview is clinically indicated?** | | No |
| **2.  Review of Inmate's MENTAL HEALTH record indicates that an in-person interview is clinically indicated?** | | No |
| **3.  Review of Inmate's SENTRY record indicates that an in-person interview is clinically indicated?** | | No |
| **4.  Is there any other information which indicates current need or request for Psychological Services?** | | No |

**Summary**

After a review of the PSIQ, mental health, and SENTRY data, no clinical indications are present which warrant a clinical interview.  The Inmate Handbook contains information concerning Psychology Services and the inmate will attend an Admission and Orientation session where Psychology Services will be reviewed.

Completed by LeFever, Mollie PsyD/Chief Psychologist on 03/17/2017 09:25

**Exhibit A**
**Attach. 10, p.7**

# Bureau of Prisons
# Psychology Services
# SHU Review

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ▮▮▮▮▮▮ | **Sex:** | M | **Facility** ALP | **Unit Team:** | I |
| **Date:** | 01/20/2017 09:45 | **Provider:** | Seymour, Colin Psych Intern | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 01/15/2017 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

### Comments

The inmate has reported no mental health concerns and SHU staff have reported no observed mental health problems or issues with this inmate.  Continue to see through 30-day SHU Review process or individually upon request/referral.

Completed by Seymour, Colin Psych Intern on 01/20/2017 09:45

**Reviewed by Mitchell, John PsyD/Chief Psychologist on 01/25/2017 15:26**

**Exhibit A**
**Attach. 10, p.8**

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

# Bureau of Prisons
## Psychology Services
### SHU Review

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ███████ | **Sex:** | M | **Facility** ALP | **Unit Team:** | I |
| **Date:** | 12/23/2016 10:10 | **Provider:** | Seymour, Colin Psych Intern | | | |

| | | | |
|---|---|---|---|
| **Placed in SHU:** | 12/04/2016 | **Type:** | SHU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

**Comments**

The inmate has reported no mental health concerns and SHU staff have reported no observed mental health problems or issues with this inmate. Continue to see through 30-day SHU Review process or individually upon request/referral.

Completed by Seymour, Colin Psych Intern on 12/23/2016 10:10

**Reviewed by Gemberling, A. PsyD on 12/23/2016 12:30**

**Exhibit A
Attach. 10, p.9**

# Bureau of Prisons
# Psychology Services
# Group Participation

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | |
|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | **Reg #:** 47208-066 |
| **Date of Birth:** | | **Sex:** M | **Facilitator:** (P)Klembara, Tara DTS | |
| **Date:** 08/30/2016 | | **Group Facility:** ALP | **Group Title:** [382] Tuesday 8:30 08/30/2016 | |

**Status:** Expulsion
**Enroll Date:** 08/30/2016   **End Date:** 10/25/2016
**Total Hours:** 0

## SESSION DATA:

**Number of Sessions:** 7     **First Session Date:** 09/08/2016     **Last Session Date:** 10/18/2016

| Date | Title | Duration | Attendance | Participation | Homework |
|---|---|---|---|---|---|
| 10/18/2016 | Staff on AL | 0 | Incomplete Session | Not Apply | Not Apply |
| 10/12/2016 | Staff Recall No 830/930 Moves | 0 | Incomplete Session | Not Apply | Not Apply |
| 10/11/2016 | Adverse Weather | 0 | Incomplete Session | Not Apply | Not Apply |
| 09/27/2016 | Facilities Working on Fire Alarm in Department | 0 | Incomplete Session | Not Apply | Not Apply |
| 09/20/2016 | Adverse Weather | 0 | Incomplete Session | Not Apply | Not Apply |
| 09/13/2016 | Institutional Recall 8:30 AM | 0 | Incomplete Session | Not Apply | Not Apply |
| 09/08/2016 | Staff Recall/Adverse Weather | 0 | Incomplete Session | Not Apply | Not Apply |

| Attendance | | Participation | | Homework | |
|---|---|---|---|---|---|
| Complete Session Present | 0.0 % | Good | 0.0 % | Not Apply | 100.0 % |
| Incomplete Session Excused | 100.0 % | Fair | 0.0 % | Satisfactory | 0.0 % |
| Incomplete Session Not Excused | 0.0 % | Poor | 0.0 % | Unsatisfactory | 0.0 % |
| Absent Excused | 0.0 % | Not Apply | 100.0 % | | |
| Absent Not Excused | 0.0 % | | | | |

## COMMENTS:

| Date | Provider |
|---|---|
| 10/25/2016 | Klembara, Tara DTS |

Inmate failed to show for callouts on 09/26/2016 and 10/25/2016.

**Exhibit A**
**Attach. 10, p.10**

**Bureau of Prisons**                           **\*\*SENSITIVE BUT UNCLASSIFIED\*\***
**Psychology Services**
**Transfer Intake Screening**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | ▮▮▮▮▮ | Sex: | M        Facility: ALP | Unit Team: | I |
| Date: | 08/03/2016 14:33 | Provider: | McCain, Tiffiny PsyD | | |

Date of Intrasystem Transfer:   07/20/2016        Transfered From:   LEW--LEWISBURG USP

**1. Review of Inmate's PSIQ indicates that an in-person interview is clinically indicated?**   No

**2. Review of Inmate's MENTAL HEALTH record indicates that an in-person interview is clinically indicated?**   No

**3. Review of Inmate's SENTRY record indicates that an in-person interview is clinically indicated?**   No

**4. Is there any other information which indicates current need or request for Psychological Services?**   No

**Summary**

   After a review of the PSIQ, mental health, and SENTRY data, no clinical indications are present which warrant a clinical interview.  The Inmate Handbook contains information concerning Psychology Services and the inmate will attend an Admission and Orientation session where Psychology Services will be reviewed.

Completed by McCain, Tiffiny PsyD on 08/03/2016 14:34

**Exhibit A**
**Attach. 10, p.11**

## Bureau of Prisons
## Psychology Services
## Clinical Intervention - Clinical Contact

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | ███████ | Sex: | M    Facility:  LEW | Unit Team: | X-BLOCK |
| Date: | 07/13/2016 14:12 | Provider: | McCrea, Sheila PsyD | | |

**Focus of Session**

Inmate LEATH was seen today after he requested to be pulled out of his cell to speak to psychology during rounds yesterday.

**Subjective/Objective Presentation**

Subjective: Inmate LEATH reported that he is feeling particularly stressed due to his recent injury and the impact on his eyesight, as well as recent issues with his son.

Objective: Inmate LEATH is a 50-year old, BLACK male, who was alert and oriented. Hygiene and the conditions of his cell were appropriate. Speech was normal in rate, rhythm, and tone. Eye contact was maintained throughout the encounter without marked disturbance. No evidence of psychomotor agitation or retardation was observed. He presented as polite and cooperative with this writer. Speech and thought processes were coherent, logical, and goal directed. Attention and concentration appeared to be within normal limits. Inmate LEATH demonstrated no obvious impairments in memory. No overt symptoms of psychosis were observed, reported, or suspected. Mood was euthymic with full, unrestricted range of affect. He did not endorse suicidal/homicidal ideation, plan, or intent.

**Intervention(s)**

Inmate LEATH described how his and his son's situations have impacted his stress level and admitted that he does not know how to deal with the increase.  He was open to offered suggestions and interventions and agreed to receive materials to further help with stress.  He indicated that he is able to read, although it hurts his good eye at times.  The materials being sent to him (10 Relaxation Techniques that Zap Stress Fast and How to Deal with Stress) have been modified to a much larger font to make the reading easier for him.

**Progress/Plan**

Inmate LEATH will continue to be seen during routine rounds and for SMU Reviews.  He agreed to check in regarding the provided materials during rounds next week. He was made aware of how to contact Psychology Services.

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by McCrea, Sheila PsyD on 07/13/2016 14:17

**Reviewed by Sage, Jessica PsyD/Chief Psychologist on 07/13/2016 15:43**

**Exhibit A
Attach. 10, p.12**

# Bureau of Prisons
# Psychology Services
# SMU Review

**SENSITIVE BUT UNCLASSIFIED**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ▮▮▮▮▮ | **Sex:** | M | **Facility** LEW | **Unit Team:** | X-BLOCK |
| **Date:** | 07/12/2016 13:43 | **Provider:** | McCrea, Sheila PsyD | | | |

| | | | |
|---|---|---|---|
| **Placed in SMU:** | 06/15/2016 | **Type:** | SMU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Low |

### Comments

Inmate LEATH has been designated for placement in the Special Management Unit. In accordance with Program Statement 5217.01, Special Management Units, a psychological review was conducted. LEATH was offered the opportunity to speak with Psychology Services on this date. Other staff members and/or available records were consulted as necessary and appropriate.

The findings of this review are:

MENTAL STATUS: Current mental status, emotional expression, and behavior do not suggest significant mental health problems.  Inmate Leath requested to speak with his case manager and to be pulled out of his cell to speak with psychology.  He will be pulled out tomorrow.

ADJUSTMENT: Based on available information, current adjustment to Special Management Unit appears to be SATISFACTORY.

THREAT TO SELF: Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, existing conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS: Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, existing conditions, and other information available at the time of the review, the current potential for harm to others is judged to be MODERATE.

Significant mental health concerns were not evident in this review.  He will continue to be seen during routine rounds and as needed.

Completed by McCrea, Sheila PsyD on 07/13/2016 14:12

**Reviewed by Sage, Jessica PsyD/Chief Psychologist on 07/13/2016 15:42**

**Exhibit A
Attach. 10, p.13**

# Bureau of Prisons
# Psychology Services
# SMU Review

**\*\*SENSITIVE BUT UNCLASSIFIED\*\***

| | | | | | | |
|---|---|---|---|---|---|---|
| **Inmate Name:** | LEATH, JAMES | | | | **Reg #:** | 47208-066 |
| **Date of Birth:** | ▮▮▮▮▮ | **Sex:** | M | **Facility** LEW | **Unit Team:** | X-BLOCK |
| **Date:** | 06/15/2016 11:32 | **Provider:** | Eigenbrode, Rachel PsyD | | | |

| | | | |
|---|---|---|---|
| **Placed in SMU:** | 10/05/2015 | **Type:** | SMU |
| **Status:** | ADMIN.DETENTION | **Threat to Self:** | Low |
| **Basis of Review:** | Inmate was interviewed | **Adjustment:** | Satisfactory, segregation not detrimental |
| **Mental Status:** | No significant mental health issues. | **Threat to Others:** | Moderate |

## Comments

Inmate LEATH has been designated for placement in the Special Management Unit. In accordance with Program Statement 5217.01, Special Management Units, a psychological review was conducted. LEATH was offered the opportunity to speak with Psychology Services on this date. Other staff members and/or available records were consulted as necessary and appropriate.

The findings of this review are:

MENTAL STATUS: Current mental status, emotional expression, and behavior do not suggest significant mental health problems.

ADJUSTMENT: Based on available information, current adjustment to Special Management Unit appears to be SATISFACTORY.

THREAT TO SELF: Precise prediction of self-injurious behavior is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, existing conditions, and other information available at the time of the review, the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS: Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change. Based on the inmate's history, existing conditions, and other information available at the time of the review, the current potential for harm to others is judged to be MODERATE.

Significant mental health concerns were not evident in this review.  He will continue to be seen during routine rounds and as needed.

Completed by Eigenbrode, Rachel PsyD on 06/22/2016 12:38

**Drafted by Bohner, Rebekah Psychology Contractor**

**Exhibit A**
**Attach. 10, p.14**

**Bureau of Prisons**          **SENSITIVE BUT UNCLASSIFIED**
**Psychology Services**
**Clinical Intervention - Clinical Contact**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | LEATH, JAMES | | | Reg #: | 47208-066 |
| Date of Birth: | ▮▮▮▮▮ | Sex: | M | Facility: LEW | Unit Team: X-BLOCK |
| Date: | 06/02/2016 13:05 | Provider: | McCrea, Sheila PsyD | | |

**Focus of Session**

Inmate Leath was seen in urgent care today following his return from the hospital after a fight with his cell mate, to assess psychological status and treatment needs.

**Subjective/Objective Presentation**

Inmate Leath was seen in the urgent care room after his return from the hospital. He presented as calm and cooperative and stated that he was doing "as good as I can" at the moment. He indicated some concern with his vision, particularly in being able to shower properly and what cell he would be placed in. He also stated that he wanted to speak with his family to ensure that his medical needs were being treated appropriately. He was referred to his unit case manager to request a phone call for this reason. He adamantly denied any suicidal ideation and indicated that he did not need anything from psychology at this time.

MSE: Inmate LEATH is a 50-year old BLACK male who appeared his chronological age. He was alert and oriented times three and demonstrated no sign of fatigue. He was dressed appropriately and grooming appeared well kept as possible. Speech was normal in rate, rhythm, and tone. No evidence of psychomotor agitation or retardation was observed. He presented as polite and cooperative with this writer. Thought process was linear and logical while content was goal directed. Attention and concentration appear to be within normal limits. Inmate LEATH demonstrated no obvious impairments in memory. Perceptual disturbances were denied and delusions were not elicited. Mood was euthymic with full, unrestricted range of affect. He denied suicidal/homicidal ideation, plan, or intent. Insight and judgment presented as limited.

A review of records shows that Inmate Leath has no mental health history either prior to or during his incarceration. He is designated as a Care 1 - MH inmate and has no psychiatric diagnosis.

**Intervention(s)**

As noted, Inmate Leath denied the need for any psychological services at this time. He was referred to the appropriate staff for the concerns that he expressed regarding a phone call to his family and adequate cell accommodations.

**Progress/Plan**

A formal follow-up is not required at this time. Inmate LEATH will continue to be seen during routine rounds and for SMU Reviews. He was made aware of how to contact Psychology Services should the need arise.

**Diagnosis:**

No Diagnosis, No Dx - Current

Completed by McCrea, Sheila PsyD on 06/02/2016 13:29

**Reviewed by Sage, Jessica PsyD/Chief Psychologist on 06/03/2016 11:00**

**Exhibit A**
**Attach. 10, p.15**

BP-A0304
AUG 11

**DISCIPLINE HEARING OFFICER REPORT**   CDFRM

**U.S. DEPARTMENT OF JUSTICE**                         **FEDERAL BUREAU**

DEFENDANT
EXHIBIT

**Attach. 11**

| | |
|---|---|
| Institution: USP, Lewisburg | Incident Report Number:  2856472 |

| | | |
|---|---|---|
| NAME OF INMATE:  LEATH, James | REG.NO.:  47208-066 | UNIT:  X-Block |

Date of Incident Report:  5-30-2016        Offense Code:  201

Date of Incident:  5-30-2016

Summary of Charges:  Fighting with Another Person

**I.    NOTICE OF CHARGE(S)**

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) **6-3-2016** at (time) **7:50 a.m.** (by staff member) **L. Bidelspach** .

B. The DHO Hearing was held on (date) **6-13-2016** at (time) **11:00 a.m.** .

C. The inmate was advised of the rights before the DHO by (staff member) **G. Reese** on (date) **6-3-2016** and copy of the advisement of rights form is attached.

**II.   STAFF REPRESENTATIVE**

A. Inmate waived right to staff representative.  Yes **XX** No _____ .

B. Inmate requested staff representative and **N/A** appeared.

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: **N/A** .

D. Staff representative **N/A** was appointed.

E. Staff representative statement: **N/A**

**III.  PRESENTATION OF EVIDENCE**

A. Inmate _____ (admits) **XX** (denies) the charge(s).

B. Summary of inmate statement:

Inmate Leath acknowledged he understood his rights before the DHO, was waiving his right to staff representation in this case, and was ready to proceed with the hearing.  Inmate Leath presented no documents for the DHO to consider.  Inmate Leath testified that Section 11 of the incident report is not accurate.  Inmate Leath testified, in response to Section 11 of the incident report, "I never admitted to anything.  If he ▮▮▮▮ admitted to something, why can't you just find him guilty and let me go.  Look at my situation.  He gouged my eyes out.  I can't see."  The DHO acknowledged the testimony of Leath, however, noted ▮▮▮▮ also sustained severe injuries as a result of the incident.  The DHO reviewed the Federal Bureau of Prisons Health Services Clinical Encounter Forms, prepared with regard to inmates ▮▮▮▮ and LEATH, James #47208-066, dated 5-30-2016 with Leath, and informed Leath this evidence, despite his (Leath's) injuries, supports a conclusion Leath and ▮▮▮▮ were involved in a fight.  The DHO questioned Leath, and afforded him an opportunity to describe the details of the incident from his position.  Leath stated "Man, I can't get into all that.  I don't do that."  Inmate Leath declined to comment further regarding the incident.  Inmate Leath made no complaints of procedural errors during the hearing.

C. Witnesses:
1. The inmate requested witnesses.  Yes_____ No **XX** .

2. The following persons were called as witness at this hearing and appeared:  **N/A** .

3. A summary of the testimony of each witness is attached **N/A** .

4. The following persons requested were not called for the reason(s) given:  **N/A** .

5. Unavailable witnesses were requested to submit written statements and those statements received were considered **N/A** .

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:
Memoranda from J. Leonowicz, A. Resseguie, and D. Hess, dated 5-30-2016; Federal Bureau of Prisons Health Services Clinical Encounter Forms, prepared with regard to inmates LEATH, James #47208-066 and ▮▮▮▮▮▮▮▮▮▮▮▮ dated 5-30-2016; Photographs of inmates LEATH, James #47208-066 and ▮▮▮▮▮▮▮▮▮▮ and the incident scene, J-Block cell 316, taken following the incident

1

BP-A0304
AUG 11

**DISCIPLINE HEARING OFFICER REPORT**   CDFRM

**U.S. DEPARTMENT OF JUSTICE**                                      **FEDERAL BUREAU PRISONS**

| Name of Inmate: | Reg. No.: | Hearing Date: |
|---|---|---|
| LEATH, James | 47208-066 | 6-13-2016 |

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate.  The confidential information was documented in a separate report.  The confidential information has been (confidential informants have been) determined to be reliable because: __N/A__ .

IV.    FINDINGS OF THE DHO

__XX__ A. The act was committed as charged.          ____ C. No prohibited act was committed:

____ B. The following act was committed:          ____ D. Expunge according to Inmate
                                                                Discipline PS.
_____ .

V.    SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.):

The DHO finds that inmate Leath committed the prohibited act of Fighting, Code 201.  This finding is based on the eyewitness written account of the reporting officer, which indicates on 5-30-2016 at approximately 9:08 p.m., the reporting officer was notified via radio to report to J-Block 3rd Floor due to inmates ████████████ and LEATH, James #47208-066, housed in J-Block cell 316, having injuries consistent with being in a physical altercation.  Specifically, the J-Block #3 Officer approached J-Block cell 316 as he was making irregular rounds and observed inmates ████████ and Leath covered in blood.  Upon the arrival of the reporting officer, inmates ████████ and Leath submitted to hand restraints.  The inmates were removed from the cell and escorted by other staff members to the Urgent Care Rooms in the Health Services area to be evaluated.  Based on the inmates' injuries, it was determined that inmates ████████ and Leath were involved in a physical altercation not witnessed by staff.  The inmates sustained multiple injuries that required outside medical treatment.

This finding is further based upon the Federal Bureau of Prisons Health Services Clinical Encounter Form, prepared with regard to inmate ████████ dated 5-30-2016.  This form documents inmate ████████ was noted to have sustained the following injuries during an examination by the healthcare provider following the incident:  the lateral aspect of his upper lip was missing on both sides; bite marks on his lower lip, which appeared to go completely through his lower lip; an abrasion on the medial aspect of his left eyebrow; a hematoma and bruising forming on the lateral aspect of his left eyebrow; bite marks to both of his thumbs; and an abrasion to the medial aspect of his left knee.  The form indicates ████████ stated to the healthcare provider that he sustained the injuries as a result of "falling out of bed and hitting his head on the ground."  Finally, the form notes ████████ was transferred via ambulance to a local community hospital for further evaluation and treatment due to the severity of the injuries he sustained.

This finding is further based upon the Federal Bureau of Prisons Health Services Clinical Encounter Form, prepared with regard to inmate LEATH, James #47208-066, dated 5-30-2016.  This form documents inmate Leath was noted to have sustained the following injuries during an examination by the healthcare provider following the incident:  missing upper cartilage on both ears; a laceration to his left eyelid; trauma to the cornea of the left eye (Leath stated repeatedly during the examination that he could not see out of this eye); a lateral gaze with the right eye (Leath stated repeatedly during the examination that he could not see out of this eye); an abrasion to his upper forehead; trauma to the inside of his upper lip; a bite mark on his right thumb; missing the pad on his right middle finger; a bruise forming over the left clavicle; a bruise forming on the upper medial aspect of his right bicep; an abrasion to his right first knuckle; an abrasion on his left shoulder blade; and significant periorbital swelling.  Finally, the form notes Leath was transferred via ambulance to a local community hospital for further evaluation and treatment due to the severity of the injuries he sustained.

This finding is further based upon the photographs of inmates ████████ and LEATH, James #47208-066 taken following the incident.  These photographs depict visually the nature of the injuries sustained by each of the inmates and support and corroborate the Federal Bureau of Prisons Health Services Clinical Encounter Forms, prepared with regard to inmates ████████ and LEATH, James #47208-066, dated 5-30-2016, as documented in the preceding paragraphs.

This finding is further based upon the testimony of inmate Leath, in which he did not specifically deny a physical altercation occurred between him and ████████ rather, attempted to mitigate or justify his actions during the incident.  Inmate Leath testified in response to Section 11 of the incident report, "I never admitted to anything.  If he ████████ admitted to something, why can't you just find him guilty and let me go.  Look at my situation.  He gouged my eyes out.  I can't see."  The DHO acknowledged the testimony of Leath, however, noted ████████ also sustained severe injuries as a result of the incident.  The DHO reviewed the Federal Bureau of Prisons Health

2

**Exhibit A**
**Attach. 11, p.2**

BP-A0304
AUG 11

**DISCIPLINE HEARING OFFICER REPORT**   CDFRM

**U.S. DEPARTMENT OF JUSTICE**                                      **FEDERAL BUREAU PRISONS**

| Name of Inmate: | Reg. No.: | Hearing Date: |
|---|---|---|
| LEATH, James | 47208-066 | 6-13-2016 |

Services Clinical Encounter Forms, prepared with regard to inmates ███████████ and LEATH, James #47208-066, dated 5-30-2016 with Leath, and informed Leath this evidence, despite his (Leath's) injuries, supports a conclusion Leath and ████████ were involved in a fight.  The DHO questioned Leath, and afforded him an opportunity to describe the details of the incident from his position.  Leath stated "Man, I can't get into all that.  I don't do that."  Inmate Leath declined to comment further regarding the incident.

The DHO notes and has considered as evidence in this case the testimony of inmate Leath, in which he inferred or implied he did not instigate the incident and was merely responding to aggression and injury by ████████  Leath further testified he should be found "not guilty" of the charges based solely on the severity of the injuries he sustained.  The DHO gives less weight to this evidence than that to which the greater weight is given in this case, for the following reasons.  First, both inmates sustained incredibly severe injuries during the incident, consistent with being involved in a fight.  Moreover, when afforded an opportunity to describe the details of the incident from his position Leath stated "Man, I can't get into all that.  I don't do that."  This fact provides an adverse inference that inmate Leath committed the prohibited act as charged.  The DHO has concluded, therefore, that Leath's testimony regarding his alleged rationale for engaging in the act is not evidence supporting a finding that he did not commit a prohibited act in this case, nor does it constitute sufficient justification for committing the prohibited act, nor does it mitigate the severity of the prohibited act committed in this case.

The greater weight of the evidence in this case, therefore, supports the finding inmate Leath committed the prohibited act of Fighting, Code 201.

VI.    SANCTION(S) OR ACTION(S) IMPOSED:

CODE: 201

Disallow Good Conduct Time: 27 days
Disciplinary Segregation: 30 days
Loss of Commissary Privilege: 120 days

VII.   REASON FOR EACH SANCTION OR ACTION TAKEN:

Fighting in a correctional institution inherently jeopardizes the security and good order of the institution.  The rationale for the sanctions imposed in this case, therefore, is to punish the inmate for his misconduct, which is viewed as having an adverse effect on the security and orderly operation of the institution, as well as to deter future misconduct.  Disciplinary segregation is imposed as punishment for the misconduct.  Disallowed Good Conduct Time is imposed to demonstrate that engaging in misconduct will prolong inmate Leath's period of incarceration.  Loss of commissary privileges is imposed to demonstrate that engaging in misconduct will result in the loss of pleasurable privileges while incarcerated.

VIII.  APPEAL RIGHTS:   __XX__   The inmate has been advised of the findings, specific evidence relied on, sanction(s)/action(s) and reasons for the action.  The inmate has been advised of the right to appeal this action within 20 calendar days under the Administrative Remedy Procedure.  A copy of this report has been given to the inmate.

IX.    Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| B. Chambers, DHO | | 12 July 2016 |

Delivered to Inmate: _Sflowers 7/13/16_

Prescribed by P5270                                     Replaces BP-304(52) of JAN 88

3

**Exhibit A
Attach. 11, p.3**

DEFENDANT
EXHIBIT

B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES LEATH, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL NO. 3:2017-CV-1418** |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SIA JAMES FOSNOT

1.      I am currently employed by the Federal Bureau of Prisons (hereafter "BOP"), and assigned to the United States Penitentiary, Lewisburg, PA (hereafter "USP Lewisburg"), as the Special Investigative Agent (SIA).  As part of my duties and responsibilities, I have access to inmates' records, electronic data maintained on the BOP's SENTRY computer system, Administrative Remedy data, and BOP Program Statements.  I certify that the Attachments referenced herein are true and accurate to the best of my knowledge.

2.      Records indicate Leath arrived at USP Lewisburg on October 5, 2015.

3.      Upon Leath's arrival at USP Lewisburg and again on October 14, 2015, a Special Investigative Supervisor ("SIS") interview was completed.  This type of interview is used to assist administration in identifying other inmates who may be a safety concern for the inmate being interviewed.  See Attachment 1, Intake Screening Forms.

1

**Exhibit B, p.1**

4.    As noted on both forms, Leath expressed no safety concerns, nor did he indicate a need for separation from any class of inmates or any specific person.

5.    Typically, and in accordance with Institution Supplement 5217.02B, Special Management Units, cell assignments are the responsibility of the Unit Team. However, in emergency situations where inmates need to be separated, custody staff can reassign them to another cell. See Attachment 2.

6.    Although Leath was a Central Inmate Monitoring System ("CIMS") inmate, he and his cellmate were not assigned as separatees.

7.    Both inmates shared a cell from April 24, 2016, until the incident on May 30, 2016. Neither expressed any safety concerns.

8.    Furthermore, there is no knowledge or record of Leath or his cellmate expressing any concerns for their safety surrounding the May 30, 2016 incident.

9.    Staff rely on information provided to them by inmates, regarding their safety concerns. If a threat is made, or a concern is reported to staff, the inmates involved will be separated until an investigation can be conducted.

10.    Inmates can raise safety/security concerns with any staff at any time. If an inmate feels he cannot be housed with another inmate, he can notify staff who will forward the information for investigation. The inmates involved will be separated from each other pending the investigation.

2

**Exhibit B, p.2**

11.    Inmates who are involved in an altercation with each other are immediately made formal separatees.

I declare that the foregoing is true and correct and is given under penalty of perjury pursuant to 28 U.S.C. § 1746.  I further declare that the documents attached to this declaration are true and accurate copies of documents maintained in the ordinary course of business by the Federal Bureau of Prisons and were created at or near the time of the occurrence of the matters reflected therein by someone with knowledge and were made by the Bureau of Prisons as a regular practice.

I am the custodian of the documents or am otherwise qualified to execute this certification, pursuant to Fed. R. Evid. 803(6) and 902(11).  I declare that the foregoing is true and correct, and is given under penalty of perjury pursuant to 28 U.S.C. §1746.

Executed this 25th day of June 2019.

James Fosnot, SIA
USP Lewisburg

3

**Exhibit B, p.3**

DEFENDANT
EXHIBIT

**Attach. 1**

## SIS INMATE INTERVIEW
## USP Lewisburg SMU INITIAL SCREENING FORM

Date of interview: _10/5/2015_

| Inmate Name: | Reg. No.: |
|---|---|
| Leath, James | 47208-066 |
| Gang Affiliation: (Good / Bad Standing)    Nom | Separation Concerns:    Nom |

Interview Questions:

What institution placed you in this program?
_CAA - Fut Assault + Dispose d Controband_

Where are you from (hometown, neighborhood, etc.)?
_Philadelphia, PA_

Do you belong to a gang, group, or organization? If so which (street/prison, neighborhood gang)?
_Muslim_

Are you active?   Are you in good standing?
_Yes_

If yes, what rank, position, or title do you hold?
_Sharill in the past_

Would you consider yourself a person of influence?
_Yes_

If you are not active, are you willing to debrief?
_N/A_

Who do you have problems with?
_Nobody_

What is your nickname?   Muslim name?
_Yack, Jamal →_

Were you involved in any major incidents with other gangs/geographical/religious inmates?
_No_

Have you requested PC at another institution?   Yes / No

Have you ever testified against anyone? If so is it on your PSI?   Yes / No

Remarks:

X _James Leath_                    Staff Witness Signature
_____          _____
Inmate Signature                   Interviewing Staff

***FOIA EXEMPT***

<u>INMATE INTERVIEW</u>
<u>QUAY SCREENING FORM</u>

Date of interview: _10-14-15_               Date arrived at LEW: _10-5-15_

| Inmate Name: <br> _Leath, James_ | Reg. No.: <br> _47208-066_ |
|---|---|
| STG Gang Affiliation: (Good / Bad Standing) <br> _Muslim_ <br><br> Other STG Information: | Separation Concerns: |

**Interview Questions:**                    Release date: _Life_

What institution placed you in this program?
_CAA, assault officer_
Where are you from (hometown, neighborhood, etc.)?
_Phila._
Do you belong to a gang, group, or organization? If so which (street/prison, neighborhood gang)?
_Muslim or Philly_
Are you active?  Are you in good standing?
_Yes_
If yes, what rank, position, or title do you hold?

Would you consider yourself a person of influence?
_— Sharif in State_
If you are not active, are you willing to debrief?

Who do you have problems with?
_no_
What is your nickname?  Muslim name?
_Tack_
Were you involved in any major incidents with other gangs/geographical/religious inmates?
_no_
Have you requested PC at another institution?  YES / NO

Have you ever testified against anyone? If so is it on your PSI?  YES (NO)

_____          _Blkiit_ _____  SIS Tech
Inmate Signature                          Interviewing Staff

**FOI  EXEMPT**

**Exhibit B**
**Attach. 1, p.2**

**DEFENDANT
EXHIBIT**

**Attach. 2**

The attached USP Lewisburg Supplement:
LEW 5217.02B, <u>Special Management Units</u>,
was certified as current:  October 5, 2018.

_____
David J. Ebbert, Warden

**Exhibit B
Attach. 2, p.1**

The attached USP Lewisburg Supplement:
LEW 5217.02B, <u>Special Management Units</u>,
was certified as current:  March 23, 2018

_____
David J. Ebbert, Warden

Special Management Units
LEW 5217.02B
November 22, 2016



**U.S. Department of Justice**
**Federal Bureau of Prisons**
**U.S. Penitentiary**
Lewisburg, PA 17837

# *Institution*
# *Supplement*

1. <u>PURPOSE AND SCOPE</u>  To implement local procedures for addressing operations and conditions for the Special Management Unit (SMU) at USP Lewisburg, Pennsylvania, pursuant to the Program Statement 5217.02, <u>Special Management Units</u>, dated August 9, 2016.

2. <u>PROGRAM OBJECTIVE</u>  To establish operating procedures for the implementation of an efficient, safe and secure SMU program through the enforcement of sound correctional decisions to be carried out by staff at USP Lewisburg. This is a three phase program which begins with Level One and continues through Level Three.  Advancement through the program will depend on the inmate's progression, with positive adjustment, resulting in the movement to the next level.  With advancement through the levels, more privileges will become available to the inmate.

3. <u>DIRECTIVES AFFECTED</u>

   a. <u>Directive Referenced:</u>  Program Statement 5217.02, <u>Special Management Units</u>, (08/09/2016).

   b. <u>Directive Rescinded:</u>  Institution Supplement 5217.02, (09/22/2016).

4. <u>STANDARDS REFERENCED:</u>  American Correctional Association, Standards for Adult Correctional Institutions, 4th Edition: 4-4276, 4-4277, 4-4283, 4-4287, 4-4288, 4-4290, 4-4292, 4-4295, 4-4296, 4-4297, 4-4299, 4-4300, 4-4301, 4-4363M, 4-4368M, 4-4491, 4-4497, 4-4498, 4-4510, and 4-4517. Performance Based Standards for Adult Local Detention facilities, 4th Edition: None.  2nd Edition Standards for Administration of Correctional Agencies: 2-CO-4A-01, 2-CO-4B-01, 2-CO-4B-04, 2-CO-4E-01, 2-CO-4F-01, 2-CO-5B-01, 2-CO-5C-01, 2-CO-5D-01, 2-CO-5E-01, 2-CO-5F-01. Standards for Correctional Training Academies:  None.

**Exhibit B**
**Attach. 2, p.3**

Special Management Units
LEW 5217.02B
November 22, 2016

5.  ADMISSION AND ORIENTATION PROCEDURES:
During the intake screening process, inmates designated to
the SMU will receive a SMU Inmate Admission & Orientation
(A&O) handbook.  This handbook contains information
specific to the SMU program, as well as information
traditionally covered in A&O lectures.  Additionally, A&O
lectures are broadcast on FM frequency 88.5 every Wednesday
at 8:30 a.m.

6.  PROCEDURES

a.  Conditions of Confinement:  Inmates will be
assigned to a cell which ordinarily houses two
occupants.  Cell assignments will be the
responsibility of the Unit Team, with direct
oversight provided by the Unit Manager.  Inmates
will be accountable for maintaining acceptable
levels of sanitation in their cells and or living
areas.

b.  Personal Hygiene Items:  Inmates have access to a
wash basin and toilet.  Hygiene items are
provided to inmates; however, limited hygiene
items are available for purchase through the
inmate commissary.  Inmates have the opportunity
to shower at least three times per week.

c.  Other Supplies:  Writing paper, writing
instruments, and envelopes will be issued by
Correctional Services staff.

d.  Linen Exchange:  Inmates will be issued a laundry
bag with an adequate supply of clothing, towels
and linens.  Specific procedures for linen
exchange are addressed in the SMU Handbook which
is issued upon arrival.  The Warden may impose
alternative clothing and/or linen for seven days,
for inmates who destroy or alter institutional
clothing or linen.

e.  Meals:  Inmates in Level One through Level Three
will receive three meals per day, via satellite
feeding.

f.  Recreation:  Inmates will be offered the
opportunity to exercise outside their individual
quarters for at least five hours per week,

Sensitive but Unclassified                           2

**Exhibit B
Attach. 2, p.4**

Special Management Units
LEW 5217.02B
November 22, 2016

ordinarily in one-hour periods on different days.
The Warden may deny these exercise periods for up
to one week at a time if it is determined that an
inmate's recreation jeopardizes the safety,
security, or orderly operation of the
institution.

g.   **Personal Property:**  Inmates in Level One through
Level Three will have limited personal property.
Additional personal property limitations may be
imposed by the Warden to maintain institution
security.

h.   **Commissary:**  Commissary items will be available
to inmates on all three levels of the program.
The East and West side housing units will shop
commissary on a bi-weekly basis.  Inmates on
commissary restrictions will only be permitted to
purchase postage stamps, certain hygiene items,
and over the counter medications.

i.   **Visiting:**  Inmates must submit a written request
to the Unit Manager at least two weeks in advance
of the expected visit. Visiting request forms     -
must be requested through the Unit Counselor.

Provided there are no visiting restrictions as
the result of disciplinary or other reasons,
visitation for inmates in Levels One through
Three will be facilitated via video visiting and
will only be available to immediate family
members which include parents or (legal guardians
which must be verified), siblings, offspring,
spouses, and grandparents.  The relationship must
be verified.

As the availability of video equipment is
limited, visits will be limited to one hour per
inmate.  Visits will be scheduled in accordance
with availability.  All SMU visiting will be
conducted on the weekends with a memorandum of
approval.

j.   **Correspondence and Telephones:**  Written
correspondence as outlined in Program
Statement 5265.14, **Correspondence**, dated

**Exhibit B
Attach. 2, p.5**

Special Management Units
LEW 5217.02B
November 22, 2016

April 5, 2011, will be permitted.  Incoming
special mail will be delivered by Unit Team
staff.  Outgoing special mail will be collected
by staff for mailing on a daily basis.  Inmates
in the SMU may use the telephones in their
assigned housing unit from 6:00 a.m. until
10:00 p.m., provided they are not on telephone
restrictions.  Inmates in Level One will be
permitted two 15-minute telephone calls per
month.  Inmates in Level Two will be permitted
four 15-minute telephone calls per month.
Inmates in Level Three will be permitted fifteen
phone calls per month not to exceed 150 minutes.

k.   <u>Legal Phone Calls</u>:  Unit Staff will facilitate
legal phone calls according to national policy.

l.   <u>Legal Activities</u>:  Housing Units will be equipped
with an Electronic Law Library (ELL).  Inmates
must submit a written request to staff to use the
ELL.  Priority will be given to inmates who
demonstrate an imminent court deadline.
Otherwise, use of the ELL will be based on the
order of each request.  A log will be maintained
in each housing unit equipped with an ELL for
accountability.  Requested materials will be
completed and delivered based upon the needs of
the inmate population and the availability of
staff and other resources.

m.   <u>Medical Care</u>:  Medical staff will make rounds in
each SMU housing units on a daily basis.  Inmates
have the ability to sign up for sick call Monday
through Friday (excluding holidays), and have
access to emergency medical care 24 hours a day,
seven days a week.

n.   <u>Mental Health Care</u>:  Inmates will be seen at
least once every 30 days by Psychology Services
Staff for a mental health review.  Inmates with
psychiatric or other mental health needs will be
seen as needed to meet their needs.

o.   <u>Religious Activities</u>:  Chaplains will be
available for counseling and accommodation of
religious needs on a one-on-one basis.

Sensitive but Unclassified                                    4

**Exhibit B**
**Attach. 2, p.6**

Special Management Units
LEW 5217.02B
November 22, 2016

p.   30-Day Condition Review:  The Unit Correctional
Counselor will conduct 30-day reviews in
accordance with National Policy utilizing form
BP-A0951, Special Management Unit (SMU) 30 Day
Conditions Review.  The Unit Manager will be
responsible for oversight of this review.

q.   Housing Unit Daily Record:  The housing unit
officer completes Form BP-A0950, Housing Unit
Daily Record, daily.  All inmates being removed
from a secure area and/or escorted between secure
areas will be pat searched to include the use of
a metal detector and will be subjected to visual
searches as outlined in Program Statement
5521.06, Searches of Housing Units, Inmates, and
Inmate Work Areas.

7.   SMU PROGRESSION AND PROGRAM COMPLETION:  Inmates must
complete SMU programming for the level they are assigned
regardless of their housing unit assignment.  Inmates who
successfully complete the program will be managed in
accordance with the Level Three - Level Progression /
Redesignation Criteria set forth in the SMU Program
Statement.

8.   OFFICE OF PRIMARY INTEREST:  Correctional Services and
Correctional Programs.

9.   EFFECTIVE DATE:  Supplement is effective upon issuance.

_____
David J. Ebbert, Warden

**Exhibit B
Attach. 2, p.7**



**U.S. Department of Justice**
Federal Bureau of Prisons

**DEFENDANT
EXHIBIT**

**Attach. 3**

P R O G R A M   S T A T E M E N T

OPI:          CPD/CSB
NUMBER:   5270.11
DATE:        November  23, 2016

# Special Housing Units

           /s/
*Approved*:  Thomas R. Kane
Acting Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

**§ 541.20  Purpose.**

**This subpart describes the Federal Bureau of Prisons' (Bureau) operation of special housing units (SHU) at Bureau institutions.  The Bureau's operation of SHUs is authorized by 18 U.S.C. 4042(a)(2) and (3).**

a. **Program Objectives**.  The expected results of this program are:

- Special Housing Unit placement should always serve a specific penological purpose.
- Inmates are housed in the least restrictive setting necessary to ensure their own safety, as well as the safety of staff, other inmates, and the public.
- A safe and orderly environment will be provided for staff and inmates.
- Living conditions for inmates in disciplinary segregation and administrative detention will meet or exceed applicable standards.
- Accurate and complete records will be maintained on conditions and events in special housing units.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

b.  **Summary of Changes**

*Policy Rescinded*
P5270.10        Special Housing Units (7/29/11)
Memorandum from Assistant Director Scott Dodrill, Secure Housing Unit Operations, dated
3/2/10
Memorandum from Assistant Director Frank Strada, Special Housing Unit Training, dated
4/17/2015

The following changes have been incorporated into the policy:

■   Several changes have been implemented to adhere to Department of Justice recommendations
    regarding guiding principles.

■   Training standards have been updated.

■   Alternate Clothing guidance is provided.

■   Objectives were defined.

■   Forms have been updated.

■   Circumstances under which pregnant inmates can be placed in SHU have been defined.

■   Psychological concerns regarding SHU placements have been addressed.

c.  **Institution Supplement**.  None required.  Should local facilities make any changes outside
the required changes in the national policy or establish any additional local procedures to
implement the national policy, the local Union may invoke to negotiate procedures or
appropriate arrangements.

2.   **SPECIAL HOUSING UNITS (SHUS)**

**§ 541.21  Special Housing Units (SHUs).**

**Special Housing Units (SHUs) are housing units in Bureau institutions where
inmates are securely separated from the general inmate population, and may be
housed either alone or with other inmates.  Special housing units help ensure the
safety, security, and orderly operation of correctional facilities, and protect the
public, by providing alternative housing assignments for inmates removed from
the general population.**

For inmates with suspected or confirmed contagious diseases, refer to the Program Statements
**Intake Screening**, **Infectious Disease Management**, and **Patient Care**, and, when applicable,
the Pandemic Influenza Plan**.**

Alternative segregation housing arrangements outside the Special Housing Unit itself must be proposed by the Warden to the Regional Director, and ultimately approved by the Assistant Director, Correctional Programs Division, before activation.  Alternative segregation housing of this type will only be approved as SHU overflow for inmates in administrative detention or disciplinary segregation status.  Operation of such alternative segregation housing requires compliance with all Bureau rules, policies, staffing, and post orders for operating Special Housing Units.

General population inmates are not permitted to enter a secure housing unit to interact with inmates for dispute resolutions, intelligence gathering, or security threat group/disruptive group meetings.  This also applies to removing inmates from a secure housing unit to meet with  inmates in general population.  Institution staff must rely on trained investigative techniques, link analysis, and other means of gathering information without allowing inmates into a secure housing setting to conduct face-to-face meetings with one another.

Inmates who are pregnant, who are post-partum (up to 8 weeks), who recently had a miscarriage (up to 4 weeks), or  who recently had a terminated pregnancy (up to 4 weeks) should not be placed in restrictive housing.  In   rare situations, these inmates may be placed in restrictive housing as a temporary  response to behavior that poses a serious and immediate risk of physical harm or to ensure the  safety, security, and orderly running of a BOP facility.

3.   **STATUS WHEN PLACED IN THE SHU**

**§ 541.22  Status when placed in the SHU.**

**When placed in the SHU, you are either in administrative detention status or disciplinary segregation status.**

**(a)   *Administrative detention status.*  Administrative detention status is an administrative status which removes you from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public.  Administrative detention status is non-punitive, and can occur for a variety of reasons.**

The Warden may impose temporarily more restrictive conditions on an inmate (which may be in an area ordinarily set aside for disciplinary segregation and therefore requires the withdrawal of privileges ordinarily afforded in administrative detention status, until a hearing before the DHO can be held) who:

**Exhibit B
Attach. 3, p.3**

- Is causing a serious disruption (threatening life, serious bodily harm, or property) in administrative detention.
- Cannot be controlled within the physical confines of administrative detention.
- Upon advice of qualified health personnel, does not require confinement in the institution hospital if the institution has one for mental or physical treatment, or who would ordinarily be housed in the institution hospital for mental or physical treatment, but who cannot safely be housed there because the hospital does not have a room or cell with adequate security provisions.

Inmate confined under these more restrictive conditions must have their status reviewed and fully documented on a new BP-A0321 every 5 days.

The Warden may delegate this authority no further than to the official in charge of the institution when the move is necessary.

A fully documented report Special Housing Unit − Temporary Restrictive Housing Order (BP-A0321) is maintained in the Inmate Central File.

**(b)   *Disciplinary segregation status.*  Disciplinary segregation status is a punitive status imposed only by a Discipline Hearing Officer (DHO) as a sanction for committing a prohibited act(s).**

4.   **ADMINISTRATIVE DETENTION STATUS**

**§ 541.23  Administrative detention status.**

**You may be placed in administrative detention status for the following reasons:**

**(a)   *Pending Classification or Reclassification.*  You are a new commitment pending classification or under review for Reclassification.**

This includes newly arrived inmates from the Bus, Airlift, and U.S. Marshals Service.

**(b)   *Holdover Status.*  You are in holdover status during transfer to a designated institution or other destination.**

**(c)   *Removal from general population.*  Your presence in the general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution and:**

**(1)  *Investigation.*  You are under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law;**

**(2)  *Transfer.*  You are pending transfer to another institution or location;**

**(3)  *Protection cases.*  You requested, or staff determined you need, administrative detention status for your own protection; or**

**(4)  *Post-disciplinary detention.*  You are ending confinement in disciplinary segregation status, and your return to the general population would threaten the safety, security, and orderly operation of a correctional facility, or public safety.**

Staff must obtain approval from a Lieutenant or the Captain before placing an inmate in Administrative Detention status pending investigation of a disciplinary violation.  When considering approval for Administrative Detention, the seriousness of the violation should be reviewed.

In making Special Housing determination, officials should consider the seriousness of the alleged offense, including whether the offense involved violence, involved escape, or posed a threat to institutional safety or the orderly running of the institution.

If an inmate is terminating confinement in disciplinary segregation and staff determine placement in the general population is not prudent, the inmate may be placed in administrative detention status if warranted by the conditions established above.  The decision for post-disciplinary detention must be based on a separate review, not solely on the initial hearing before the DHO that resulted in the inmate's placement in disciplinary segregation.

The Segregation Review Official (SRO) advises the inmate of this determination and the reason for the action via an Administrative Detention Order (ADO; BP-A0308). The Warden or shift supervisor can order immediate segregation.  Ordinarily, within 24 hours of an inmate's placement in Administrative Detention, a supervisory official not involved in the initial placement will review and approve the placement decision.

Except for pretrial inmates or inmates in a control unit program, staff ordinarily, within 90 days of an inmate's placement in post-disciplinary detention, must either return the inmate to the general inmate population or request a transfer of the inmate to a more suitable institution using Form EMS-A409, Request for Transfer/Application of Management Variable.  The Regional Correctional Programs Administrator will be copied on the completed form.

**Exhibit B**
**Attach. 3, p.5**

The institution must generate a regional referral for each inmate in post-disciplinary detention in excess of 90 days that includes case-specific information stating why the inmate is not  appropriate for return to general population or immediate transfer.  The Regional Director must  submit a recommendation for post-disciplinary detention in excess of 90 days and every  additional 60 days thereafter to the Assistant Director, Correctional Programs Division (CPD) for  concurrence. Distribution includes a copy to the GroupWise mailbox BOP-CPD/DHO~.

The institution generates an ADO that cites the same case-specific information and includes documentation indicating that the SRO has advised the inmate of the basis for the extended stay.

5.   **DISCIPLINARY SEGREGATION STATUS**

**§ 541.24  Disciplinary segregation status.**

**You may be placed in disciplinary segregation status only by the DHO as a disciplinary sanction.**

6.   **NOTICE RECEIVED WHEN PLACED IN THE SHU**

**§ 541.25  Notice received when placed in the SHU.**

**You will be notified of the reason(s) you are placed in the SHU as follows:**

The Lieutenant or other correctional supervisor prepares an Administrative Detention Order (ADO; BP-A0308).  The specific reason for placement in SHU must be supported by objective evidence and clearly articulated in the narrative section of the ADO.  A new ADO is required if an inmate's status in administrative detention changes.  Inmates will remain in SHU for no  longer than necessary to address the specific reason for placement.  Distribution of copies is  indicated on the ADO.

**(a)   *Administrative detention status.*  When placed in administrative detention status, you will receive a copy of the administrative detention order, ordinarily within 24 hours, detailing the reason(s) for your placement.  However, when placed in administrative detention status pending classification or while in holdover status, you will not receive an administrative detention order.**

Pending classification refers to newly arrived inmates.

**(b)   *Disciplinary segregation status.*  When you are to be placed in disciplinary segregation status as a sanction for violating Bureau regulations, you will be informed by the DHO at the end of your discipline hearing.**

7.  **REVIEW OF PLACEMENT IN THE SHU**

**§ 541.26  Review of placement in the SHU.**

**Your placement in the SHU will be reviewed by the Segregation Review Official (SRO) as follows:**

**(a)   *Three day review.*  Within three work days of your placement in administrative detention status, not counting the day you were admitted, weekends, and holidays, the SRO will review the supporting records.  If you are in disciplinary segregation status, this review will not occur.**

For reviews of Protection Cases see section 9.

**(b)   *Seven day reviews.*  Within seven continuous calendar days of your placement in either administrative detention or disciplinary segregation status, the SRO will formally review your status at a hearing you can attend.  Subsequent reviews of your records will be performed in your absence by the SRO every seven continuous calendar days thereafter.**

**(c)   *Thirty day reviews.*  After every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation status, the SRO will formally review your status at a hearing you can attend.**

**(d)   *Administrative remedy program.*  You can submit a formal grievance challenging your placement in the SHU through the Administrative Remedy Program, 28 CFR part 542, subpart B.**

28 CFR Part 542, Subpart B, refers to the Program Statement **Administrative Remedy Program.**

The SRO refers to the individual at each Bureau institution assigned to review the status of each inmate housed in disciplinary segregation and administrative detention.  The SRO must conduct the required reviews.  The SRO does not have to be a DHO.  Ordinarily, the SRO is the Captain (may be delegated to a Lieutenant responsible for supervision of the SHU).  This review must include:

■   A review of the inmate's records while in the SHU (Special Housing Unit Record, BP-A0292).
■   All available memoranda from staff (including psychology staff).

**Exhibit B
Attach. 3, p.7**

- All available investigatory memoranda.
- The SRO completes a Special Housing Review (BP-A0295) after review of the Special Housing Unit Record and other relevant documentation.  Maintain permanent logs.

A multidisciplinary team that includes, at a minimum, institution executive staff, Correctional Services, unit staff, Health Services, and psychology staff reviews the inmate's initial and ongoing  placement in SHU.  This committee meets on a regular basis, ordinarily weekly.

8. **PROTECTION CASE − PLACEMENT IN ADMINISTRATIVE DETENTION STATUS**

**§ 541.27  Protection case − placement in Administrative Detention status.**

**You may be placed in administrative detention status as a protection case in the following circumstances.**

**(a)    *Victim of inmate assault or threats.*  You were the victim of an inmate assault,  or are being threatened by other inmates, including threats of harm if you do not  act in a certain way, for example, threats of harm unless you engage in sexual  activity.**

**(b)    *Inmate informant.*  Your safety is threatened because you provided, or are perceived as having provided, information to staff or law enforcement authorities regarding other inmates or persons in the community.**

**(c)    *Inmate refusal to enter general population.*  You refuse to enter the general population because of alleged pressures or threats from unidentified inmates, or for no expressed reason.**

**(d)    *Staff concern.*  Based on evidence, staff believe your safety may be seriously  jeopardized by placement in the general population.**

When an inmate is placed in Administrative Detention for an investigative period and the threat is verified, correctional officials should seek alternative housing, by transferring the threatened inmate either to the general population of another institution or to a special-purpose housing unit for inmates who face similar threats, with conditions comparable to those of the general population.

When the inmate poses such security risk that even a special-purpose housing unit is insufficient to ensure the inmate's safety and the safety of staff, other inmates, and the public, the inmate

**Exhibit B
Attach. 3, p.8**

may be housed in more restrictive conditions.  The inmate's placement should be regularly reviewed to monitor any medical or mental health deterioration and to determine whether the security risks have subsided.

9.   **PROTECTION CASE − REVIEW OF PLACEMENT IN THE SHU**

**§ 541.28  Protection case − review of placement in the SHU.**

**(a)   *Staff investigation.*  Whenever you are placed in the SHU as a protection case, whether requested by you or staff, an investigation will occur to verify the reasons for your placement.**

**(b)   *Hearing.*  You will receive a hearing according to the procedural requirements of § 541.26(b) within seven calendar days of your placement.  Additionally, if you feel at any time your placement in the SHU as a protection case is unnecessary, you may request a hearing under this section.**

**(c)   *Periodic review.* If you remain in administrative detention status following such a hearing, you will be periodically reviewed as an ordinary administrative detention case under § 541.26.**

When an inmate is placed in administrative detention for protection, the Warden or designee (ordinarily the Captain), must review the placement within two work days of the placement to determine if continued protective custody is necessary.  This review includes documents that led to the inmate being placed in protective custody status and any other documents pertinent to the inmate's protection.

10.   **STAFF VERIFICATION OF NEED FOR PROTECTION**

**§ 541.29  Staff verification of need for protection.**

**If a staff investigation verifies your need for placement in the SHU as a protection case, you may remain in the SHU or be transferred to another institution where your status as a protection case may not be necessary, at the Warden's discretion.**

Exhibit B
Attach. 3, p.9

11.   **LACK OF VERIFICATION OF NEED FOR PROTECTION**

**§ 541.30  Lack of verification of need for protection.**

**If a staff investigation fails to verify your need for placement in the SHU as a protection case, you will be instructed to return to the general population.  If you refuse to return to the general population under these circumstances, you may be subject to disciplinary action.**

Inmates refusing placement in general population should be maintained in Administrative Detention status and, if appropriate, initiate disciplinary action.

12.   **CONDITIONS OF CONFINEMENT IN THE SHU**

**§ 541.31  Conditions of confinement in the SHU.**

**Your living conditions in the SHU will meet or exceed standards for healthy and humane treatment, including, but not limited to, the following specific conditions:**

**(a)   *Environment*.  Your living quarters will be well-ventilated, adequately lighted,  appropriately heated, and maintained in a sanitary condition.**

**(b)   *Cell Occupancy*.  Your living quarters will ordinarily house only the amount of  occupants for which it is designed.  The Warden, however, may authorize more occupants so long as adequate standards can be maintained.**

**(c)   *Clothing*.  You will receive adequate institution clothing, including footwear,  while housed in the SHU.  You will be provided necessary opportunities to  exchange clothing and/or have it washed.**

The Warden's written approval is required prior to placing an inmate on alternate clothing/linen status. The Warden or Acting Warden may not delegate the authority to place an inmate in alternate  clothing/linen (e.g., paper).  The memorandum must include, at a minimum, the signature of the Warden, Health Services Administrator, and a psychologist.  A written explanation of the reason(s) for alternate clothing/linen status must be included in the Warden's authorization.  This status will be reviewed every 3 days.  Inmates will not be authorized to remain in alternate clothing/linen for more than 6 days.  After 6 days, the inmate is removed from the alternate clothing/linen status, or, if necessary, a new authorization is generated.  Inmates must be offered a change of clothing daily and the clothing must be adequate to the temperature in the SHU.

**Exhibit B
Attach. 3, p.10**

Alternate clothing/linen is authorized when an inmate alters, destroys, or uses a clothing/linen issued article in a manner that poses a threat to safety, security, or good order of the SHU or to herself/himself, other inmates, or staff.

Alternate clothing/linen will not be used as punishment or during external transportation (i.e., outside the secure perimeter).  Inmates that originate from BOP facilities will not be transported in alternate clothing for any reason.  Ordinarily, inmates with serious mental illness and those with identified chronic or acute suicide risk are not placed in paper clothing.  Paper clothing is not used on suicide watch.

**(d)   *Bedding.*   You will receive a mattress, blankets, a pillow, and linens for  sleeping.  You will receive necessary opportunities to exchange linens.**

If the institution issues the combination mattress with a pillow incorporated, a separate pillow will not be issued.  Staff may remove an inmate's mattress during non-sleeping daytime hours as a "loss of privilege" sanction imposed by the Unit Discipline Committee (UDC)/DHO.  Removal of an inmate's mattress is  otherwise prohibited, absent life or safety concerns as specifically documented and authorized by  the Warden, or his/her designee.

**(e)   *Food.*  You will receive nutritionally adequate meals.**

Refer to the Program Statement **Food Service Manual** for standards and guidelines for feeding inmates in Special Housing Units.  When an inmate uses food products, Food Service items, or the feeding process itself in a manner that poses a threat to the safety, security, or good order of the institution, or to the inmate him-/herself, other inmates, or staff, a written explanation of the reason(s) for alternate meal status must be included in the CEO's authorization and approved by Health Services. The Warden's written approval is required prior to placing an  inmate on alternative meal status.   After 7 days, the  inmate is removed from the alternative meal service or, if necessary, a new authorization is  generated.

**(f)   *Personal hygiene.*   You will have access to a wash basin and toilet.  You will receive personal items necessary to maintain an acceptable level of personal hygiene, for example, toilet tissue, soap, toothbrush and cleanser, shaving utensils, *etc.*  You will ordinarily have an opportunity to shower and shave at least three times per week.  You will have access to hair care services as necessary.**

**(g)   *Exercise.*  You will receive the opportunity to exercise outside your individual  quarters at least five hours per week, ordinarily on different days in**

**Exhibit B
Attach. 3, p.11**

**one-hour periods.   You can be denied these exercise periods for a week at a time by order of the Warden if it is determined that your use of exercise privileges threatens  safety, security, and orderly operation of a correctional facility, or public safety.**

If weather, resources, and staffing permit, the inmate shall receive outdoor exercise periods. "Week" means one calendar week.

Plans for increasing recreation time are developed locally for each institution in an effort to provide additional out of cell time.  These plans will be developed considering the views and input from the local union.

The following factors must be considered when developing plans to increase out of cell time for recreation:

- Inmate to correctional services staff ratio in SHU.
- Total number of inmates in SHU.
- Limitations of the physical plant and infrastructure, especially regarding spaces used for recreation.

When an institution possesses the resources identified within the three factors listed above to implement these plans, it should do so.

A memorandum for the plan will be generated.  The Warden will review the plan at least annually and make adjustments as necessary.

Restriction or denial of exercise is not used as punishment.  The Warden or Acting Warden may not delegate the authority to restrict or deny exercise.  Exercise periods are only restricted or denied when the inmate's activities pose a threat to the safety, security, and orderly operation of a correctional facility, or health conditions of the unit.

The appropriate staff member recommends recreation restrictions to a supervisor who then makes the recommendation to the Warden in writing.  The recommending staff member describes briefly the reason for recommending a restriction and its proposed extent.  The Warden reviews the recommendation and approves, modifies, or denies the restriction.  If the Warden approves a restriction, it must be based on the conclusion that the inmate's actions pose a threat to the safety, security, and orderly operation of a correctional facility or health conditions of the unit.

**Exhibit B
Attach. 3, p.12**

**(h)   *Personal property.*   In either status, your amount of personal property may be  limited for reasons of fire safety or sanitation.**

**(1)   In administrative detention status you are ordinarily allowed a reasonable amount of personal property and reasonable access to the commissary.**

**(2)   In disciplinary segregation status your personal property will be impounded, with the exception of limited reading/writing materials, and religious articles. Also, your commissary privileges may be limited.**

(3)   Personal property ordinarily allowed in administrative detention (if not otherwise a threat to institution security) includes:

- Bible, Koran, or other scriptures (1).
- Books, paperback (5).
- Eyeglasses, prescription (2).
- Legal material (see the Program Statement **Inmate Legal Activities**).
- Magazine (3).
- Mail (10).
- Newspaper (1).
- Personal hygiene items (1 of each type) (no dental floss or razors*).
- Photographs (25).
- Authorized religious medals/headgear (e.g., kufi).
- Shoes, shower (1).
- Shoes, other (1).
- Snack foods without aluminum foil wrappers (5 individual packs).
- Soft drinks, powdered (1 container).
- Stationery/stamps (20 each).
- Wedding band (1).
- Radio with ear plugs (1).
- Watch (must not have metal backing) (1).

*Razors are controlled by SHU staff.  Only disposable razors are used.

The Warden may modify the quantity and type of personal property allowed.  Personal property may be limited or withheld for reasons of security, fire safety, or housekeeping.

Unauthorized use of any authorized item may result in the restriction of the item. If there are numerous misuses of an authorized item, the Warden may determine that the item will not be issued in the SHU.

**Exhibit B**
**Attach. 3, p.13**

**Reading Material**.  The inmate will receive a reasonable amount of non-legal reading material, not to exceed five books per inmate at any one time, on a circulating basis.  Staff shall provide the inmate the opportunity to possess religious scriptures of the inmate's faith.

**(i)    *Correspondence*.  You will receive correspondence privileges according to part 540, subpart B.**

Part 540, Subpart B, refers to the Program Statement **Correspondence**.

**(j)    *Telephone*.  You will receive telephone privileges according to part 540, subpart I.**

Part 540, Subpart I, refers to the Program Statement **Inmate Telephone Regulations**.

If the inmate has not been restricted from telephone use as the result of a specific disciplinary sanction, he/she is allowed to make one telephone call per month.  Meaning, the inmate should receive a phone call within the first 30 calendar days of placement in the Special Housing Unit and within every 30 calendar days thereafter.

**(k)    *Visiting*.  You will receive visiting privileges according to part 540, subpart D.**

Part 540, Subpart D, refers to the Program Statement **Visiting Regulations**.

**(l)    *Legal activities*.  You will receive an opportunity to perform personal legal activities according to part 543, subpart B.**

Part 543, Subpart B, refers to the Program Statement **Inmate Legal Activities**.

**(m)    *Staff monitoring*.  You will be monitored by staff assigned to the SHU, including program and unit team staff.**

Program staff, including unit staff, arrange to visit inmates in a SHU within a reasonable time after receiving the inmate's request.

In addition to direct supervision by the unit officer, qualified health personnel and one or more responsible officers the Warden designates (ordinarily the Institution Duty Officer) visit each segregated inmate daily, including weekends and holidays.  A Lieutenant must visit the SHU during each shift to ensure all procedures are followed.

Exhibit B
Attach. 3, p.14

Duress buttons, if present, will be utilized only for emergency and/or life-threatening situations,  to include health-related issues.  The use of the duress button for anything other than an  emergency and/or life-threatening situation is subject to disciplinary action.

**(n)   *Programming activities.*  In administrative detention status, you will have access to programming activities to the extent safety, security, orderly operation of a correctional facility, or public safety are not jeopardized.  In disciplinary segregation status, your participation in programming activities, *e.g.*, educational programs, may be suspended.**

All out of cell time will be recorded in BP-A0292, Special Housing Unit Record.

**(o)   *Administrative Remedy Program.*  You can submit a formal grievance challenging any aspect of your confinement in the SHU through the Administrative Remedy Program, 28 CFR part 542, subpart B.**

28 CFR Part 542, Subpart B, refers to the Program Statement **Administrative Remedy  Program**.

13.   **MEDICAL AND MENTAL HEALTH CARE IN THE SHU**

**§ 541.32  Medical and mental health care in the SHU.**

**(a)   *Medical care.*  A health services staff member will visit you daily to provide necessary medical care.  Emergency medical care is always available.**

While in a SHU, inmates may continue taking their prescribed medications.

**(b)   *Mental health care.*  After every 30 calendar days of continuous placement in either administrative detention or disciplinary segregation status, mental health staff will examine you, including a personal interview.  Emergency mental health care is always available.**

Generally, an inmate who has been identified by Psychology/Health Services as a Care-3 (MH), Care-4 (MH),  psychology alert in SENTRY, or  identified on the monthly  SHU advisory should not be placed in Special Housing unless he/she presents an immediate  and/or serious danger to self, staff, or the orderly running of a facility.

If an inmate who has been identified by Psychology/Health Services as a Care-3 (MH), Care-4 (MH),  psychology alert in SENTRY, or identified on the monthly SHU  advisory (Hot List), is placed in Special Housing, psychology services should be notified and  conduct a mental health

evaluation within 24 hours of placement.  Staff should conduct a psychiatric or psychological assessment, including a personal interview,   when administrative detention continues beyond 30 days.  The assessment, submitted to the SRO  in a written report with a copy to the inmate's central file, addresses:

- The inmate's adjustment to surroundings.
- The threat the inmate poses to self, staff, and other inmates.

Staff conduct a similar psychiatric or psychological assessment and report at 30-day intervals should detention continue for an extended period.

## 14.   RELEASE FROM THE SHU

**§ 541.33  Release from the SHU.**

**(a)   *Administrative detention status.*  You will be released from administrative detention status when the reasons for your placement no longer exist.**

**(b)   *Disciplinary segregation status.*  You will be released from disciplinary segregation status after satisfying the sanction imposed by the DHO.  The SRO may release you earlier if it is determined you no longer require disciplinary segregation status.**

Ordinarily, inmates nearing the end of their term of incarceration will not be placed in SHU, except when their presence in General Population threatens the safety, security, or the orderly running of a BOP facility.

Every effort should be made to avoid releasing an inmate directly from SHU to the community. If the inmate remains in SHU within 180 days of release, options to release the inmate to less restrictive settings should be considered.  If a less restrictive setting is not possible, the inmate will receive targeted reentry programming to prepare for return to the community.

A clear plan for returning the inmate to less restrictive conditions will be developed and is ordinarily shared with the inmate.

The SRO may not increase any previously imposed sanction(s). When considering release from disciplinary segregation, the SRO first consults with the Captain and must notify the Discipline Hearing Officer (DHO) of the  inmate's release from disciplinary segregation before satisfying the imposed sanction.

**Exhibit B
Attach. 3, p.16**

15. **TRAINING**

Completion of quarterly training will be required for staff assigned to SHU prior to the start of each new quarter, regardless of how many times a staff member has completed the training. When assignment to a SHU post is known sufficiently in advance, each staff member should be afforded a reasonable amount of duty time to complete the training. For instances when last-minute assignments to the SHU occur, the employer must advise the staff of the general requirements of a SHU post and answer any questions.

This training session may include, but is not limited to, search procedures, escort procedures, application of restraints, use of force, orderly supervision, cell/unit sanitation, emergency response, suicide prevention, and dealing with mentally ill inmates, as well as other security procedures related to the unit. If this in-person training is completed, a training sheet will be completed documenting the training, and will be routed to the Captain and Human Resources Department for retention.

16. **AGENCY'S ACA ACCREDITATION PROVISIONS**

- 4th Edition Standards for Adult Correctional Institutions: 4-4133, 4-4235, 4-4249, 4-4250, 4-4251, 4-4252, 4-4253, 4-4254, 4-4255, 4-4256, 4-4258, 4-4260, 4-4261, 4-4262, 4-4263, 4-4264, 4-4265, 4-4266, 4-4267, 4-4268, 4-4269, 4-4270, 4-4271, 4-4272, and 4-4273.
- 4th Edition Performance-Based Standards for Adult Local Detention Facilities: 4-ALDF-2A-44, 4-ALDF-2A-45, 4-ALDF-2A-46, 4-ALDF-2A-47, 4-ALDF-2A-48, 4-ALDF-2A-49, 4-ALDF-2A-50, 4-ALDF-2A-51, 4-ALDF-2A-53, 4-ALDF-2A-55, 4-ALDF-2A-56, 4-ALDF-2A-57, 4-ALDF-2A-58, 4-ALDF-2A-59, 4-ALDF-2A-60, 4-ALDF-2A-61, 4-ALDF-2A-62, 4-ALDF-2A-63, 4-ALDF-2A-64, 4-ALDF-2A-65, and 4-ALDF-2A□66.

**REFERENCES**

*Program Statements*

| | | |
|---|---|---|
| P1315.07 | Inmate Legal Activities (11/5/99) |
| P1330.18 | Administrative Remedy Program (1/6/14) |
| P4700.06 | Food Service Manual (9/3/11) |
| P5100.08 | Inmate Security Designation and Custody Classification (9/12/06) |
| P5212.07 | Control Unit Programs (2/20/01) |
| P5264.08 | Inmate Telephone Regulations (1/24/08) |
| P5265.14 | Correspondence (4/5/11) |
| P5267.09 | Visiting Regulations (12/10/15) |
| P5270.09 | Inmate Discipline Program (7/8/11) |
| P6031.04 | Patient Care (6/3/14) |

**Exhibit B
Attach. 3, p.17**

P6340.04          Psychiatric Services (1/15/05)
P6360.01          Pharmacy Services (1/15/05)

*BOP Forms*
BP-A0292          Special Housing Unit Record
BP-A0295          Special Housing Review
BP-A0308          Administrative Detention Order
BP-A0321          Special Housing Unit − Temporary Restrictive Housing Order

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

**Exhibit B
Attach. 3, p.18**



DEFENDANT
EXHIBIT

C

1          UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3

4   JAMES LEATH,

              Plaintiff,

5

6        vs.                    Case No.:  3:17-CV-1418

7   UNITED STATES OF AMERICA,

              Defendant.

8

9   _____/

10

11

12       VIDEO CONFERENCE DEPOSITION OF JAMES LEATH

13           Wednesday, November 14, 2018

14                 10:15 a.m.

15

16

17

18

19             Taken in the offices of:

20                 USP ATWATER

21                1 Federal Way

22              Atwater, California

23

24

25   REPORTED BY:  KAREN A. AUFDERMAUR, CSR 10919

                                                      1

```
 1    APPEARANCES VIA TELECONFERENCE:

 2       FOR PLAINTIFF:

 3            LAW OFFICES OF JONATHAN J. SOBEL
              BY:  JONATHAN J. SOBEL, ATTORNEY AT LAW
 4            1500 Walnut Street, Suite 2000
              Philadelphia, PA 19102
 5            T:  215.735.7535
              mate98@aol.com
 6

 7       FOR DEFENDANT:

 8            UNITED STATES DEPARTMENT OF JUSTICE
              BY:  RICHARD D. EULISS, ASSISTANT UNITED STATES
 9                 ATTORNEY
              228 Walnut Street
10            Harrisburg, PA 17101
              T:  717.221.4482
11            Richard.D.Euliss@usdoj.gov

12
         ALSO PRESENT:
13
              Susan Albert, Paralegal Specialist
14            Cristina M. Guthrie, Paralegal Specialist
              F. Haskett, Guard
15            D. Coggins, Guard
              Karen A. Aufdermaur, Reporter
16
                        ---oOo---
17

18

19

20

21

22

23

24

25
                                                            2
```

INDEX OF EXAMINATIONS

BY:                                                    PAGE

Mr. Euliss                                               4

Mr. Sobel                                              40


---oOo---


INDEX OF EXHIBITS

(No exhibits were marked.)

3

**Exhibit C, p.3**

```
 1              WEDNESDAY, NOVEMBER 14, 2018, ATWATER, CALIFORNIA

 2                              10:15 A.M.

 3                              *    *    *

 4                           JAMES LEATH,

 5         having been duly sworn, was examined and testified

 6                            as follows:

 7

 8                           EXAMINATION

 9     BY MR. EULISS:

10         Q.   Hello, Mr. Leath.  My name is Richard Euliss.  I

11     just want to test the audio.  If you could just give me an

12     affirmative yes if you can hear me.

13         A.   I can hear you.  Yes, I can hear it.

14         Q.   And it turns out I can hear you.  Okay.  Great.

15     So again I'm an assistant U.S. attorney out here in

16     Harrisburg and I represent the United States in the case

17     that you have filed.  I think you can see on your screen

18     your attorney, Jonathan Sobel, is appearing remotely out

19     in Philadelphia.  Can you see him?

20         A.   I think he's on the left, on my left.  Or, no, on

21     his right and I'm on my left corner in the -- in a corner.

22         Q.   Okay.

23         A.   It's two --

24         Q.   Just want to make sure --

25         A.   It looks like it's two women beside him, one
```

4

**Exhibit C, p.4**

1   beside.  Each woman is beside him.  That's what it looked

2   like.

3       Q.   Okay.  I think you're seeing me there.  That's

4   probably me.  Mr. Sobel is appearing by himself at a desk

5   in a courtroom.  Can you see him?

6       A.   Sobel is -- I see -- I see.  Who's Sobel?  Could

7   you raise your hand a little bit?  Well, duh.  That's you?

8            MR. SOBEL:  Yeah.  Can you see me?

9            THE WITNESS:  Okay.  I see you.

10           MR. EULISS:  Q.  Okay.  I just want to make sure

11  that you were able to see where your lawyer is.  I'm not

12  sure how much you'll hear from him during this, but if

13  he's there, he may go ahead and enter some objections

14  occasionally.  But have you ever been deposed before, Mr.

15  Leath?

16      A.   Deposed?

17      Q.   Yes.  Have you ever had your deposition taken

18  like we're doing right now?

19      A.   No, I haven't.

20      Q.   All right.  I'm just going to give you some

21  preliminary instructions and guidance on what you can

22  expect here, and then we'll just, excuse me, start

23  talking, diving into some questions.

24           So as you see next to you we have a court

25  reporter there, Karen.  She's got her keyboard there.  She

                                                              5

1    is transcribing word for word everything that we all say

2    here today to create a written record of it.  So every

3    question I ask she's going to transcribe, and then every

4    answer you provide she's simply going to transcribe.  And

5    at the end of the deposition she'll process that and

6    create a transcript so that we can refer back to it later

7    in the case about, you know, what questions I asked and

8    what answers you gave and potentially whatever objections

9    Mr. Sobel chooses to enter.

10          She gave you an oath at the top, so I take it you

11   understand that you are now testifying under oath; is that

12   right?

13        A.   Yes, she did.

14        Q.   Okay.  Great.  Now because Karen is taking down

15   what we're saying, it's important that the responses you

16   give to my questions are audible rather than using head

17   nods and head shakes.  Oftentimes through depositions it

18   can start taking on a conversational feel.  It's just

19   important to remember that we're trying to get a written

20   record of what's said, so to give audible responses.  And

21   similarly to make sure and do the best we can to not talk

22   over one another so that Karen can have an easier time

23   capturing what everyone says.

24          Do you have any questions for me?

25        A.   I'm good.  I'm waiting on you.

6

**Exhibit C, p.6**

1       Q.   Okay.  Okay.  No, that's fine.  That's fine.  All

2    right.  Just at the top of this deposition before we get

3    to substantive questions, I know from reading your

4    complaint that you're suffering from significant vision

5    loss and I wanted to know whether or not you are capable

6    of reading any documents if we were to put some of them in

7    front of you today.

8       A.   Well, closely I can read them, this close.  I'm

9    blind in my left eye and I see partially out of my right

10   eye.  Both my eyes were operated on.  I'm quite sure that

11   you have the medical reports from the hospitals.

12      Q.   Okay.  All right.  That's good.  I just didn't

13   want to put anything in front of you if you were not going

14   to be able to look at it and review it.

15      A.   Well, the only reason I had --

16      Q.   I want to make sure we're fair there.  All right.

17   So --

18      A.   The only reason I can see is if my glasses.  As

19   far as read something, if it's close, close to me.  The

20   doctor tell me after like it's -- if the stenographer is

21   right here, I can't see this -- this letter clearly, and

22   it's that's about, what, 25 to 30 inches from the front of

23   me.  Can't see that.  So it would have to be close to me

24   too.  And like seeing you, seeing you, I don't see none of

25   you all's faces clearly.  Nothing.  I don't see you all

7

1    clearly at all.  That's how bad my vision is.

2         Q.   Okay.  I understand.

3         A.   I used to have 20 -- I used to have 20/40 vision.

4    That's what they told me, 20/20 vision.  It was better

5    than 20/20.

6         Q.   All right.  We will get back to the state of your

7    vision without a doubt later in the deposition.  I just

8    want to start with your time at USP Lewisburg.  You're

9    presently incarcerated at Atwater; correct?

10        A.   Correct.

11        Q.   All right.  Do you recall when you were first

12   brought to Lewisburg?

13        A.   I don't know the exact dates, but it was -- I

14   think it was in 2015.  It might have been 2015 I'm quite

15   sure or more towards '16.  I'm not sure of the correct

16   date.

17        Q.   Okay.  And were you transferred to Lewisburg from

18   another penitentiary?

19        A.   No.  I came from Dallas State Penitentiary in the

20   Philadelphia system.  I came from Dallas State

21   Penitentiary to Lackawanna County.  From a Lackawanna

22   County they took me to Canaan.

23        Q.   Can you tell me why you were transferred to USP

24   Lewisburg in '15?

25        A.   Well, I got a -- the officer, they -- at the time

8

**Exhibit C, p.8**

1     you know the situation at Canaan with the officer that got

2     -- that got killed.  They was really being really strict

3     on guys.  This is my first -- this is my first shot in a

4     USP.  They said that I assaulted a guard and I had -- and

5     they said I pulled or had something on me or something,

6     but they never got nothing on me.  They never got nothing.

7     They said there was contraband.  They don't know what it

8     was.  They said I assaulted a guard.  If I had assaulted a

9     guard, the FBI would have picked it up and gave me a

10    charge for it.  They never -- they never -- they never --

11    they sent the video off to the -- sent the video out --

12    this is me telling you.  I'm only telling you what they

13    telling me.

14           They sent the video out to the FBI.  The FBI sent

15    it back, but they didn't bring no charges against me.

16    They said that I didn't ever assault the guard, but the

17    FBOP is saying that I started -- they didn't let me see

18    the video or nothing, which I know I never assaulted the

19    guard.  I was in jail -- I was in jail -- I did 23 years

20    in the state penitentiary.  All right?  I came and I was

21    on parole and came here.  These people, they put me in the

22    SMU program.  They signed me up for the SMU program for

23    no -- for my extraction.  I did my SHU time and

24    everything.  They gave me a one -- one and a two series.

25    I think you have it right -- you should have all the

9

1    documents right here.  Do you not have that?

2        Q.   Yeah, I have everything you and your attorney

3    have produced to us.

4        A.   As far as so --

5        Q.   So when you first arrived to Lewisburg -- I'm

6    sorry?

7        A.   Go ahead.  What was you saying?

8        Q.   When you first arrived to USP Lewisburg, did you

9    immediately go into SMU?

10       A.   Yeah, I got processed and went into the SMU.  I

11   was doing good and everything.

12       Q.   Did you know anyone at USP Lewisburg when you

13   first arrived?

14       A.   No.  Remember, I just did 23 and a half years.

15       Q.   And when you first --

16       A.   I just did 23 and a half years in a state

17   penitentiary in Philadelphia system.  I don't know no one

18   in a federal system.

19       Q.   All right.  And when you first arrived at USP

20   Lewisburg, did prison officials ask whether there were

21   other prisoners there that had a problem with you?

22       A.   Yeah, I tell them I don't have no problem.  Like

23   I told you, I shouldn't have had no problem.  I hadn't

24   been there for 23 years so how do I have a problem.

25       Q.   Okay.

                                                        10

1      A.    The last time I was in the federal system was

2   from '93 to '95 when I was going to court.  I was down in

3   Farrington, New Jersey.  And from '93 to '95 --

4      Q.    All right.  Did you have --

5      A.    From '93 to '95 --

6      Q.    Did you have a cellmate when you first arrived at

7   Lewisburg?

8      A.    Yeah.

9      Q.    Do you remember that individual's name?

10     A.    I don't.

11     Q.    Was that individual your only cellmate until

12  Trevor Charlton became your cellmate?

13     A.    Well, I had -- I had a couple -- I had like

14  three people.  I figured I had like one, two -- I might

15  have had three other cellmates, two other cellmates before

16  that, before that incident.

17     Q.    Do you know why those two or three prior

18  cellmates were transferred away from you?

19     A.    Well, the other two -- well, we was in the cell

20  -- one time we was in the -- we was in the shower.  One of

21  the cellmates got in there and the other guy got in there.

22  One of my cellmates -- one of my cellmates -- they had us

23  in a four-man cell.  I was -- I was telling them in

24  Lewisburg, they got you in a four-man cell.  It's four men

25  to a cell and one taller and all that.

11

**Exhibit C, p.11**

1       And I was telling my cellie I don't really want

2   to be in that type of cell right now with four inmates in

3   the cell.  I don't know how it came about, but anyway, you

4   got these officers there named Hess and Shesley, Moore and

5   -- Hess, Shesley, Moore, and Gilligan.  Right?  Do you

6   hear me?

7       Q.    Yeah.

8       A.    The situation happened in the shower where I'm in

9   the shower and a nurse comes in.  You know, she comes into

10  the shower room.  It's a shower room about a little bit

11  bigger than this.  There's about six showers in there.  So

12  the shower room in there and everything.  They take

13  everybody out.  They come to me.  You know, we always

14  speak to the nurses.  It's nothing -- nothing about it.

15      So the guard -- so the guard -- she comes into

16  the shower room though to give a guy medicine, give this

17  other inmate medicine, give him his medicine.  So the

18  guard says something to me about, you know, you're in the

19  shower and this and that and you're talking, and I'm like,

20  yeah, but I always speak to her; what's the problem?  So

21  he say -- he say all right.  So they get into -- he say

22  something to me.  They tell them to take me back to the

23  shower.

24      When I get back to the shower, he kicked me in my

25  back.  I'm handcuffed already.  He kicked me in my back

12

**Exhibit C, p.12**

1    and punched me all up in my face and, you know, cut me up,

2    cut my eyes up and all that.  This is how all this shit

3    started in the SMU.

4        Q.   All right.  So this incident that you're telling

5    me about, this all happened before Trevor Charlton became

6    your cellmate?

7        A.   Yeah.  And this is -- and the same guard,

8    Shesley, that put his hand on me put that dude in my cell.

9        Q.   Okay.

10       A.   All it was was a --

11       Q.   Tell me the name --

12       A.   Shesley.  Officer Shesley.

13       Q.   Tell me the names of the guards again.

14       A.   Moore, Hess, Gilligan, and Shesley.

15       Q.   Okay.  Officer Moore.

16       A.   They all work -- they all work --

17       Q.   And then Hess you said?

18       A.   All the guards that work J-Block.  It was the

19   whole J-Block.  J-Block, the J-Block on the bottom tier.

20   I was on the first tier.

21       Q.   All right.  And you said Gillian, was that the

22   third officer's name?

23       A.   Gilligan.  Gilligan, yeah, that's his name.

24   Gilligan, like Gilligan's Island.  If I ain't mistaken,

25   it's Gilligan.

                                                           13

**Exhibit C, p.13**

1       Q.   Hess.

2       A.   Hess, Shesley.  Hess, Shesley, Moore, and

3   Gilligan.

4       Q.   All right.

5       A.   I'm in the shower.  They're telling me --

6       Q.   Shesley?

7       A.   Shesley.  Shesley.  They're telling me -- I go

8   and sit down and I said, listen, we're not compatible in a

9   cell.  I even told Bingenger.  I think his name is

10  Bingenger.  He's my counselor or he's my unit team.

11  Bingenger or Begginger.

12          I'm saying that right, Sobel?  What's his name?

13          MR. SOBEL:  Just testify from your recollection.

14          THE WITNESS:  You don't sound like Sobel, man.

15          MR. EULISS:  That's your attorney.  That's --

16  that was your attorney.

17          Jonathan, maybe you can just identify yourself

18  when you speak so there's clarity on that.

19          MR. SOBEL:  I'll do that.  I'll do that.

20          THE WITNESS:  I'm saying from your -- I don't

21  have any -- I don't have any paperwork from here, so I'm

22  asking you is that the name that I gave you in your

23  paperwork?

24          MR. SOBEL:  This is Jonathan Sobel.  They just

25  want you to rely on your recollection.  Don't worry about

                                                        14

**Exhibit C, p.14**

1    if you have the paperwork or not.

2         THE WITNESS:  No, I'm saying is the name correct?

3         MR. SOBEL:  Don't worry about that.  Just answer

4    the question if you remember it.  That's all.

5         THE WITNESS:  Okay.  Well, that's the situation

6    right there as far as -- I think it was -- whatever the

7    unit guy name, I asked him six times to move out the cell.

8    They laughing and giggling like it's a joke.  You know

9    what I mean?  Like it's a problem for me to move.  I'm

10   trying to alleviate the situation.  And this is -- and

11   this, the situation that happened and the guards is

12   telling me in the shower while he's in another shower.

13   They take him to another shower why don't I put my hands

14   on him.  And I said there ain't no reason for me to put my

15   hands on that man.  I'm not trying to go through that.

16   "But that's the only way you all are going to get moved."

17   This is what they're telling him.  This is the SMU.  I'm

18   quite sure you all have heard this before because I'm sure

19   you all have heard about the SMU program in Lewisburg.  I

20   know this ain't the first time.

21        Q.   All right.  And you said that -- and you said

22   that you suffered an eye injury as a result of this?

23        A.   Yeah, both of my eyes.  Both of my eyes were

24   operated on.

25        Q.   Now I'm talking about this incident that you're

                                                        15

**Exhibit C, p.15**

1    telling us about in the shower.  You said you suffered an

2    eye injury there?

3         A.    No, I didn't that.  I said -- I'm telling you

4    what happened that led up to the situation.  You're not

5    listening to me.  I said that this is what the guards is

6    doing, playing -- they're playing -- they're playing good

7    cop/bad cop.  They're telling him the same thing.  When he

8    come in the cell, he can tell you the same situation.

9    When he come in the cell, he's telling me:  Yo, why they

10   tell -- they told you to put your hands on me.  And I'm

11   like, yeah, that's what they're telling me to do to you.

12        Q.    All right.  Let's put -- let's put your

13   interactions with Charlton aside for a moment because

14   we're definitely going to get there.  But I was asking you

15   about prior cellmates.  You said that you had two to three

16   cellmates prior to Charlton.  And what got us on this

17   conversation about this incident in the shower was me

18   asking you why were you separated from those prior

19   cellmates, so that's what I'm trying to get to the bottom

20   of now.

21             Do you know why the two or three cellmates you

22   had prior to Charlton, why you were separated from them?

23        A.    Well, sometimes -- sometime -- the SMU was all

24   about trying to get a cellie that's compatible with you.

25   If you don't have a cellie that's compatible with you --

16

**Exhibit C, p.16**

1    because you're in the cell from 18 months with the same

2    person.  You're going to be in the cell with this same

3    person, so if you're not compatible with this person, it's

4    not going to work, brother.

5            I'm a Muslim.  I pray five times a day and all of

6    that.  Some of them guys are not into that and they get

7    offended about you getting up and doing certain stuff in a

8    cell.  So if you're not -- if they don't have an open mind

9    to what you're going through, it's a problem.  What you

10   have to do is a problem there.

11       Q.   Okay.  So is it fair to say that the prior

12   cellmates, you were removed from them because they

13   disliked the religious practices that you exercised?

14       A.   Well, I'm saying basically it can be that or, you

15   know, some people just ain't compatible.

16       Q.   Did you get into any fights with your prior

17   cellmates?

18       A.   Well, one cellmate I got into a confrontation

19   with.  That's how I got moved out the four-man cell.

20   That's how when they had me in the four- --

21       Q.   Can you tell me about that confrontation?

22       A.   I told him -- he was a homosexual.  I don't want

23   him around me.  I don't want him around me.  I found out

24   he was a homosexual.  I don't want him around me.  I'm a

25   Muslim.  I don't do none of that, so he got to get away

                                                          17

1    from me.  So I told Hess this.  And I told Hess this and

2    all that and this is how the whole situation come about.

3    Because I tell him I don't want to be around the

4    homosexuals.  And I'm quite sure you have it on a

5    write-up.  I said it out to his face in the cell when I

6    was in the cell with them.  They're homosexuals.  I don't

7    want to be around them.

8         Q.    All right.  Did -- did you get into a physical

9    altercation with this prior cellmate who was a homosexual?

10        A.    They wouldn't let me out the cell.  He -- I think

11   he put a request in for us to come to the cell, four-man

12   cell.  So I'm tripping.  We was in a two-man cell, so it

13   is -- it wasn't even our turn for us to put -- but he put

14   a request in for behind my -- he put a copout behind my

15   back.  I didn't even know.  I was in the yard.  He put a

16   request in to go to the cell -- to the cell -- to a

17   four-man cell.  I didn't know it.  So when they put us in

18   -- when they did the 21-day move to move us in the cell,

19   I'm like:  Yo, what is this about?  So I don't make no

20   complaints.  I go to the cell.

21            So some -- then I go to the yard and come back.

22   You know, I know something is going on.  I had a feeling

23   about this dude when they first matched us and put us in

24   the cell with each other.  So I'm like, okay, I don't

25   really care because I'm not into what he into.  Okay?  So

18

**Exhibit C, p.18**

1   now when we get into the four-man cell, I go to the yard

2   and come back.  I'm not with what's going on so I tried to

3   get moved.  They wouldn't move me out the cell.  So he pp

4   the one that brought me in the cell, we get into a

5   confrontation because he don't want to be in the cell with

6   the other two guys that's in there.

7       Q.   What confrontation did you get into?  Was it just

8   verbal or did you get physical?

9       A.   Well, I guess I got the write-up.  I'm saying you

10   have the shots right there.  The shots -- it was a

11   physical altercation.  It got into a physical altercation

12   in there.  I got into a physical altercation with the one

13   was my cellie and they moved me out the cell.  They moved

14   me in a cell by myself.  That's when the other cellie came

15   in.  Before that -- after that I had another cellie.

16   After that I had another cellie that was a Muslim man.  We

17   got along good.  You see, that's the whole thing.  I had

18   another cellie after that that was a Muslim.  He was a

19   Muslim.  We was in a four-man cell too when all this

20   happened, when the situation happened when they moved me

21   up on the third floor.

22       Q.   All right.  Let's start talking a little bit

23   about Trevor Charlton.  When did you first meet him?

24       A.   What you say?  Say that again.  When I first meet

25   who?

19

**Exhibit C, p.19**

1      Q.   Trevor Charlton.

2      A.   Listen to me, I can't tell you that.

3      Q.   Yeah.  When did you first meet him?

4      A.   Listen to me.  You should have all that from the

5  SMU when his date come in.  I can't tell you no dates and

6  all of that.  The dates is going to be -- it's vague in

7  the dates.  I couldn't tell you the dates.  Okay?  I don't

8  know what dates it is.  I don't know what the dates is.  I

9  don't have --

10     Q.   That's okay that you don't know the dates.

11     A.   All right.  The date, as far as the date, I don't

12  know what date.  It's years ago.  All right?  Right now --

13  the only reason why I can't tell you the date or the

14  situation that happened because during my -- during my

15  process of getting transferred, all of my paperwork is --

16  got missing from this situation.  All of a sudden they

17  come up missing.

18     Q.   All right.  I'm not asking for a specific date.

19  When I say to you when did you first meet him, why don't

20  we rephrase it to say describe the circumstances under

21  which you first met him.  Was it when he was first brought

22  to your cell to be your cellmate?

23     A.   That's the only way I ever meet him, man.  Listen

24  to me.  I'm trying to do the 18 months and get out of

25  there.  My situation is -- I'm saying I'm trying to get

20

1    back my life since.  Okay?  I'm -- I'm in the courts at

2    this present time waiting on a decision.  So my thing

3    is -- my thing is I'm trying to do this program and get

4    out.  They put me here under false pretenses and lied to

5    me and got me in this situation.  So I'm trying to -- I'm

6    trying to get out of this situation and the fastest I

7    could and get up out of here.  And I'm trying to do the

8    program and complete the program and get up out of here.

9        Q.   All right.  So Charlton was brought to your cell

10   after you were moved to a cell by yourself?

11       A.   Right.  After the situation happened in the

12   shower with --

13       Q.   All right.

14       A.   After the situation happened in the shower with

15   the guard Shesley when I'm handcuffed and he put his hands

16   on me.

17       Q.   Okay.  Well, you hadn't met Charlton before you

18   said.  This is the first time you're meeting him when they

19   brought him to your cell; right?

20       A.   I never met this man.

21       Q.   All right.  So how did you guys get along in the

22   beginning?

23       A.   Well, when you first come in a cell, you know,

24   when you first came to the cell, the situation as far as

25   he had -- he was under restraints.  He was under

21

**Exhibit C, p.21**

```
 1    restraints.  He had -- you know how -- he had like open
 2    wounds on the back of his ankles and his hands.  He was on
 3    restraints.  So they put a problematic dude in my cell.
 4    All right?  A dude that's staying in trouble or whatever.
 5    I'm trying to complete this program and get up out of
 6    here.  I only had one that one incident.  Only had one
 7    incident.  Okay.  And if you see on the write-ups, you
 8    know, at the one time it was two write-ups that they gave
 9    me that they threw out.  With him it was a process because
10    of him because of something burning in the cell.  You know
11    what I mean?  Then the guard is telling me that we know
12    that since he's the problem, the unit team dude, Bingenger
13    or whatever his name is, he's telling me:  All right.  I
14    know this guy is a problem, but we're going to throw your
15    write-ups out, but he's the problem.
16            And I'm going like:  Listen, man, why you all
17    going to put me in cell with this guy.  But they don't
18    want to move me from this.  They don't move me.  He keeps
19    laughing and joking like it's a problem.  And he's the
20    unit -- he's the unit manager.  He's supposed to alleviate
21    the problem.
22       Q.   Okay.  But describe to me what the -- before you
23    and Charlton got into this fight, describe to me what the
24    tension was between you guys.  Why did you not like each
25    other?
```

22

**Exhibit C, p.22**

1    A.   Well, for one thing he say he don't like being

2    around Muslims.  He don't like Muslims.  He was a

3    Christian and that was the problem.  He was a Christian, I

4    was a Muslim.  He didn't want to be around me.  He told

5    the people that he wanted to move back on C-Block.  So

6    now --

7    Q.   Who did he tell that he wanted to move?

8    A.   He told -- if I ain't mistaken, he told Hess

9    that.  Hess and it was -- and it was another guard.  I

10    can't remember his name at the present time, but he was

11    working on the top, on the third tier.

12    Q.   Did he tell Hess -- did Charlton tell Hess that

13    if Hess didn't move Charlton, that Charlton was going to

14    hurt you?

15    A.   I never heard that.  All I know is this.  If you

16    got me in one shower and you got him in another shower,

17    you telling me -- Moore and Gilligan is telling me to put

18    my hands on him.  You understand what I'm saying?  It's

19    like they're playing conquer and divide.  They're telling

20    me to put my hands.  I'm telling him, listen, man, I'm not

21    into that.  I'm trying to get up out of here.  "But that's

22    the only way you all are going to get moved because we

23    don't care."  This is what they're saying.  "We don't

24    care."

25    So I'm telling them like -- and then at one point

1    I'm telling the unit manager Begginger, or whatever his

2    man is.  He got a funny name.  Bingenger or Begginger,

3    something like that.  I'm telling him:  Look, could you

4    move me out of this situation.  They're not -- they're not

5    trying to do anything.  They haven't done anything about

6    it.  And this has been going on -- I've been his cellie

7    for about damn near about four or five months.  Might have

8    been more.  Three or four months.  Me, I was the dude's

9    cellie, but I'm telling them, I'm telling them, you know,

10   I'm trying to get moved out of this situation because it's

11   not -- it's not going compatible for me.  You know what I

12   mean?

13          I'm saying at the time I'm 50 years old, man.

14   I'm saying all this stuff that I've been doing.  I'm

15   not -- I'm at a place and a rest in my life, man, you

16   know, I'm trying to do better things in my life and do

17   something better.  And at the present time I'm already in

18   this situation because of false -- of falsified

19   documentation.  They falsified documentation and put me in

20   this situation already, so I'm not -- I'm not trying to

21   make a worse situation for me.  It's all falsified because

22   if the FBI, if they sent a video out to the FBI and an

23   officer just got killed down in Canaan.  At that present

24   time it's been almost past a year.  If I put my hands on

25   this officer and assaulted the officer, they would have

                                                              24

**Exhibit C, p.24**

1   given me a case.  They would have gave me a street case

2   for that.

3       Q.   Let -- let's go back to what you were saying

4   about the shower real quick.  When you said that they were

5   telling you to put your hands on him, who's him?  You mean

6   one of officers or Charlton?

7       A.   No, they said put my hands on the inmate, the

8   cellmate Charlton.

9       Q.   So they were trying to get you to fight him?

10      A.   And listen -- they was trying to get me to have

11  an altercation or fight him and they was telling him the

12  same thing.  They put me in one shower and put him in

13  another shower and this is what they was doing, man.

14      Q.   Okay.

15      A.   And then he had come in the cell and tell me did

16  they say this to you, and I was like, yeah, they said the

17  same thing to me to you.  So he's already -- I mean, it

18  was like some Willie Lynch shit they were doing.  You

19  know, conquer and divide.

20      Q.   All right.  All right.  So you and Charlton are

21  talking to each other and you realize that these guards

22  are telling each of you separately to fight each other.

23  What makes you guys actually end up fighting?

24      A.   Listen, man, he's telling me that and he's -- and

25  I'm saying -- I asked him:  Look, this is what you want?

25

**Exhibit C, p.25**

1    This is what I'm saying.  When I say this is what you

2    want, I'm saying is this what you're about.  He said, no,

3    this ain't what I'm about.  Okay.  Then my thing is if you

4    don't want to be in here, let's separate, man, and get

5    away from each other.

6           Now a week, about a couple weeks later he's

7    playing with the same two guards and telling them:  Well,

8    I don't want to move.  You know, I don't want to move.  So

9    I don't know what's going on with them or what type of

10   deal they made with him.  You see what I'm saying?  So now

11   I'm like trying to get up out of here, but I'm not -- I'm

12   saying for real for real I'm not trying to go through the

13   situation with the guards.

14          Just like the situation when he brought me

15   upstairs.  He's going to loosen the handcuffs up and

16   there's two, three guards on the top on the other tier and

17   another guard on another tier.  He's trying to get me to

18   slip off the handcuffs to do something to them.  You know

19   what I mean?  Because I think they're trying to kill me.

20   That's what I'm trying to think.  That's what it seemed

21   like to me.  They're trying to set me up so they can do

22   something to me.

23      Q.   All right.  So did you ever --

24      A.   And I -- and I heard that -- I heard that dudes

25   got pushed down the steps and hurt and all this in this

                                                            26

1    program.  And I heard that guys, they beat guys half to

2    death all that in this program.  This is what's going on

3    in this program.

4         Q.   All right.  Did you ever say to any guards that

5    you felt threatened by Mr. Charlton and you needed to move

6    your cell because of that?

7         A.   No, I ain't never felt threatened by him.  I

8    never felt threatened by him.  The point what I'm saying

9    is if they telling him one thing and they're telling me

10   one thing, I know what they're telling me to do, so

11   they're telling him the same type of thing.  But the point

12   what I'm trying to say is I never felt threatened.  It was

13   the point that I felt threatened, it was the point that

14   I'm trying to alleviate the situation so I can do the

15   program and get up out of here.

16              I'm saying, you know, I got five grandkids, man,

17   and I got son and a daughter I'm trying to get -- I would

18   say out of what I'm trying to get closer to my family and

19   my kids.  And I'm trying to get closer to my -- I'm trying

20   to get back to what I was doing before I went to the

21   program.

22        Q.   All right.  So just to make sure that we're

23   clear, you never said to any prison official that Mr.

24   Charlton was going to physically harm you if you did not

25   move cells?

27

**Exhibit C, p.27**

1    A.   No.  I said that we're not compatible.  That's

2  what I told -- that's what I kept telling Bingenger.  Told

3  them we're not compatible, we don't get along, can you

4  move us.  Can you move one of us.

5    Q.   All right.  All right.  Let's talk about the day

6  that you and Mr. Charlton did end up fighting.  Can you

7  walk me through that.  Tell me how it started.

8    A.   Well, the man put his hands on -- the man swung

9  on me; right?  And I ain't going to lie, you know, I beat

10  him.  I did what I had to do.  And he was down.  I let the

11  man up.  I tell the man get up off me.  He had my leg,

12  holding to my leg, so I'm like get off me.  I try to pull

13  back, and the man, he act like he was going to let it be

14  ended.

15       Now remember, I'm 50 years old at the time.  He's

16  40.  I'm not worried about this guy because, you know, I

17  already -- I know that -- I'm not saying that, you know,

18  I'm the type of guy that's -- that -- I can handle myself.

19  Put it that way.  I'm not worried about him.  My thing is

20  I'm trying to alleviate the problem.  The problem -- the

21  problem is -- the problem with the situation is this, that

22  we are -- is going at it, we're going at each other for

23  the simple fact is this.  They're not doing their job.

24  They in control of this program.  They're the authority.

25  When I went to them and told them and my counselor and the

28

1  unit manager, listen, I'm trying to get moved, man, they

2  didn't move me.  This is their fault.  This -- the whole

3  situation occurred because this is their fault.  I asked

4  them over six times to be moved.  He asked at least three

5  to four times, and then he switched up after the guards

6  started talking to us in the shower.

7      Q.   All right.  Why did he swing on you?  You said

8  the whole thing started because he swung on you.  What led

9  to him doing that?

10     A.   I was getting up off my salat.  This is the salat

11 prayer.  It was late and it was after the Isha prayer.  It

12 was the late prayer.  I was on Isha prayer, late prayer.

13 He got an attitude about that.

14     Q.   Okay.

15     A.   He was fishing under the door.

16     Q.   What did he say to you?

17     A.   He was fishing under the door with some other

18 guys.  Excuse me.  Let me off my prayer real quick and you

19 can go back and what you were doing.  You know, fishing

20 lines, you know how it is, under the door.  I'm trying to

21 get -- I'm trying to take care of that and make my Isha

22 salat.  He got an attitude with me about offering my

23 prayer.

24          And this is the situation where it's -- this is

25 what he already told them.  He told them already that he

29

1    didn't want to be in a cell with a Muslim.  So they should

2    have moved us already.  They should have -- they should

3    have alleviated the situation.

4        Q.   All right.  Did anybody witness the fight between

5    you and Mr. Charlton?

6        A.   I'm saying you all should have it on camera.  You

7    all should have had all of that.  You've got cameras in

8    there.  You all should have all of that.

9        Q.   Did any -- did any other prisoners witness the

10   fight?

11       A.   I don't know.  We in a cell by ourself.  I can't

12   tell you all that.

13       Q.   As far as you know did any of the guards witness

14   the fight?

15       A.   I can't tell you all that.  I don't know.  All I

16   know -- all I know is the officer came and I was escorted

17   at that time.  I was escorted to the hospital.  I went to

18   the infirmary and they escorted me to the outside

19   hospital.  Excuse me.

20       Q.   When -- when Charlton swung on you or even the

21   moments leading up to that when he was giving you problems

22   with your prayer, did you ever call out for the guards?

23       A.   No.  I'm saying why would I do that.

24       Q.   All right.  So he hit you first?

25       A.   All I was doing was -- all I was doing was

30

**Exhibit C, p.30**

1    defending myself, man.  That's all I did.  I never

2    initiated.

3        Q.   Okay.

4        A.   I never initiated anything or anything.  I was

5    defending myself.

6        Q.   All right.  Let's talk about your injuries.  Tell

7    me about the injuries that you suffered as a result of

8    that fight.

9        A.   I lost -- I got a finger stuck in my eye.  A

10   finger got stuck in my eye, in my left eye and in my right

11   eye.  And I can't see -- I can't see anything.  I'm blind

12   in my left eye and I can only see partially out of my

13   right eye a little bit.  I can see better with my glasses.

14       Q.   Okay.  And both of those -- both of those

15   injuries to both eyes were from the fight?

16       A.   Yeah.

17       Q.   Do you have cataracts in one of your eyes?

18       A.   That's -- that's the result of this -- that's the

19   result of my right eye, seeing out of my right eye.

20   That's the result after the operation of -- excuse me.

21   After the operation and all the situation that happened as

22   far as the operations and the care for my eye, I develop a

23   cataract in my right eye.

24       Q.   Okay.  And -- oops.  How did I do that?  Hang on

25   one second, folks.  Oh, there you are.  All right.

                                                          31

**Exhibit C, p.31**

1     A.    What is that that you keep doing with the -- what

2     is that that's -- you know, you keep on with the camera,

3     like is it on and off.

4     Q.    What's the camera doing?

5     A.    Is it off and on?

6     Q.    Can you see me now?

7     A.    Yeah, it's on now, but it seemed like every time

8     I talk it's going off and on like.

9     Q.    Okay.  So other than the eyes, you also suffered

10    some injuries to your ears, right?

11    A.    Yeah.

12    Q.    Can you describe those for me?

13    A.    Yeah.  Well, I was bitten.  I was bitten on the

14    head, bitten on my finger.

15    Q.    Uh-huh.

16    A.    You know, like I was bitten, you know, like I --

17    I'm trying to say like, you know, this is -- this is what

18    happened.

19    Q.    Okay.  And are parts of your ear missing as a

20    result of this?

21    A.    Yes.

22    Q.    Same thing with your finger, is there a piece of

23    your finger missing?

24    A.    Well, no, no, the finger, they sewed it up.  It's

25    all right.  You know, I got a little scar on it, but it's

                                                              32

1    okay.

2         Q.   Okay.  Now I know you have a corrections officer

3    in there with you.  I'm wondering if it's possible for you

4    to come up close to the camera just so we can see your

5    ears.  Can we do that?

6              OFFICER COGGINS:  Yeah.

7              THE WITNESS:  They sewed it up.

8              MR. EULISS:  Q.  Yeah, you can't really tell.

9         A.   On both of them.  And my eye.  My eyes.  And this

10   is the eye I can see out a little bit.  This is the blind

11   eye, my left eye.

12        Q.   Uh-huh.  Any other physical injuries?

13        A.   No, that's it.

14        Q.   Okay.  Now what about -- go ahead.

15        A.   Go ahead.  I'm saying I was at -- I went to

16   see --

17        Q.   Any emotional --

18        A.   Well, I'm --

19        Q.   Please finish.  Finish your answer.  What were

20   you going to say?

21        A.   I'm saying, you know, as far as a situation like

22   this, you're going to have -- you're going to have

23   emotional damage and all that type in there, you know.

24   But I mean, it's physical damage, emotional damage, you

25   know, and I'm dealing with it.  I haven't went to see the

                                                            33

**Exhibit C, p.33**

1   -- when I was there in Lewisburg, I had seen a

2   psychiatrist about the situation of trying to deal with my

3   eye loss and all that, you know.  And I just got point of

4   views from her and taking up the class as far as the

5   mental health classes and stuff.  I took -- I took some

6   incentives myself with the books and read and I passed the

7   mental health classes and stuff like that.  I got the

8   certificates for that to help myself.

9        Once my eye got a little bit better where I could

10  put the papers up and read and I could read a little bit,

11  I read the stuff and did the paper -- and did the work on

12  that.

13       Q.   Okay.  Could you describe some of the emotional

14  and psychological injuries that you're continuing to

15  suffer from?

16       A.   Well, I'm not -- I'm not saying that it's

17  psychological injury.  It's like as far as it's a mental

18  thing where it's -- you know, I'm -- I'm just dealing with

19  the situation that happened to me.  Having -- having my

20  vision all my life and this happen, you know, is a

21  situation where I have to adapt to my situation.  And I'm

22  trying to adapt and do better and I'm going through the

23  transformation right now as far as I transformed and I

24  have a disability now for this.  And it's a disability and

25  I trans- -- you know what I mean?  And I am trying to make

34

1   the transformation into, you know, this situation to make

2   my life a little bit better.

3          I have to -- I have to adapt to my surroundings

4   and everything and I have to adapt to my eyes being not --

5   having like -- having a good sight and then I don't have

6   it, it's -- my eyes is, you know, is really bad.  I mean I

7   can't see.  I can't see out of my left eye.  I'm blind in

8   my left eye and I can see partially out of my right and

9   I'm adapting to the situation.  It's a transformation.

10  It's a hell of a transformation.

11      Q.   Going back to when you were still cellmates with

12  Charlton, did you make any written requests or --

13      A.   Yeah.

14      Q.   -- put anything down in writing requesting that

15  you or Charlton be moved or that you two be separated?

16      A.   Well, Bingenger told me -- this is when he was

17  going on a two-week vacation or something.  He said I'll

18  be back in two weeks, and this situation happened when he

19  was on vacation.  All right?  But three -- three months

20  prior to this I had been asking about getting away from

21  this situation three months prior to this.  So this happen

22  when he went on vacation for like two weeks.

23      Q.   Okay.  So you didn't -- you didn't do anything in

24  writing?

25      A.   Well, yeah, I wrote him.  I gave him a request.

35

**Exhibit C, p.35**

1    I gave Bingenger a request slip.  I gave him copouts

2    saying that I would like to be moved, verbally and written

3    copouts.

4        Q.   Okay.  All right.

5        A.   He was at my door.  He had come around and made

6    his rounds.  He would make his rounds and that's how I

7    expressed this to him.

8        Q.   All right.  So you're at Atwater now.  Do you

9    have a cellmate right now?

10       A.   Not right now.

11       Q.   How long has it been since you've had a cellmate?

12       A.   Well, we've been on lockdown since --

13       Q.   About?

14       A.   We've been on lockdown I think about two weeks

15   now.  I just had a cellie.  I just --

16       Q.   Did you have a cellmate before the lockdown?

17       A.   Yes.

18       Q.   How did you get along with that cellmate?

19       A.   It was all right.  You know what I mean?  We

20   know -- we -- it was good.  You keep asking me about these

21   cellmates like you're trying to paint a pattern like I'm

22   the problem.  Like you're trying to paint the picture or

23   something.

24       Q.   What about -- what about when you left Lewisburg.

25   You went to Big Sandy; right?

                                                           36

**Exhibit C, p.36**

1    A.    Yeah.

2    Q.    Okay.  And I had -- did you get into an

3    altercation when you --

4    A.    No.  When I went -- when I left Lewisburg, I went

5    to Allenwood.  This is what -- I went to Allenwood, then I

6    went to -- then I went to Big Sandy.  Then Coleman and

7    then here.  And I never had any infractions.  I never had

8    any infractions or write-ups.

9         At Big Sandy I got into an altercation.  I had --

10   I got into an altercation in the hole with a cellie.

11   That's the only infractions.

12   Q.    Can you tell -- all right.  Tell me about that

13   altercation with the cellie in Big Sandy.

14   A.    I'm saying the situation in the cell, the

15   situation in the cell with the dude, he coming in all high

16   off K2 and he's tripping.  That's all.  And, you know, it

17   wasn't nothing about -- it wasn't really about nothing

18   nothing.  He's just tripping and, you know, he's high off

19   K2 and they put him in my cell.

20   Q.    Was he your cellmate at that time --

21   A.    Yes.

22   Q.    -- when he was high on K2 when you guys got into

23   this fight?

24   A.    Yeah, he was tripping on K2.  It wasn't nothing.

25   It really wasn't nothing.  I got transferred right after

                                                          37

1    that.

2         Q.   Okay.  Who hit who first in that altercation?

3         A.   I never hit -- I never initiate anything, man.

4    At the time I'm -- can I ask you something?

5         Q.   So this --

6         A.   I'm blind in my eye.  Do you think I would

7    initiate a situation where I'm not -- you know, I'm -- I'm

8    blind at this present time.  I'm not going to initiate

9    anything.

10        Q.   All right.  So he hit you first.  What preceded

11   him hitting you?  What happened that he ended up striking

12   you?

13        A.   No, well, the man was -- I tell you the man was

14   dysfunctional as far as he was high off drugs.  When

15   you -- I'm quite sure you all know about that.  If he's

16   high off these synthetic type of drugs, he's dysfunctional

17   and he just snapped out and, you know, I just was

18   defending myself.

19        Q.   Okay.  And had you been putting in copouts when

20   you were at Big Sandy asking -- you know, saying that you

21   shouldn't have a cellie because of your vision loss?

22        A.   No, I -- I put a copout in because I'm dealing

23   with the situation with these cellies.  And I said,

24   listen, it's in my files, it's in my files that they put

25   me in a single cell down in Lewisburg.  So it's in my

                                                            38

1    files that I'm not supposed to be with a cellie.  It's

2    already in my -- it's written in my files.  It's written

3    in my paperwork that, so why should I have to put it in.

4    When I tell them that, they said, yeah, you're right, you

5    know, but we got -- there's always some type of excuse.

6        Q.    Right.  Okay.  But it was in your file, but did

7    you put in those copouts while you were in Big Sandy?

8        A.    At the time I was in the SHU.  I was waiting on

9    to get transferred.

10        Q.    So you did?  That's a yes, you put in the

11    copouts?

12        A.    No, I'm saying at the time I don't know if -- if

13    you're talking about a situation that when a captain came

14    to see me because of my cellie say something to him and

15    they put us -- they took us out and put us in cages and we

16    saw each other and all that.  And I'm like listen, man, I

17    got a situation with my eyes, this, this, and that.  And

18    you know, they took him and put him in another cell, but

19    they're still going to put somebody in your cell.  So, you

20    know, it's -- it's like defeating the purpose for even

21    putting the situation in.

22        MR. EULISS:  Okay.  Let's take a five-minute

23    break.  I just want to go over a couple things.  And,

24    Jonathan, if you have any questions, we may turn to you

25    soon.

39

**Exhibit C, p.39**

1        MR. SOBEL:  Thank you.

2        MR. EULISS:  We'll go off the record for five.

3            (Recess from 11:07 a.m. to 11:12 a.m.)

4        MR. EULISS:  Mr. Leath, thank you for taking the

5    time to answer my questions today.  I don't have anything

6    further for you, so I'll turn it over to Mr. Sobel to see

7    if he has anything.

8        MR. SOBEL:  I just have a couple questions.

9

10                        EXAMINATION

11   BY MR. SOBEL:

12       Q.   James, good afternoon.

13       A.   Good afternoon.

14       Q.   Do you remember after the incident with Mr.

15   Charlton where you were treated --

16       A.   Yeah.

17       Q.   -- for medical treatment?

18       A.   It was up -- I think I gave you the -- if I ain't

19   mistaken, I gave you the name of the hospital.  I know I

20   remember when I was at Big Sandy I know it was Pikeville

21   -- the Pikeville Medical Center, right -- Pikeville --

22   Pikeville Medical Center, I know I was treated there.  The

23   one that I did the operation at I'm not sure where I was

24   at.  It was -- it was out in -- it was out in that area

25   Lewisburg area.

                                                        40

**Exhibit C, p.40**

1    Q.    Okay.  When you said Pikeville, are you talking

2    about Kentucky?

3    A.    Yeah, that's out in Kentucky.  I was out in

4    Kentucky.  I remember I had a Hazelett -- Hay Kazelett --

5    Kay Hazelett.  Kay Hazelett.  That was my ophthalmologist.

6    Q.    Did you receive any treatment when you were in

7    Florida?

8    A.    Yeah, I was -- when I was in Florida, did I go

9    out?  I never went out.  When I was in Florida I never

10   went out for my eyes.  I never went out.  Only -- only at

11   Big Sandy and if I ain't mistaken Lewisburg.  And did I go

12   Allenwood?  I might have went back to the doctors at

13   Allenwood.  Whatever -- whatever the doctors on that note,

14   the hospital on that note.  I don't remember.  I know

15   remember Pikeville Medical Center.  That was out in Big

16   Sandy out in Kentucky.  I remember that.  That was real

17   nice.

18   Q.    And were you in Victorville, California?

19   A.    Well, Victorville, I stayed there just -- this is

20   like an overnight stay to come here.  That was like a

21   two-week stay.  That was like a holding facility.

22   Q.    Have you seen any doctors since you've been in

23   Atwater?

24   A.    Well, I had a Dr. Goodman, Good- -- I think it

25   was a Goodman if I ain't mistaken.  I just got a pair of

41

1    glasses and they're not even right.  I can't see out of

2    them right.  Everything is like -- you know, I really need

3    -- I really need to get to see an outside ophthalmologist

4    to get some good glasses for my eyes.

5         Q.   Have you been outside of the facility -- of the

6    prison since --

7         A.   Here, no, I haven't.

8         Q.   -- you've been in Atwater?

9         A.   No, I've never been out.  I haven't even seen a

10   doctor.  They had the doctor come in here, this guy

11   Goodman or Guzman or something like that.  Dr. Goodman.

12        Q.   All right.  Did you -- did you say one of the

13   guard's names was Lettinger?

14        A.   No.  I said the guard's name was Gilligan.

15        Q.   Not Gilligan.

16        A.   What you talking about?

17        Q.   No.  Did you testify during the deposition that

18   someone you had interaction with who I believe you said

19   took a vacation for a few weeks?

20        A.   Yeah.  Begginger, Bingenger.  He's supposed to be

21   the unit manager.  He's supposed to be the unit manager.

22   Bingenger, Bellinger, or something like that.  I think you

23   have it in those notes.  I think I gave the correct name

24   because I think I gave it to you then.

25        Q.   Okay.  Is Mr. Charlton currently in Atwater?

                                                          42

```
 1        A.    No.  He wouldn't be here.  I didn't see him.

 2             MR. SOBEL:  Okay.  That's all I have.  Thank you.

 3             MR. EULISS:  Okay.  That's it.  We can conclude

 4    then.

 5             MR. SOBEL:  All right.

 6             MR. EULISS:  Jonathan, are you going to read and

 7    sign or what?

 8             MR. SOBEL:  Yeah, I can.

 9             MR. EULISS:  It's probably a little hard.

10             MR. SOBEL:  Yeah, for him to do it, yeah.

11             THE WITNESS:  What you say?

12             MR. SOBEL:  I'll review the transcript, make sure

13    everything is accurate and then sign it and send it back

14    to the court reporter.  Okay?

15             MR. EULISS:  Well, I don't think you can do that;

16    right?

17             MR. SOBEL:  I don't think he can.

18             MR. EULISS:  Yeah, all right.  So, I mean, I

19    guess we can talk about this more, but it sounds to me

20    like you're going to waive read and sign then?

21             MR. SOBEL:  Yeah, yeah, that's fine.  If you want

22    to do it that way, that's fine.

23             MR. EULISS:  Okay.  All right.  Cool.  We're

24    done.  Thank you.

25             MR. SOBEL:  Thank you.
```

43

**Exhibit C, p.43**

1                      (Whereupon, the deposition of JAMES

2                 LEATH concluded at 11:19 a.m.)

3                   --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

1   STATE OF CALIFORNIA,  )
                          )
2   COUNTY OF MERCED.     )

3           I, KAREN A. AUFDERMAUR, a Certified

4   Shorthand Reporter of the State of California, do hereby

5   certify:

6           That on November 14, 2018, at the hour of 10:15

7   o'clock a.m. thereof, the witness herein named, JAMES

8   LEATH, appeared before me for the purpose of giving his

9   deposition; that after the witness was duly sworn by me in

10  all respects as required by law, I took down in shorthand

11  notes the said witness' testimony and the proceedings had

12  at the time of the giving of such testimony.

13          It was stipulated by and between counsel, with

14  the consent of the witness, that examination, reading, and

15  signing of the deposition be waived and the deposition for

16  all purposes in this case shall be deemed to have been

17  signed by the witness.

18          That I thereafter transcribed my shorthand notes

19  of such testimony by computer-aided transcription, the

20  above and foregoing being a full, true, and correct

21  transcript of all proceedings had and testimony given.

22

23          _____

24          KAREN A. AUFDERMAUR, CSR #10919

25          Certified Shorthand Reporter

45

**Exhibit C, p.45**

DEFENDANT
EXHIBIT

D

# Transcript of the Testimony of:

# Hazelett, M.D., F.A.A.O. Kay

**Date:** March 29, 2019

**Case:** James Leath v. United States of America
3:17-CV-1418

*Tom Crites & Associates International, Inc.*
*P.O. Box 9438*
*Savannah, Georgia 31412*
*Phone:  800-631-3480*
*Fax:  912-233-7777*
*critesreporting@aol.com*
*www.critesintl.com*

1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES LEATH,                 )
                             )
     Plaintiff,              )
                             )  CIVIL ACTION FILE
 vs.                         )
                             )  NO. 3:17-CV-1418
UNITED STATES OF AMERICA,)
                             )
     Defendant.              )


          Videotaped Deposition (by VTC) of KAY

HAZELETT, M.D., F.A.A.O., taken by counsel for

Defendant, pursuant to Notice, before Tracy Z.

Norwood, Certified Shorthand Reporter and

Registered Professional Reporter, at UNITED STATES

ATTORNEY'S OFFICE, 22 Barnard Street, Suite 300,

Savannah, Georgia, on March 29, 2019, having

commenced at 10:55 a.m.

**Exhibit D, p.2**

2

2    APPEARANCES OF COUNSEL:

3        FOR THE PLAINTIFF (via telephone):

4                Jonathan J. Sobel, Esquire

5                LAW OFFICES OF JONATHAN J. SOBEL

6                1500 Walnut Street, Suite 2000

7                Philadelphia, Pennsylvania 19102

8                (215) 735-7535

9        FOR THE DEFENDANT (via videoconference):

10               Richard D. Euliss, Esquire

11               ASSISTANT UNITED STATES ATTORNEY

12               Cristina M. Guthrie, Paralegal

13               228 Walnut Street

14               Harrisburg, Pennsylvania 17101

15               (771) 221-4482

16               richard.d.euliss@usdoj.gov

17                           - - -

18

19

20

21

22

23

24

25

**Exhibit D, p.3**

3

2                       I N D E X

3                                               PAGE

4    EXAMINATION:

5              By Mr. Euliss........................... 5

6              By Mr. Sobel........................... 16

7              By MR. Euliss.......................... 21

8    ATTESTATION...................................... 23

9    ERRATA SHEET..................................... 24

10   CERTIFICATE...................................... 25

11                       - - -

12

13           D O C U M E N T A R Y   E V I D E N C E

14   EXHIBIT  DESCRIPTION                            PAGE

15    1       Medical Records......................... 5

16                       - - -

17

18

19

20

21

22

23

24

25

**Exhibit D, p.4**

Hazelett, M.D., F.A.A.O. Kay                              March 29, 2019
James Leath v. United States of America

4

2          D I S C L O S U R E   S T A T E M E N T

3

4    STATE OF GEORGIA

5    COUNTY OF CHATHAM

6

7          Pursuant to Article 10.B of the Rules of
     Regulations of the Board of Court Reporting of the
8    Judicial Council of Georgia, I make the following
     disclosure:
9
           I am a Georgia Certified Court Reporter.
10
           I am not disqualified for a relationship
11   of interest under the provisions of O.C.G.A.
     9-11-28(c).
12
           I am an employee of Tom Crites &
13   Associates, International, Inc.

14         My office was contacted by Mr. Euliss's
     office to provide court reporting services for
15   this proceeding.

16         Tom Crites & Associates International,
     Inc. will not be taking this proceeding under any
17   contract that is prohibited by Georgia Law.

18         This, the 29th day of March, 2019.

19

20

21    _____
      Tracy Z. Norwood
22    Certified Shorthand Reporter,
      6569-8937-0082-9184, and
23    Registered Professional Reporter

24

25

**Exhibit D, p.5**

5

1   EULISS - DR. HAZELETT

2                            (Whereupon, Medical Records

3                            were marked as Deposition

4                            Exhibit No. 1 for

5                            identification.)

6                    KAY HAZELETT, M.D., F.A.A.O.

7   having been produced and first duly sworn as a witness,

8   testified as follows:

9                        EXAMINATION

10  BY MR. EULISS:

11     Q.   Dr. Hazelett, can you state your name for the

12  record and see if Mr. Sobel can hear it?

13     A.   I'm Dr. Kay Hazelett.  I'm from Pikeville,

14  Kentucky.  I'm an ophthalmologist.

15     Q.   Hazelett.  I apologize for that

16  pronunciation.

17               MR. EULISS:  Jonathan, did you hear

18          that?

19               MR. SOBEL:  Yes.

20               MR. EULISS:  Okay.  Great.

21  BY MR. EULISS:

22     Q.   Because we're now on the record, just to be

23  clear, Jonathan Sobel is appearing by telephone right

24  now.  He's waiting for -- to be called at a courthouse.

25  He's going to let us know when that happens.  We'll

**Exhibit D, p.6**

Hazelett, M.D., F.A.A.O. Kay                                    March 29, 2019
James Leath v. United States of America

6

1   EULISS - DR. HAZELETT

2   take a brief recess until he's done and hop back on the

3   record if necessary.

4          Dr. Hazelett, thank you for coming.  Again,

5   my name is Richard Euliss.  I represent the United

6   States of America in this case.  Mr. James Leath has

7   filed suit against the government stemming from some

8   injuries he suffered to at least one of his eyes.  I

9   just had some questions for you about some of your

10  medical records that were produced to us by Mr. Sobel,

11  which is Mr. Leath's attorney.

12         I believe the court reporter has given you a

13  composite exhibit; is that right?  You have that there?

14  **A.**   Yes.

15         MR. EULISS:  Okay.  Jonathan, just so

16         you know, this is the same packet of

17         information we sent to you yesterday.

18  BY MR. EULISS:

19  **Q.**   Dr. Hazelett, do you recognize these

20  materials that are there for Exhibit 1?

21  **A.**   Yes.  I recognize my portion of them.

22  **Q.**   Okay.  So are these your medical records for

23  your treatment of Mr. Leath?

24  **A.**   Part of them are.  This also includes a bunch

25  of other doctors' notes.

**Exhibit D, p.7**

7

1   EULISS - DR. HAZELETT

2       **Q.**   Do you know if those other doctors' notes are

3   part of your medical records that were maybe

4   transferred to you?

5       **A.**   No, they are not.

6       **Q.**   They're not.  Okay.  Well, let's get started

7   with the part that is up here at the top.  Actually

8   before we do that, if you could just explain for me

9   briefly how you came to treat Mr. Leath?

10      **A.**   The jail called and made an appointment for

11  him to see me.  I work for a hospital and the hospital

12  has a contract to provide medical care.  So they called

13  and scheduled an appointment.

14      **Q.**   Okay.  So you regularly see VOP inmates then?

15      **A.**   When needed I do.

16      **Q.**   Okay.  All right.  Let's go ahead and dive

17  into these records, if we could.  You'll see there are

18  Bates numbers at the bottom, PLF dash and then some

19  numbers?

20      **A.**   Yes.

21      **Q.**   If you could please page through and tell me

22  the page number where it's your testimony that your

23  medical records stop and somebody else's begins?

24      **A.**   Mine start on 22 and mine --

25      **Q.**   Uh-huh.

**Exhibit D, p.8**

8

1    EULISS - DR. HAZELETT

2         **A.**    -- end on 31.

3         **Q.**    Okay.  Good enough.  So it looks like, let's

4    see here, if we look at page 27, it looks like you had

5    a visit with Mr. Leath on April 7, 2017.  Do you see

6    that?

7         **A.**    Yes.

8         **Q.**    And then it also looks like on page 22 you

9    had a second visit on May 25, 2017.  Do you see that?

10        **A.**    Yes.

11        **Q.**    Is it your understanding that those are the

12   only two times that you saw Mr. Leath?

13        **A.**    Yes.

14        **Q.**    All right.  Back to page 27, if we can.  I

15   want to go to history of present illness and you have

16   some text below that.  Do you see that?

17        **A.**    Yes.

18        **Q.**    All right.  I just want to talk a little bit

19   about what you have in here and where that comes from.

20   So it says the 51-year-old male presents for evaluation

21   of blurry vision in the right eye.  And then the second

22   sentence says it started about five months ago.  Where

23   did you get that information from?

24        **A.**    From the patient.

25        **Q.**    Okay.  So this was Mr. Leath's description to

**Exhibit D, p.9**

9

1    EULISS - DR. HAZELETT

2    you?

3        **A.**   Yes.  It was his response to questions from

4    my technician.

5        **Q.**   Understood.  So your technician took these

6    notes then?

7        **A.**   Yes.

8        **Q.**   What's your technician's name?

9        **A.**   This one was, her name was Ashlie Smith.

10       **Q.**   Okay.  And does Miss Smith, as far as you

11   know, take these notes contemporaneously from the time

12   that the patient offers them?

13       **A.**   Pardon?

14       **Q.**   Sorry.  I'll rephrase.

15            Jonathan, are you okay over there?

16            MR. SOBEL:  I have to -- I'm actually

17            going to start right now.

18            MR. EULISS:  Okay.  We'll adjourn.

19            MR. SOBEL:  15 minutes.

20            MR. EULISS:  We'll adjourn for 15

21            minutes.  We'll go off the record.

22                        (Whereupon, a recess was

23                        taken.)

24   BY MR. EULISS:

25       **Q.**   Dr. Hazelett, Mr. Sobel is back.  He tells us

**Exhibit D, p.10**

10

1   EULISS - DR. HAZELETT

2   that he needs -- that the judge is going to be calling

3   him back in a few minutes so we'll try to cover some

4   more ground here.

5           Dr. Hazelett, we were talking about page 27,

6   Bates mark 27.  You had told me that your technician

7   Ashlie Smith takes these notes for you; is that right?

8       **A.**   Yes.

9       **Q.**   And what I was asking was when we had to

10  break, whether she takes those notes contemporaneously

11  with the time that the patient recounts the information

12  to her?

13      **A.**   Yes.  She is sitting with a computer.  She's

14  asking questions and typing while he's answering

15  questions.

16      **Q.**   Okay.  Great.  Thank you.

17          All right.  So I want to go down a little bit

18  farther into that paragraph.  About midway down towards

19  the right side it says S slash P trauma to the left eye

20  05/2016.  Do you see that?

21      **A.**   Yes.

22      **Q.**   Can you tell me what S/P trauma means?

23      **A.**   Status post.

24      **Q.**   What does that mean, status post?

25      **A.**   After.  That he has a history of trauma.

**Exhibit D, p.11**

11

1    EULISS - DR. HAZELETT

2        Q.    Okay.  To left eye, okay.  With ruptured

3    globe, does that mean that the eyeball burst?

4        A.    Yes.

5        Q.    Okay.  And laceration to LUL and laceration

6    to OD.  Can you tell me what that means?

7        A.    Laceration to left upper lid and laceration

8    to the right eye.

9        Q.    OD is right eye?

10       A.    Correct.

11       Q.    What does OD stand for?

12       A.    Ocular dexter.

13       Q.    Okay.  What would be the acronym for the left

14   eye?

15       A.    OS.

16       Q.    Okay.  So there was a laceration to the right

17   eye?

18       A.    That was the history that we were given.

19       Q.    Okay.  And then I just want to go to the next

20   sentence.  It says he had a medical and now there's a

21   word there that I'm going to ask you to pronounce and

22   then tell me what it means.

23       A.    That should be medial, not medical, and it is

24   canthoplasty.  And canthoplasty -- the canthus is the

25   outer angle of the eye, like this area here

**Exhibit D, p.12**

12

1    EULISS - DR. HAZELETT

2    (indicating).  And so he had a surgery -- he had a

3    surgery involving that area, the lateral orbit.

4         Q.   So is --

5         A.   The outside edge.

6         Q.   Is it actually like the bone?

7         A.   The canthus is the tendinous tissue that hold

8    the eyelids to that bone.  It's an anatomical term for

9    this angle here, the canthus, that area of the eyelids.

10        Q.   Okay.  Understood.  Okay.  So I want to go a

11   little farther into the notes from that April

12   7th meeting.  So if you could please turn to page Bates

13   marked 30 and let me know when you're there, please.

14        A.   I'm there.

15        Q.   Okay.  Towards the bottom we have some boxes

16   there.  Number 3 where it says assessment, age-related

17   nuclear cataract bilateral, do you see that?

18        A.   Yes.

19        Q.   Does bilateral mean both eyes?

20        A.   Yes.

21        Q.   Okay.  And what's an age-related nuclear

22   cataract?

23        A.   The lens of the eye as we age becomes

24   cataractous and there's different areas of the lens

25   that can be described.  The nucleus is the center

**Exhibit D, p.13**

13

1   EULISS - DR. HAZELETT

2   portion of the lens.

3        Q.   Do you know whether or not that cataract, the

4   age-related cataract, in Mr. Leath's case, affected his

5   vision?

6        A.   No.  I don't think it had anything to do with

7   his vision in either eye.

8        Q.   Okay.  Do you know -- what's your basis for

9   that belief?

10       A.   That's a very minimal amount of cataract that

11  was described on the right eye, and this is, in my

12  opinion, an error in the record because it's -- I don't

13  think that the exam describes a cataract in his left

14  eye.  So I think this should be an age-related cataract

15  right eye and a cortical cataract in the right eye

16  because that's what's described in the notes.

17       Q.   Understood.  Okay.  So what's the

18  difference -- now, you explained age-related.  How does

19  a cortical age-related cataract differ from just the

20  age-related cataract?

21       A.   When the lens of the eye forms, the nucleus

22  forms first, the center-most portion.  You sort of

23  regard it as an oblong onion.  The nucleus is the

24  center.  The cortex is the next layer.  The next layer

25  is the layer underneath the capsule and there's the

**Exhibit D, p.14**

14

1   EULISS - DR. HAZELETT

2   capsule.  So it's just the area of the lens where this

3   occurs.

4        Q.   Okay.  Understood.  All right.  And then I

5   just want to go to page 31 where it says assessment,

6   slash, plan.  Do you see that?

7        A.   Uh-huh.

8        Q.   Number 2, assessment, it says blindless --

9   excuse me, blindness left eye, normal vision right eye.

10  Do you see that?

11       A.   Yes.

12       Q.   Now, how do you define normal vision in this

13  context?  Would that be 20/20?  What does that mean?

14       A.   He's seeing 20/20.

15       Q.   Okay.  So he's seeing 20/20 in his right eye?

16       A.   It's not necessarily a description of all the

17  vision in that eye.  It's a description of the acuity

18  in the eye.

19       Q.   What would the difference be there?

20       A.   This describes the acuity, the letters he's

21  able to read at the end of the room.

22       Q.   Oh, I see.  Okay.  So when you say normal

23  vision, that means he was able to read the chart?

24       A.   Yes.  The 20/20 line on the chart.

25       Q.   All right.  Moving right along, let's see,

**Exhibit D, p.15**

15

1   EULISS - DR. HAZELETT

2   here.  Let's go, please, to the May 25th visit that

3   begins on page 22.  And let's go to history of present

4   illness again.  Let's see.  We have a quote in that

5   narrative, "my vision has been getting blurry in my

6   right eye since I began using the ointment in my left

7   eye."  Do you see that?

8       **A.**   Yes.

9       **Q.**   And I don't know -- feel free to look at the

10  material around it.  I don't understand -- is that

11  possible that vision in one eye can get worse from the

12  application of ointment in the other?

13      **A.**   The reason that quote was put in there

14  specifically like that is because it's sort of a

15  strange statement for him to make because he's blind in

16  his left eye.  So putting ointment in his left eye

17  should do absolutely nothing to his right eye.

18      **Q.**   Okay.  And then page 26, if we could.  Again,

19  assessment, I just want to confirm that we have the

20  same information here.  So it says blindness left eye,

21  normal vision right eye, correct?

22      **A.**   Correct.

23      **Q.**   And so does that mean at this appointment he

24  was again given that letter chart and passed 20/20?

25      **A.**   Yes.

**Exhibit D, p.16**

16

1    SOBEL - DR. HAZELETT

2       **Q.**   In the right eye?

3       **A.**   Yes.

4       **Q.**   Okay.

5            MR. EULISS:  Hang on.  All right.

6            Dr. Hazelett, I told you I would be quick and

7            I was.  I just want to give Mr. Sobel an

8            opportunity to ask you any questions if he

9            has any.  Jonathan?

10           MR. SOBEL:  Absolutely.  I think the

11           judge is coming in.  Can I -- I only have

12           about five minutes.

13           MR. EULISS:  Okay.  Five minutes of

14           questions?  Okay.

15           MR. SOBEL:  Yes.  I'll send you an

16           e-mail right back.

17           MR. EULISS:  Okay.  Thanks.  So let's go

18           off the record.

19                      (Whereupon, a recess was

20                      taken.)

21                      EXAMINATION

22   BY MR. SOBEL:

23      **Q.**   Good afternoon, Doctor.  I apologize for the

24   way that this transpired.  Can you hear me?

25      **A.**   Yes.

**Exhibit D, p.17**

17

1    SOBEL - DR. HAZELETT

2         **Q.**   Did she say yes?

3              MR. EULISS:  She did say yes.

4    BY MR. SOBEL:

5         **Q.**   Doctor, are you an ophthalmologist, a

6    optometrist?  What's your specialty?

7         **A.**   I'm an ophthalmologist.

8         **Q.**   Okay.  Is that a doctor --

9         **A.**   I'm an M.D.

10        **Q.**   -- that practices surgery?

11        **A.**   I'm an M.D.

12        **Q.**   Excuse me?

13        **A.**   I'm an M.D.

14        **Q.**   Okay.  Now, when Mr. Leath, when you saw him,

15   was that in the prison or was that in your office?

16        **A.**   In my office.

17        **Q.**   Okay.  Someone from the prison transported

18   him to your office, correct?

19        **A.**   Yes.

20        **Q.**   And do you treat, regularly treat, inmates

21   from Big Sandy in your office?

22        **A.**   I see prisoners maybe five, six times a year.

23   It's not a common occurrence.

24        **Q.**   Okay.  Do you ever go to the prison to treat?

25        **A.**   No.

**Exhibit D, p.18**

18

1   SOBEL - DR. HAZELETT

2       Q.   Is it fair to say you've only seen Mr. Leath

3   on two occasions?

4       A.   Yes.

5       Q.   And do you know at whose request it was?  Did

6   Mr. Leath make the request or did the prison make the

7   request?

8       A.   I do not know.  He appeared on my schedule.

9       Q.   And did you have any records with you when

10  you were meeting with Mr. Leath?

11      A.   No.

12      Q.   The records that your office provided, do you

13  know where they came from?

14      A.   The records my office provided are page 22

15  through 31.  The rest came from somewhere else.

16      Q.   And it's your testimony you didn't have those

17  records at the time that you met with Mr. Leath?

18      A.   Yes.

19      Q.   Okay.  Did you ever review those records?

20      A.   This is the first time I've seen the rest of

21  those records, today.

22      Q.   Okay.  The first time you saw them was today;

23  is that what you said?

24      A.   Yes.

25      Q.   Okay.  And how long was your appointment with

**Exhibit D, p.19**

19

1   SOBEL - DR. HAZELETT

2   Mr. Leath?

3       **A.**   I have no idea.

4       **Q.**   And everything he told your assistant was

5   written down in the notes?

6       **A.**   I don't know what he told my assistant.  I

7   know what I've read, which is what my assistant typed

8   in.

9       **Q.**   And the appointment consisted of your

10  examination of him?

11      **A.**   Correct.

12      **Q.**   Okay.  And do you know why you only saw him

13  on two occasions?

14      **A.**   When I saw him on the second occasion, at

15  that point in my note I specified return in three to

16  four weeks and that did not happen.

17      **Q.**   And he never -- I'm sorry?

18      **A.**   And that did not happen.

19      **Q.**   Okay.  So he never returned?

20      **A.**   Correct.

21      **Q.**   And in your examination, did he have any

22  vision in his left eye?

23      **A.**   No.  Actually --

24      **Q.**   It's your testimony that the vision in his

25  right eye was --

**Exhibit D, p.20**

20

1   SOBEL - DR. HAZELETT

2        **A.**   Actually I made an incorrect statement.  The

3   three to four weeks was on the initial exam and he did

4   keep that appointment.  On the second exam it said

5   return in one year and that is the appointment that

6   wasn't kept.

7        **Q.**   Okay.  And I forgot what I was asking you.

8   Is it your testimony that in his right eye the vision

9   was 20/20?

10       **A.**   Correct.

11       **Q.**   Did you notice any bruising or lacerations to

12   the right eye?

13       **A.**   At the time I saw him, I did not notice any

14   bruising or laceration, but it was apparently at least

15   a year since his injury.

16       **Q.**   Okay.  Obviously you have no idea what his

17   condition is today, correct?

18       **A.**   Correct.

19            MR. SOBEL:  That's all.  Thank you,

20            Doctor.

21            MR. EULISS:  Real quick, I'm going to

22            ask two business records questions, Jonathan.

23            MR. SOBEL:  Yes.

24            MR. EULISS:  Just because Dr. Hazelett

25            is not going to be available for trial.

**Exhibit D, p.21**

21

1    EULISS - DR. HAZELETT

2                            EXAMINATION

3    BY MR. EULISS:

4       Q.   Doctor, the pages from 22 to 31, is keeping

5    medical records such as these a regular practice at

6    your office?

7       A.   Yes.

8       Q.   Okay.  And are those medical records kept in

9    the course of regularly-conducted activity, that being

10   the practice of medicine?

11      A.   I'm not sure what your question is.  It's

12   normally a practice to keep medical records.

13      Q.   Sure.  I'll ask it again.  It's some lawyer

14   lingo.  We can break it down if we need to but so you

15   can hear it again.

16           Are those records from pages 22 to 31, are

17   they kept by your office in the ordinary course of

18   regularly-conducted activity, being the practice of

19   medicine?

20      A.   Yes.

21           MR. EULISS:  Okay.  Thank you.

22           Jonathan, anything else?  Dr. Hazelett, thank

23           you.

24           THE REPORTER:  Mr. Sobel, do you need a

25           copy?

**Exhibit D, p.22**

22

1    EULISS - DR. HAZELETT

2                  MR. SOBEL:  No, I don't.  Thank you.

3                  THE WITNESS:  I would like to review

4         my --

5                  MR. EULISS:  Yes.

6                  THE WITNESS:  What's written from what I

7         said, my statement.

8                  MR. EULISS:  Absolutely.  I'm sure Tracy

9         will make a note that you've elected to read

10        and sign.

11                 THE REPORTER:  Yes.

12                 MR. EULISS:  Dr. Hazelett, thank you.

13                       (Whereupon, the deposition was

14                       concluded at 12:19 p.m. and

15                       the witness reserved her right

16                       to read and sign the

17                       deposition transcript.)

18                       * * * * *

19

20

21

22

23

24

25

**Exhibit D, p.23**

23

2                         A T T E S T A T I O N

3

4

5              I, the undersigned, have read the fore-

6        going transcript, and, with the exception of

7        any corrections specified on the attached

8        correction sheet, attest it constitutes a

9        true and correct transcription of my testimony

10       given at the time and place specified therein.

11

12

13                       (Signed): _____
                                   KAY HAZELETT, M.D., F.A.A.O.
14

15

16                       Witness: _____

17

18

19                       Date: _____

20

21

22

23

24

25    TZN

**Exhibit D, p.24**

24

2                        ERRATA SHEET

3   STATE OF GEORGIA   )
                       ) SS.
4   COUNTY OF CHATHAM  )

5

6                 I wish to make the following changes

7                 for the following reasons:

8

9   PAGE    LINE

10  ____    ____      CHANGE: _____

11                    REASON: _____

12  ____    ____      CHANGE: _____

13                    REASON: _____

14  ____    ____      CHANGE: _____

15                    REASON: _____

16  ____    ____      CHANGE: _____

17                    REASON: _____

18  ____    ____      CHANGE: _____

19                    REASON: _____

20  ____    ____      CHANGE: _____

21                    REASON: _____

22

23

24  (Signed)  _____
             KAY HAZELETT, M.D., F.A.A.O.
25

**Exhibit D, p.25**

Hazelett, M.D., F.A.A.O. Kay                                    March 29, 2019
James Leath v. United States of America

25

2                    C E R T I F I C A T E

3

4    STATE OF GEORGIA:

5    CHATHAM  COUNTY :

6

7              I hereby certify that the foregoing

8         transcript was taken down, as stated in the

9         caption, and the questions and answers thereto

10        were reduced to typewriting under my direction;

11        that the foregoing pages 1 through 24 represent a

12        true and correct transcript of the evidence given

13        upon said hearing, and I further certify that I am

14        not of kin or counsel to the parties in the case;

15        am not in the regular employ of counsel for any of

16        said parties; nor am I in anywise interested in

17        the result of said case.

18

19              Signed this the 18th day of April,

20        2019.

21

22              _____
                TRACY Z. NORWOOD
23              Certified Shorthand Reporter,
                6569-8937-0082-9184, and Registered
24              Professional Reporter

**Exhibit D, p.26**